IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

JOHN BAXLEY, JR., ERIC L. JONES,
SAMUEL STOUT, AMBER ARNETT,
EARL EDMONDSON, JOSHUA HALL,
DONNA WELLS-WRIGHT,
ROBERT WATSON, HEATHER REED,
and DANNY SPIKER, JR.,
on their own behalf and on behalf
of all others similarly situated,

        Plaintiffs,

v.                                      Civ. Act. No. 3:18cv01526
                                             (Chambers, J.)

BETSY JIVIDEN, in her official capacity as
Commissioner of the WEST VIRGINIA
DIVISION OF CORRECTIONS AND
REHABILITATION, the WEST VIRGINIA
DIVISION OF CORRECTIONS AND
REHABILITATION, and SHELBEY SEARLS, in his
official capacity as the Superintendent of WESTERN
REGIONAL JAIL AND CORRECTIONAL FACILITY,

        Defendants.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF**

1.      This is an action on behalf of inmates admitted to jail facilities throughout West

Virginia, which are administered by the West Virginia Division of Corrections and Rehabilitation.

Specifically, Plaintiffs seek to ensure that jails in West Virginia promptly provide appropriate and

necessary medical and mental health treatment to inmates upon admission, as required under the

Eighth and Fourteenth Amendments of the United States Constitution, and the Americans with

Disabilities Act. In addition, several of the named plaintiffs who are housed at Western Regional

Jail and Correctional Facility ("Western Regional") in Barboursville, West Virginia, bring this

action on behalf of inmates housed at Western Regional stemming from the Defendants' violation

of the Eighth and Fourteenth Amendments to the United States Constitution for deliberate indifference to plaintiffs' health and safety as a result of the conditions of confinement in that facility.

2.      Plaintiffs bring this suit seeking solely declaratory and injunctive relief.

## I. JURISDICTION

3.      This action arises under the Civil Rights Act, 42 U.S.C. § 1983, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12133.

4.      This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1343(a) (3)-(4) and 28 U.S.C. § 1331.

5.      Declaratory and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65.

6.      Venue is proper because one or more of the plaintiffs reside in this District, and a substantial part of the acts and omissions of which Plaintiffs complain occurred in this District. *See* 28 U.S.C. § 1391(b).

## II. PARTIES

7.      Defendant West Virginia Division of Corrections and Rehabilitation ("WVDOCR") is the administrative division of the West Virginia Department of Military Affairs and Public Safety tasked with administering and exercising direct and effective control over prisons and jails in West Virginia. WVDOCR operates nineteen jail facilities throughout West Virginia, including Western Regional, and is directly responsible for the safety, wellbeing, and constitutional treatment of all inmates in its custody. WVDOC is responsible for the actions of its agents, including medical and other subcontractors. As a government agency, WVDOCR is a "public entity" as defined by 42 U.S.C. § 12131(1) of Title II of the ADA.

8.      Defendant Betsy Jividen is the Commissioner of the WVDOCR. In that role, Defendant Jividen is vested with executive authority and responsibility for the administration, operation, and control of all WVDOCR facilities and employees of WVDOCR facilities. Defendant Jividen's duties include establishing, monitoring, and enforcing policy directives and procedures that ensure constitutional confinement and treatment of all people in the custody of the WVDOCR. Among other things, Commissioner Jividen is charged with ensuring that inmates receive appropriate medical and mental health treatment upon admission to and while housed in any West Virginia jail.  Commissioner Jividen is similarly charged with maintaining and operating the jail facilities in West Virginia in a manner that meets the minimal civilized measure of life's necessities, by providing beds and bedding for all inmates, access to basic hygiene products and laundry, and providing living conditions free of mold, human waste, and other contaminants for all inmates housed therein.

9.      At all relevant times, Defendant Jividen was acting under the color of state law. Defendant Jividen is named solely in her official capacity for the purposes of seeking declaratory and prospective injunctive relief.

10.     Defendant Shelby Searls is the Superintendent of Western Regional Jail and Correctional Facility, in Barboursville, West Virginia. In that capacity, Defendant Searls is tasked by law with the care and custody of all detainees and prisoners incarcerated at Western Regional. Defendant Searls is vested with executive authority and responsibility for the safe staffing, administration, operation, and control of Western Regional, including the oversight of all Western Regional employees, and the authority to promulgate, amend, and implement all policies and procedures within Western Regional to ensure constitutional confinement and treatment of individuals incarcerated within. Among other things, Defendant Searls is charged with ensuring

that inmates at Western Regional Jail receive appropriate medical and mental health treatment upon admission. Defendant Searls is similarly charged with maintaining and operating Western Regional in a manner that meets the minimal civilized measure of life's necessities, by providing beds and bedding for all inmates, affording access to basic hygiene products and laundry, and providing living conditions that are free of mold, human waste, and other contaminants.

11.     At all relevant times, Defendant Searls was acting under the color of state law. Defendant Searls is named solely in his official capacity for the purposes of seeking declaratory and prospective injunctive relief.

12.     Plaintiff John Baxley, Jr. was a pretrial detainee housed at Western Regional when this suit was filed; he has since been convicted and is now a prisoner housed at Western Regional. Plaintiff Baxley has been incarcerated in regional jails in West Virginia on numerous prior occasions. At all relevant times, this plaintiff is and has been a "qualified individual with a disability" as defined by the ADA.

13.     Plaintiff Eric L. Jones was a prisoner housed at Western Regional serving time for a parole revocation when this case was filed; he has since been released. Plaintiff Jones has had previous periods of incarceration at regional jails in West Virginia. At all relevant times, this plaintiff is and has been a "qualified individual with a disability" as defined by the ADA.

14.     Plaintiff Samuel Stout was a pretrial detainee housed at Western Regional Jail when this suit was filed; he is now a prisoner housed at Western Regional.

15.     Plaintiff Amber Arnett is a pretrial detainee housed at North Central Regional Jail and Correctional Facility ("North Central Regional"). This is Plaintiff Arnett's third time being incarcerated in a West Virginia regional jail. At all relevant times, this plaintiff is and has been a "qualified individual with a disability" as defined by the ADA.

16.     Plaintiff Earl Edmondson is a prisoner housed at Northern Regional Jail and Correctional Facility ("Northern Regional"). Plaintiff Edmondson has a history of prior incarcerations at regional jails in West Virginia. At all relevant times, this plaintiff is and has been a "qualified individual with a disability" as defined by the ADA.

17.     Plaintiff Joshua Hall is a prisoner housed at North Central Regional. Plaintiff Hall has a history of prior incarcerations at regional jails in West Virginia. At all relevant times, this plaintiff is and has been a "qualified individual with a disability" as defined by the ADA.

18.     Plaintiff Donna Wells-Wright was an inmate at North Central Regional and at Northern Regional on a parole revocation; she was released in or around November 2019. Plaintiff Wells-Wright has a history of prior incarcerations at regional jails in West Virginia. At all relevant times, this plaintiff is and has been a "qualified individual with a disability" as defined by the ADA.

19.     Plaintiff Robert Watson is a pretrial detainee housed at Northern Regional. Plaintiff Watson has a history of prior incarcerations at regional jails in West Virginia At all relevant times, this plaintiff is and has been a "qualified individual with a disability" as defined by the ADA.

20.     Plaintiff Heather Reed is a prisoner housed at Lakin Correctional Center and Jail ("Lakin"); she was transferred to Lakin in or around December 2019, after being housed at Northern Regional Jail and Tygart Valley Regional Jail and Correctional Facility ("Tygart Valley Regional"). Plaintiff Reed has been incarcerated at regional jails in West Virginia on numerous prior occasions. At all relevant times, this plaintiff is and has been a "qualified individual with a disability" as defined by the ADA.

21.     Plaintiff Danny Spiker, Jr. was a pretrial detainee housed at Tygart Valley Regional until his transfer to Mildred Mitchell Bateman Hospital, from which he was released without

returning to jail. Plaintiff Spiker has pending warrants against him in two counties, and understands that he will be arrested and re-admitted to a regional jail once those warrants are approved. At all relevant times, this plaintiff is and has been a "qualified individual with a disability" as defined by the ADA.

22.     Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

### III.  STATEMENT OF FACTS

**A.**     **Class A and Subclass**

**Failure to provide Medical and Mental Health Treatment to Inmates upon Admission**

23.     Pursuant to West Virginia Code of State Rules § 95-1-14.1, entitled Right to medical care, "[a]ll inmates shall have prompt access to necessary medical, dental, and psychiatric care, provided in a reasonable manner by licensed personnel."

24.     Upon information and belief, Defendants lack an adequate policy and/or routinely fail to implement adequate practices to ensure prompt treatment of inmates who have serious medical and/or mental health needs upon admission to jail.

25.     Defendants' policies, or lack thereof, are consistent across all West Virginia regional jails, as demonstrated by the common failure to provide timely and adequate treatment to inmates upon incarceration at jails across West Virginia, as described in further detail below.

26.     Defendants retain the services of a contractor to assist in providing medical and mental health services in the regional jails; in this capacity, the contractor serves as Defendants' agent. This same contractor is engaged in each of the West Virginia regional jails such that the policies, procedures, and practices relating to treatment of inmates at each facility is consistent across facilities.

**Plaintiff Baxley**

27.     Plaintiff John Baxley, Jr. arrived at Western Regional on or about August 15, 2018, with multiple preexisting mental and physical health diagnoses.

28.     Among other things, Mr. Baxley has been diagnosed with depression, anxiety, bi-polar disorder, paranoid delusional disorder, and schizophrenia, as well as a seizure disorder and severe asthma, and substance abuse disorder.

29.     Prior to admission to Western Regional, Mr. Baxley was prescribed Seroquel and Trazodone to treat his mental illnesses, Depakote and Klonopin to treat his seizure disorder, and two asthma inhalers.

30.     Upon his arrest and admission to Western Regional, Mr. Baxley's wife called the facility seeking to bring his medications, but her request was denied.

31.     After being informed of his serious mental health diagnoses, Mr. Baxley was placed on suicide watch but was not given his anti-psychotic and antidepressant medications.

32.     Abruptly stopping antidepressant and antipsychotic medications is known to cause serious withdrawal symptoms, including suicidal thoughts and behaviors.

33.     Suicide watch is an extremely restrictive setting. When a pretrial detainee such as Mr. Baxley is placed on suicide watch, s/he is stripped of all clothing and instead given a light weight smock to wear; s/he is not permitted to have any bedding or other personal affects.

34.     In Mr. Baxley's case, he was housed in a cell with seven inmates, who upon information and belief were also on suicide watch, many because they were detoxing from street drugs; there were not enough beds for all the inmates, and many, including Mr. Baxley, had to sleep on the floor.

35.     Mr. Baxley went without any antipsychotic medications for approximately three days.  During this period he did, in fact, feel suicidal and entered a psychotic state, in which he had auditory and visual hallucinations, and suffered physical side effects including hot and cold flashes, sweats, nausea, inability to sleep, and loss of appetite.

36.     After approximately three days, Mr. Baxley began receiving Seroquil and Depakote, but not at the same dosages that he had been prescribed prior to admission; Mr. Baxley was not provided with Trazadone or Klonopin.

37.     In or around mid-September 2018, Mr. Baxley met with a mental health provider, and reported auditory hallucinations.

38.     In or around October 15, 2018, after going without a proper anti-psychotic medication regime, Mr. Baxley entered a psychotic state; upon information and belief, Mr. Baxley reported to correctional officers that "voices in my head are telling me to do horrible things, get me out of here before it's too late."

39.     Officers were summoned to remove him from the cell, but Mr. Baxley responded to them in a violent manner because he was in a psychotic state at the time and believed they were trying to hurt him; as a result, Mr. Baxley was sprayed with chemical agents by the officers.

40.     In or around December 2018, Mr. Baxley was transferred to a WVDOCR prison facility for a short period, during which time he was placed on a new anti-depressant medication.

41.     Mr. Baxley was then transferred back to Western Regional on or about January 26, 2019; upon information and belief, the prison transferred him back with a packet of information regarding Mr. Baxley's diagnoses and prescriptions, and a short supply of his medications.

42.     After the supply ran out, Mr. Baxley went approximately five days with receiving his anti-depressant because Defendants had failed to timely re-order his prescription.

43.     Like with all members of the class, Defendants failed and refused to provide Mr. Baxley timely and appropriate treatment for his pre-existing conditions upon his incarceration at a West Virginia regional jail.

44.     Like with all members of the class, Mr. Baxley suffered injury as a result.

**Plaintiff Spiker**

45.     Plaintiff Danny Spiker has been diagnosed since childhood with bi-polar disorder and attention deficit hyperactivity disorder (ADHD), has been hospitalized in mental health facilities on number occasions, and has a history of suicidal ideation.

46.     Mr. Spiker was arrested on or about October 31, 2019, and admitted to Tygart Valley Regional.

47.     Mr. Spiker was suicidal at the time of his arrest.

48.     Upon arriving at Tygart Valley Regional, Mr. Spiker informed Defendants that he was suicidal.

49.     No medical intake was done for Mr. Spiker at that time; rather he was placed in a holding cell with a number of other inmates.

50.     While in the holding cell, Mr. Spiker suffered from a panic attack, and was noted to be sweating profusely, and had a rash on his chest, arms, and neck.  As a result, Mr. Spiker was transported to a local hospital for evaluation.

51.     While at the hospital, Mr. Spiker intentionally hit his head on the corner of a desk in an effort to injure himself; his head was bandaged with liquid stitches and returned to the regional jail.

52.     Upon arrival back at Tygart Valley Regional, on or about November 1, 2019, Mr. Spiker was placed in a "pickle suit," a green suit used for suicidal inmates, and placed alone in a cell on suicide watch.

53.     Mr. Spiker was not seen by a mental health professional at this time.

54.     Despite being placed on "fifteen minute suicide watch," upon information and belief, no officer or medical personnel appropriately monitored the cell.

55.     While alone in his cell, Mr. Spiker used the Velcro on his pickle suit to rub the liquid stiches off of his wound, and continued to rub his wound until it was re-opened and bleeding.

56.     According to Defendants' own records, Mr. Spiker picked at his wounds for over three hours; when finally discovered by jail staff, Mr. Spiker was lying face down on the floor surrounded by a large amount of blood.

57.     Mr. Spiker was transported back to the local hospital and his wound was re-bandaged; he was then returned to Tygart Valley Regional and placed in a restraint chair for approximately eight hours.

58.     Upon release from the restraint chair, Mr. Spiker was placed back in a pickle suit and placed back on suicide watch, in a different single cell.

59.     Mr. Spiker remained on suicide watch for several days before being seen or evaluated by a mental health worker.

60.     This worker asked Mr. Spiker whether he was suicidal with no other evaluation or treatment, and released him from suicide watch.

61.     Mr. Spiker was then placed into general population, in a cell on the top tier of his cell block.

62.     On or about the early morning of November 10, 2019, Mr. Spiker hung himself from the balcony of his cell block, using a makeshift rope made out of his sheet.

63.     Mr. Spiker planned his attempted suicide for a time when he expected everyone to be asleep; fortunately for Mr. Spiker, an inmate on the bottom tier was awake and quickly discovered what happened; the inmate pushed up on Mr. Spiker's feet until correctional officers could cut down the rope. Mr. Spiker was still alive, but unconscious.

64.     Shortly thereafter, the jail sought to have Mr. Spiker involuntarily committed to a state psychiatric hospital; Mr. Spiker was ultimately sent to Mildred Mitchell Bateman Hospital, in Huntington, West Virginia.

65.     Upon arrival at Bateman Hospital, Mr. Spiker was immediately started on medication, which quickly alleviated Mr. Spiker's suicidal ideations.

66.     Like with all members of the class, Defendants failed and refused to provide Mr. Spiker timely and appropriate treatment for his pre-existing conditions upon his incarceration at a West Virginia regional jail.

67.     Like with all members of the class, Mr. Spiker suffered injury as a result.

**Plaintiff Wells-Wright**

68.     Plaintiff Donna Wells-Wright was admitted to Northern Regional on or about August 25, 2019.

69.     During her initial intake, Ms. Wells-Wright informed the facility of her pre-existing diagnoses, which include Chronic Obstructive Pulmonary Disease (COPD), emphysema, lumbar stenosis, cervical stenosis, spinal stenosis, deteriorating bone disease, degenerative disc disease, arthritis, high blood pressure, hiatal hernia, and gastritis.

70.     She additionally informed the Defendants that she was prescribed and taking numerous medications to assist with her breathing, pain, inflammation, and to control her high blood pressure.

71.     Ms. Wells-Wright did not receive any medications at that time.

72.     On or about August 28, 2019, Ms. Wells-Wright was transferred to North Central Regional following a court appearance.

73.     During booking into North Central, Ms. Wells-Wright again provided the information about her diagnoses and prescriptions, and gave them the name of her pharmacy where she filled her medications.

74.     Following booking, Ms. Wells-Wright was placed in a holding cell with approximately sixteen other women for seven days, while undergoing detox. Upon information and belief, Ms. Wells-Wright was detoxing in part from her pain medication, which is prescribed for her multiple chronic conditions.

75.     While in this holding cell, Ms. Wells-Wright had a blanket, but no mat or other bedding, and had to sleep on the floor.

76.     After several days, Ms. Wells-Wright began to receive minimal dosages of a few medications related to Ms. Wells-Wright's high blood pressure, COPD and emphysema; these dosages were not sufficient to treat Ms. Wells-Wright's breathing conditions.

77.     After going days without her proper medication, she was in pain, struggling to breath, and could not lift her left leg.

78.     By the time she was moved from the holding cell, she was not able to lift herself up off the floor, and had to be lifted by other people.

79.     Despite her condition, Ms. Wells-Wright was not taken to the medical unit or provided medical treatment. Instead she was placed in a general population cell on a second tier, requiring her to walk up and down 15 steps.

80.     Due to her condition, other inmates would often bring her food trays and find other ways to help Ms. Wells-Wright so that she did not have to climb the stairs.

81.     On or about September 10, 2019, fifteen days after being incarcerated, North Central Regional allowed Ms. Wells-Wright's sister to bring her inhalers to the facility.

82.     Ms. Wells-Wrights sister delivered her Spiriva inhaler, Symbicort inhaler, ProAir inhaler, and her Theophylline medication, all of which she uses to treat her COPD and emphysema.

83.     Thereafter, Ms. Wells-Wright was able to obtain regular breathing treatments.

84.     On or about September 11, 2019, Ms. Wells-Wright finally began receiving Naproxen, to help reduce inflammation and treat her arthritis.

85.     Approximately a week later, on or about September 17, 2019, Ms. Wells-Wright was moved back to Northern Regional, but her medications and inhalers were left at North Central Regional.

86.     Ms. Wells-Wright's sister then drove to North Central Regional, obtained the medications, and delivered them to Ms. Wells-Wright at Northern Regional on or about September 18, 2019.

87.     Even though they were delivered on September 18th, Ms. Wells-Wright did not receive her medications again until on or about September 21, 2019.

88.     Ms. Wells-Wright never received meaningful treatment for her chronic pain caused by her lumbar, cervical and spinal stenosis, as well as her deteriorating bone disease and degenerative disc disease.

89.     Like with all members of the class, Defendants failed and refused to provide Ms. Wells-Right timely and appropriate treatment for her pre-existing conditions upon her incarceration at a West Virginia regional jail.

90.     Like with all members of the class, Ms. Wells-Wright suffered injury as a result.

**Plaintiff Arnett**

91.     Plaintiff Amber Arnett has a history of severe depression, post-traumatic stress disorder (PTSD), and substance abuse.

92.     During prior incarcerations in West Virginia regional jails, Ms. Arnett had been recorded as being suicidal and placed on suicide watch.

93.     During prior incarcerations in West Virginia regional jails, Ms. Arnett had been prescribed Zoloft to treat her mental illness.

94.     Ms. Arnett was most recently incarcerated at North Central Regional on or about September 19, 2019.

95.     Prior to being incarcerated, Ms. Arnett had been prescribed medications to control her mental illness, including Cymbalta.

96.     At intake at North Central Regional, Ms. Arnett informed Defendants' representatives of her history with mental illness, a prior commitment to a psychiatric hospital, and history of attempting suicide.

97.     Initially after admission, Ms. Arnett was monitored and treated for detox from substance use disorder.

98.     Despite previously receiving Zoloft while incarcerated at North Central Regional to treat her symptoms of depression and PTSD, Ms. Arnett was not evaluated by any mental health providers nor prescribed any medications for her mental health conditions.

99.     After approximately ten days without psychiatric medications and without being seen by any mental health providers, Ms. Arnett began to struggle with anxiety and depression.

100.    On or about September 30, 2019, Ms. Arnett was placed on suicide watch in a holding cell with three other women also on suicide watch.

101.    All four women were placed in pickle suits; none had blankets or mats or any personal items. The cell had only one bed and thus three of the women, including Ms. Arnett, were forced to sleep on the floor.

102.    Despite Ms. Arnett making multiple requests to see a mental health provider, starting when she was first admitted and continuing thereafter, and despite being placed on suicide watch, it took Defendants an entire month to have a psychiatrist evaluate Ms. Arnett.

103.    On or about October 17, 2019, Ms. Arnett finally met with a psychiatric provider and was prescribed Effexor and Risperdal to treat her mental illness.

104.    Like with all members of the class, Defendants failed and refused to provide Ms. Arnett timely and appropriate treatment for her pre-existing conditions upon her incarceration at a West Virginia regional jail.

105.    Like with all members of the class, Ms. Arnett suffered injury as a result.

**Plaintiff Edmondson**

106.    Plaintiff Earl Edmondson is a seventy-five (75) year old Vietnam combat veteran who suffers from PTSD, a chronic sinus condition, and had been diagnosed with a bulging disc in his back prior to incarceration.

107.    At the time of his incarceration, Mr. Edmondson was awaiting a blood test related to his bone cancer diagnosis, which had been ordered by his primary care provider.

108.    Further, Mr. Edmondson requires the use of false teeth; at the time he was incarcerated, he was awaiting a fitting of his false teeth, which had been prepared and were waiting at his dental provider. Implements had already been placed in his mouth to secure the teeth.

109.    Upon admission to Northern Regional in or around July 15, 2019, Mr. Edmondson informed the Defendants of his preexisting conditions, and that he had been receiving treatment for his sinus condition, medication to treat his PTSD, and was receiving physical therapy to treat his bulging disc.

110.    Mr. Edmondson was then placed in a cell with two other men, but only one bed; as a result, Mr. Edmondson was forced to sleep on a mat on the floor below the toilet for approximately six weeks.

111.    Sleeping on a mat on the floor aggravated Mr. Edmondson's back condition, but he has never received any treatment for that condition.

112.    Despite Defendants having housed Mr. Edmondson before, and thus having records of prior treatment for his PTSD, Mr. Edmondson was not provided with any medications to treat his condition for approximately three months.

113.    While going without medications, Mr. Edmondson suffered from flash backs, panic attacks, severe depression, insomnia and low energy.

114.    After approximately three months, Mr. Edmondson was prescribed BuSpar to treat his anxiety; several weeks later, in or around November 2019, Mr. Edmondson finally met with a psychiatrist via videoconference, after which he was prescribed Prozac as well.

115.     After approximately three months, Mr. Edmondson was provided with an antibiotic to treat his sinus infection.

116.    Despite his false teeth being ready for pick up, Defendants have refused to request them from his provider and have them delivered to the jail. As a result, Mr. Edmondson's ability to eat is impaired.

117.    Despite repeated requests, Defendants have failed and refused to complete the testing necessary for Mr. Edmondson's bone cancer.

118.    Mr. Edmondson is extremely concerned about the cancer progressing without detection and treatment.

119.    Like with all members of the class, Defendants failed and refused to provide Mr. Edmondson timely and appropriate treatment for his pre-existing conditions upon his incarceration at a West Virginia regional jail.

120.    Like with all members of the class, Mr. Edmondson suffered injury as a result.

**Plaintiff Hall**

121.    Plaintiff Joshua Hall was admitted to North Central Regional Jail on or about October 1, 2019.

122.    Mr. Hall has a long history of mental health issues including severe anxiety and substance use disorder, although he had been sober for approximately a year prior to his incarceration; Mr. Hall is also diagnoses with tachycardia (a heart condition causing the heart to beat faster than it should) and high blood pressure.

123.    At the time of incarceration, Mr. Hall was prescribed and taking Lexipro and Valium to treat his anxiety, and Metoprolol for his heart and high blood pressure.

124.    Upon intake, Mr. Hall informed the facility of his diagnoses and prescriptions and was then placed in a holding cell for approximately four days, which had approximately fifteen

other men in it when Mr. Hall was placed there, but that number grew to approximately thirty-two men.  The cell was so crowded that there was no room to lie down.

125.    While in the holding cell, Mr. Hall did not receive any medications.

126.    When Mr. Hall goes without his heart medications, his heart rate quickly increases and he quickly becomes very ill.

127.    While in the holding cell without his heart medication, Mr. Hall felt sweaty, clammy, flushed, dizzy, and nauseas.

128.    After release from the holding cell, Mr. Hall began receiving Metoprolol and Lexipro.

129.    After approximately one month, he abruptly stopped receiving the Lexipro for approximately twenty days. Upon information and belief, this lapse was due solely to the Defendants failure to re-fill Mr. Hall's prescription.

130.    Like with all members of the class, Defendants failed and refused to provide Mr. Hall timely and appropriate treatment for his pre-existing conditions upon his incarceration at a West Virginia regional jail.

131.    Like with all members of the class, Mr. Hall suffered injury as a result.

**Plaintiff Watson**

132.    Plaintiff Robert Watson is deaf, has COPD, arthritis, and has been an insulin dependent diabetic for approximately twenty years, as a result of which he has diabetic nerve pain and loss of vision.

133.    Prior to incarceration, Mr. Watson treated his COPD through use of an Alburterol inhaler.

134.   When Mr. Watson was admitted to Northern Regional on or about September 30, 2019, he brought his hearing aids with him, upon which he is dependent.

135.   After several days, while he was being held in booking, his hearing aids were confiscated; they have never been returned and Mr. Watson has been told that they have been lost.

136.   Defendants have not provided Mr. Watson with new hearing aids, and Mr. Watson is unable to adequately hear what is going on around him or participate and relies on reading lips to communicate. This has interfered with his ability to participate in the daily activities at Northern Regional in the same manner as his hearing peers.

137.   Mr. Watson did begin receiving insulin upon admission to Northern Regional, however the medical providers who issue the insulin to him will not tell him how much he is receiving nor what type of insulin is being issued.

138.   Having had insulin dependent diabetes for twenty years, Mr. Watson is well-versed in understanding how much and what type of insulin he needs, and given his symptoms, he understands that he is not receiving the correct dosages at the correct times.

139.   Defendants further refuse to treat Mr. Watson's diabetes through an appropriate diet.

140.   As a result, he experiences discomfort, increased nerve pain, and increased loss of vision.

141.   While Mr. Watson was previously incarcerated at St. Mary's Correctional Center, a diabetic inmate at that facility died as a result of not receiving appropriate treatment; Mr. Watson is extremely concerned he will also die for this reason.

142.   Mr. Watson has not been provided an inhaler or other necessary treatments for his COPD, and suffers from constant discomfort in his left lung.

143.     Mr. Watson is not receiving any treatment for his diabetic nerve pain, nor his arthritis.

144.     Like with all members of the class, Defendants failed and refused to provide Mr. Watson timely and appropriate treatment for his pre-existing conditions upon his incarceration at a West Virginia regional jail.

145.     Like with all members of the class, Mr. Watson suffered injury as a result.

**Plaintiff Jones**

146.     Plaintiff Eric Jones similarly arrived at Western Regional with a preexisting medical condition.

147.     Mr. Jones has high blood pressure and, prior to being admitted to Western Regional, took daily blood pressure medication to control his disease; without daily treatment, high blood pressure can cause heart attacks, strokes, and aneurisms, among other things.

148.     Upon admission, Mr. Jones informed employees of the Defendants of his medical condition and asked to be given blood pressure medication.

149.     Mr. Jones further explained that he had, until several days before, been incarcerated at Huttonsville Correctional Center, a WVDOCR facility, where he had received medication to treat his high blood pressure.

150.     Upon information and belief, despite another WVDOCR facility having Mr. Jones's medical files, including his diagnosis of high blood pressure and prescription for medication, Defendants took no steps to obtain those records and provide Mr. Jones with his medication.

151.     Indeed, Mr. Jones went approximately two weeks without receiving any blood pressure medication.

152.    This denial of medication caused Mr. Jones significant anxiety, because he understood that failure to control his blood pressure could result in life-threatening consequences, including heart attacks, strokes, and aneurisms.

153.    Like with all members of the class, Defendants failed and refused to provide Mr. Jones timely and appropriate treatment for his pre-existing conditions upon his incarceration at a West Virginia regional jail.

154.    Like with all members of the class, Mr. Jones suffered injury as a result.

**Plaintiff Reed**

155.    Plaintiff Heather Reed has a learning disability and an intellectual disability; when in school, she was educated in special education classrooms and she cannot read or spell.

156.    In addition, Plaintiff Reed has numerous mental health and medical diagnoses, including bi-polar disorder, depression, anxiety, ADHD, Type 1 diabetes (for which she requires daily insulin), thyroid problems, Rheumatoid Arthritis, gastritis, and a heart condition.

157.    In addition to taking daily insulin for her diabetes, Ms. Reed was prescribed Lamictal to treat her bipolar disorder, Vistaril to treat her anxiety, Synthroid to treat her thyroid condition, Prilosec for gastritis, Adderall for ADHD, and a heart medication.

158.    Plaintiff Reed was transferred to Northern Regional in or around April 2019, from a jail facility in Ohio.

159.    While at the facility in Ohio, Ms. Reed was receiving numerous medications to treat her various conditions and, upon information and belief, they were transferred to Northern Regional with Ms. Reed.

160.    Upon arrival at Northern Regional, Ms. Reed was denied all medications except her insulin, thyroid medication, and heart medication.

161.    Ms. Reed repeatedly asked to be put back on her Lamictal to treat her bi-polar disorder; Ms. Reed's requests were denied and she eventually lost control and was placed in segregation due to acting out.

162.    After several months without treatment, Defendants began providing Lamictal to Ms. Reed again.

163.    In or around late July, Ms. Reed was transferred to Tygart Valley Regional.

164.    While at Tygart Valley, Ms. Reed witnessed a nurse mixing multiple types of insulin before giving her an injection.

165.    Mixing different types of insulin can be dangerous if not specifically prescribed for a patient.

166.    Upon information and belief, Ms. Reed had been prescribed Lantus insulin, which is specifically not supposed to be mixed with other insulins.

167.    Not long after discovering the mixing of insulins, Ms. Reed began to have episodes of passing out; Ms. Reed believes she may be having seizures, but she is not sure.

168.    Ms. Reed has reported these episodes but, upon information and belief, no testing has been done to determine the cause of the episodes, and Ms. Reed continues to have them.

169.    Like with all members of the class, Defendants failed and refused to provide Ms. Reed timely and appropriate treatment for her pre-existing conditions upon her incarceration at a West Virginia regional jail.

170.    Like with all members of the class, Ms. Reed suffered injury as a result.

**Class Member R.H.**

171.    Class member R.H. is an HIV positive inmate. R.H. was admitted to Western Regional in or around the summer of 2017, at which time he informed Defendants of his status as

being HIV positive and the anti-retroviral medications which he was taking prior to admission.

172.    Upon information and belief, despite having numerous inmates who are HIV positive, Defendants had no policy or procedure to ensure that R.H. could continue on his anti-retroviral medications without disruption. Defendants took no steps to quickly reinstate R.H.'s medications, such as contacting his treating physician in the community to obtain his prescriptions.

173.    R.H. did not receive any medications to treat his HIV for approximately one week; at that point, he began receiving one of the drugs that is part of his antiretroviral regimen but not the others.

174.    Upon information and belief, this practice is dangerous and contraindicated, as taking one drug in an antiretroviral regimen without the others can lead to drug resistant virus mutations.

175.    It took Defendants approximately one month to provide R.H. with the full set of antiretroviral drugs that he was supposed to be taking.

176.    Thereafter, R.H. would receive his needed medications for approximately a month at a time, but when that prescription would run out, he consistently went about a week without medications before he would begin to receive them again.

177.    Like with all members of the class, Defendants failed and refused to provide R.H. timely and appropriate treatment for his pre-existing conditions upon his incarceration at a West Virginia regional jail.

178.    Like with all members of the class, R.H. suffered injury as a result.

**Class A and Subclass Allegations**

179.    Class A includes all persons who were at any time on or after December 18, 2018,[1] or who will be, admitted to a jail in West Virginia with a discernable, treatable medical and/or mental health problem.

180.    There are questions of law or fact common to Class A.

181.    Common questions of fact for the members of Class A include whether a policy or procedure exists to ensure that class members promptly receive appropriate medical and/or mental health treatment when they enter the jails in West Virginia, and whether inmates in fact do promptly receive such treatment.

182.    Common questions of law applicable to Class A include whether Defendants have acted with deliberate indifference to serious medical needs of inmates at the time of admission to jails in West Virginia.

183.    A subclass of Class A includes all individuals who were at any time on or after December 18, 2018, inmates admitted to a jail in West Virginia who meet the definition of being a "qualified individual with a disability" under the ADA.

184.    There are questions of law or fact common to the subclass.

185.    Common questions of fact for the subclass, i.e. inmates who are qualified individuals with a disability under the ADA, include whether such inmates receive the necessary accommodations for their disabilities to enable them to participate in jail life in the same manner as non-disabled inmates.

186.    Common questions of law applicable to the subclass, i.e. inmates with qualifying

---

[1]The class timeframe relates back to the original date of filing of Plaintiffs Baxley's and Stout's pro se complaints, which were filed as a result of said Plaintiffs' failed attempt to file a class action by filing a complaint jointly with approximately twenty other inmates.

disabilities under the ADA, include whether Defendants have engaged in discrimination by failing to provide said inmates with reasonable accommodations to enable them to live with the same measure of health and safety as inmates without disabilities who are confined to jails in West Virginia.

187.   The class and subclass are so numerous that joinder of all members is impracticable.

188.   Class members of Class A and its subclass are geographically dispersed throughout the length and breadth of the state, and membership is fluid as individual inmates are admitted to and released from the jails, or are transferred to prison facilities.

189.   The claims of Plaintiffs Baxley, Jones, Arnett, Edmondson, Hall, Wells-Wright, Watson, Reed, and Spiker are typical of the claims of Class A as a whole, and the subclass. They have been subjected to and suffered injury as the result of the same policies, or lack thereof, and practices in the various facilities as the absent class and subclass members.

190.   The named plaintiffs will fairly and adequately represent and advance the interests of the class and subclasses. By filing this action, the named plaintiffs have displayed a strong interest in vindicating the rights of all who have been similarly harmed by WVDOCR's arbitrary and harmful actions. By seeking to remedy the violations of their constitutional rights, the named plaintiffs will also be advancing and proving the claims and rights of absent class members.

191.   There are no antagonistic interests between plaintiffs and the absent members of the class, and the equitable relief sought by the named plaintiffs will benefit the class generally.

192.   The named plaintiffs are represented by Mountain State Justice, Inc., a non-profit, public interest legal services firm with long and substantial expertise in class litigation on behalf of low-income West Virginians. Counsel for the putative class are knowledgeable about the conditions of confinement in correctional facilities, the rights of individuals with disabilities, and

are skilled in conducting civil rights litigation in the federal courts, including the prosecution and management of class action litigation.

193.    Defendants WVDOCR and Jividen have acted or refused to act on grounds generally applicable to the class and subclass, thereby making final equitable relief with respect to the class and subclass as a whole an appropriate remedy.

**B.    Class B**

**Conditions of Confinement at Western Regional Jail**

194.    Upon information and belief, Western Regional has housed significantly more inmates that it is designed to hold for a number of years.

195.    Due to significant overcrowding at numerous regional jails, Governor Jim Justice declared a state of emergency on or about December 31, 2017, permitting the Secretary of the Department of Military Affairs and Public Safety, which includes WVDOCR, to access the West Virginia National Guard to help staff facilities.

196.    Multiple news articles have documented the impact of overcrowding at the jail.  In August 2018, Defendant Wolfe was quoted in the Herald-Dispatch as stating, in relation to Western Regional, "overcrowding is an issue and understaffing is an issue. Until they take care of that, it's going to be an issue for anyone that's there." Hessler, Courtney, "Wolfe Dismissed as Superintendent at Western Reginal Jail," The Herald-Dispatch (August 11, 2018). Wolfe further explained that "earlier this year, the inmate population was averaging 825 to 850 inmates for a facility designed for about 575." *Id.*

197.    According to the FY2018 Annual Report for the West Virginia Regional Jail and Correctional Facility Authority,[2] Western Regional Jail was designed to hold 394 inmates. Years after the facility was built, an additional 197 bunks and 167 "stackable bunks" were added, providing beds for 758 inmates in the same amount of space.

Filthy Living Conditions

198.    Pursuant to West Virginia Code of State Rules § 95-1-10.5, "[i]nmates shall be provided sufficient cleaning equipment to maintain their cells in a clean condition."

199.    Section 95-1-10.6 of the Code of State Rules provides that "floors shall be kept clean, dry and free of hazardous substances. Floors shall be inspected regularly throughout the day for cleanliness."

200.    Inmates housed at Western Regional are forced to live in filthy, unsanitary, and dangerous conditions, and are denied cleaning supplies to remedy the conditions.

201.    Each plaintiff reports having been housed in cells with mold on the walls, ceilings, window sills, baseboards, among other areas.

202.    Both Mr. Baxley and Mr. Stout were housed in cells in which water contaminated with human waste, among other things, would flow into the cell and sit stagnant for days on end.

203.    In Mr. Stout's cell, there were not sufficient beds or bedding structures for all the inmates, and thus inmates were forced to sit, stand, and sleep in the stagnant water.

204.    Despite requesting cleaning supplies, each had to wait two days or more to obtain mops and other cleaning equipment.

---

[2] This is the last annual report to be produced by the West Virginia Regional Jail and Correctional Facilities Authority, as this entity was combined in 2018 with the West Virginia Division of Corrections and the West Virginia Division of Juvenile Services to form the WVDOCR. *See* W. Va. Code § 15a-3-1, *et seq*.

205.    Mr. Jones was placed in a cell that was filled with trash, and the walls were streaked yellow and black from human waste.  Upon information and belief, black mold was growing on the window sills and baseboards.

206.    Mr. Jones requested a broom and mop to clean his cell for two days before receiving the necessary cleaning supplies.

207.    Mr. Baxley, who is currently double-bunked in a segregation unit, has gone several weeks without receiving cleaning products, and has no opportunity to sweep or mop his cell.

Lack of Bedding

208.    West Virginia Code of State Rules § 95-1-10.10 requires that "[e]ach inmate shall be provided with one clean, fire retardant mattress, two (2) clean sheets, a clean pillow and clean pillow case. . . . Clean blankets shall be provided in a number appropriate to the season."

209.    All inmates are likewise entitled to a bed above floor level.  W.V. C.S.R. §§ 95-1-8.6.d. and -8.11.b.

210.    Inmates at Western Regional Jail are routinely double and triple bunked, meaning that the cells they are housed in do not have enough beds for all the inmates held in the cell.

211.    While inmates without a bed are sometimes provided with a mat and/or bedding structure, many are forced to sleep on the concrete floor without any bedding, sometimes for a month or longer.

212.    For example, when Mr. Baxley was first admitted to Western Regional in August 2018, he was initially housed in "booking" with six other inmates in a two bed cell.  Mr. Baxley was forced to sleep directly on the concrete floor with no bedding of any type.

213.    Similarly, Mr. Jones was housed in a single cell with two other inmates; while Mr. Jones had access to the bed, a concrete slab anchored to the wall of the cell, the two others slept

on the floor.  One of those inmates was forced to sleep under the concrete slab that formed the sole

bed in the cell.  This arrangement lasted for approximately three weeks.

214.    As previously noted, Mr. Stout has likewise been housed in a cell with two beds

and three inmates, one of whom was forced to sleep on the floor with no mat or boat bed.

215.    Inmates lucky enough to receive beds and mattresses often do not receive pillows,

sheets, or blankets.

216.    Mr. Baxley is currently housed with a cellmate in a single bed cell; while his

cellmate does have a boat bed, he does not have a sheet, pillow, or blanket.

Lack of Access to Hygiene Products

217.    West Virginia Code of State Rules § 95-1-10.7 requires that inmates be provided

with personal hygiene products upon admission and thereafter as needed.  The hygiene products

that must be provided include "soap, toothpaste, toilet paper, toothbrushes, combs, and feminine

hygiene products."

218.    Inmates throughout Western Regional are routinely not provided adequate access

to hygiene products.

219.    Mr. Jones has gone without access to hygiene products for up to five days at a time

on numerous occasions, including going without access to soap, toothbrush and toothpaste, and

toilet paper.

220.    In or around April 2019, Mr. Baxley, who is housed in segregation, routinely goes

without access to soap (which is used for hand and body soap, as well as shampoo and conditioner)

or showers for approximately four days in a row.

221.    Inmates are routinely forced to go multiple days without toilet paper.

222.    In or around February 2019, Mr. Baxley had gone four days without toilet paper, despite repeated requests to the Correctional Officers.

223.    In or around April 2019, Mr. Jones had gone for two days without toilet paper, despite repeated requests to the Correctional Officers.

Lack of Access to Laundry

224.    Pursuant to West Virginia Code of State Rules § 95-1-10.13, laundry service is to be provided daily for undergarments and at least every other day for outer garments, or as appropriate.  Similarly, laundry service is to be provided for bedding at least weekly. W. Va. C. S. R. § 95-1-10.12.  Inmates are to receive clean towels and washcloths at least three (3) times a week. W. Va. C.S.R. § 95-1-10.11.

225.    Inmates in Western Regional do not receive appropriate laundry services.

226.    Inmates who send garments out to be laundered do not receive them back.

227.    Inmates routinely are forced to hand wash their garments in the sinks in their cells without detergent and dry those garments in their cells by hanging them on beds or other structures.

228.    For example, when Mr. Jones was admitted to Western Regional, he was not provided with a towel, washcloth, or laundry bag.  Mr. Jones had to wash his own clothing in the sink without detergent, and hang the clothes to dry in his cell.

229.    Mr. Stout was in Pod A-5 for approximately two months in or around September and October 2018.  During that period, he was not able to send any items out to be laundered.

230.    Mr. Baxley's clothing has never been laundered by the facility since he was admitted in August 2018; to date, his only ability to clean his jail garb, as well as his bedding and towel, is to wash them in the sink in his solitary confinement cell.

**Class B Allegations**

231.    Class B includes all persons who were at any time on or after December 18, 2018, inmates housed at Western Regional Jail and Correctional Facility, in Barboursville, West Virginia.

232.    Class B is so numerous that joinder of all members is impracticable.

233.    Members of Class B are fluid, as individual members are admitted into Western Regional daily, and many members are subsequently released from the jail or transferred to another jail or prison facility.

234.    There are questions of law or fact common to the class.

235.    Class B common questions of fact include whether inmates at Western Regional have been forced to sleep on the floor without mats and/or other appropriate bedding, and have access to hygiene products, cleaning supplies, and the ability to do laundry, and whether the conditions of the facility violate the minimal standards of decency required to pass constitutional muster.

236.    Common questions of law applicable to Class B include whether Defendants acted with deliberate indifference to the health and safety of inmates in administering the conditions of confinement at said facility.

237.    The claims of the named plaintiffs are typical of the claims of the class as a whole. They have been subjected to and suffered injury as the result of the same policies and/or lack of policies, and same practices in the various facilities as the absent class and subclass members.

238.    The named plaintiffs will fairly and adequately represent and advance the interests of the class and subclasses. By filing this action, the named plaintiffs have displayed a strong interest in vindicating the rights of all who have been similarly harmed by Defendants arbitrary and harmful actions. By seeking to remedy the violations of their constitutional rights, the named

plaintiffs will also be advancing and proving the claims and rights of absent class members.

239.    There are no antagonistic interests between plaintiffs and the absent members of the class, and the equitable relief sought by the named plaintiffs will benefit the class generally.

240.    The named plaintiffs are represented by Mountain State Justice, Inc., a non-profit, public interest legal services firm with long and substantial expertise in class litigation on behalf of low-income West Virginians. Counsel for the putative class are knowledgeable about the conditions of confinement in correctional facilities, the rights of individuals with disabilities, and are skilled in conducting civil rights litigation in the federal courts, including the prosecution and management of class action litigation.

241.    Defendants WVDOCR, Jividen and Searls have acted or refused to act on grounds generally applicable to the class, thereby making final equitable relief with respect to the class as a whole an appropriate remedy.

## CLAIMS

### COUNT I
### VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED
### (42 U.S.C. § 1983)

242.    Plaintiffs incorporate the proceeding paragraphs by reference.

243.    Plaintiffs[3] bring this claim on behalf of themselves and all similarly situated inmates, i.e., all inmates admitted to jails in West Virginia during the class period who had a discernible and treatable health condition.

244.    Defendants Commissioner Jividen and WVDOCR have violated the Eighth Amendment right of convicted inmates to be free from cruel and unusual punishment, and the

---

[3] This Count includes all Plaintiffs other than Mr. Stout.

Fourteenth Amendment right of pretrial detainees to be free from punishment without due process, by acting with deliberate indifference to the serious medical needs of plaintiffs and similarly situated inmates.

245.    As described herein, jails in West Virginia routinely fail to promptly provide necessary medical and mental health treatment to inmates upon admission.

246.    Defendant Jividen, as Commissioner of the WVDOCR, and Defendant WVDOCR are charged with establishing, monitoring, and enforcing policies and procedures that ensure constitutional confinement and treatment of all inmates in the custody of the WVDOCR.

247.    Defendant Jividen and Defendant WVDOCR, while acting under color of state law, has been deliberately indifferent to the serious medical needs of Plaintiffs and other similarly situated inmates by failing to establish, monitor, and/or enforce policy directives and operational procedures to ensure that inmates admitted to jails in West Virginia receive prompt treatment for their medical and mental health conditions.

248.    The actions and/or inactions of said Defendants violate clearly established law.

249.    Plaintiffs and other similarly situated inmates have suffered harm as the direct and/or proximate result of Defendants' deliberate indifference to their serious medical needs, including by suffering physical, mental, and emotional injuries, as well as being denied the ability to participate in the daily activities of jail life.

250.    The actions of Defendants were committed under the color of state law, and were unreasonable, deliberate, and deprived Plaintiffs and other similarly situated inmates of clearly established constitutional rights of which a reasonable prison administrator should have known pursuant to the Eighth and Fourteenth Amendments to the United States Constitution.

**WHEREFORE,** Plaintiffs, on behalf of themselves and other similarly situated inmates, respectfully request that the Court:

(a)    Certify the class pursuant to Federal Rule of Civil Procedure 23;

(b)    Declare that Defendants' actions and/or inactions as stated herein violate the Eighth and Fourteenth Amendments to the United States Constitution;

(c)    Enjoin Defendants from all unconstitutional practices as set forth herein, and require Defendants to implement or enforce policies, procedures, and practices necessary to ensure prompt medical and mental health care is provided to all inmates admitted to a jail in West Virginia, and provide the training, equipment and supplies necessary to all relevant employees to ensure those policies and practices are implemented with fidelity;

(d)    Award attorney's fees and costs incurred during the course of this litigation, pursuant to 42 U.S.C. § 1988; and

(e)    Grant such other and further relief to which plaintiffs or the class or subclass members may be entitled in law or equity.

## COUNT II
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (42 U.S.C. § 12132)

251.    Plaintiffs incorporate the proceeding paragraphs by reference.

252.    Plaintiffs[4] bring this claim on behalf of themselves and a subclass of all similarly situated inmates, i.e., all inmates admitted to jails in West Virginia within the class period who, at

---

[4] This Count includes all Plaintiffs other than Mr. Stout.

the time of admission, met the standards of being a qualified individual with a disability under the ADA.

253.    Title II of the ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of disability, be excluded from any participation in or be denied the benefits of the servicers, programs, or activities of a public entity, or be subject to discrimination by such entity."

254.    Defendant WVDOCR is a public entity subject to and governed by requirements and prohibitions of Title II of the ADA.

255.    In violation of the ADA and 28 C.F.R. § 35.130(b), Defendants WVDOCR and Jividen have committed and are continuing to commit unlawful acts of discrimination, including:

(a)    failing to afford qualified individuals with disabilities an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(b)    providing qualified individuals with disabilities with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(c)    utilizing criteria or methods of administration that have:

(i)    the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; and

(ii)    the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.

(d)     Failing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability; and

(e)     Imposing or applying eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity.

256.    Plaintiffs and the absent members of the class are qualified persons with disabilities protected against discrimination on the basis of their disabilities by the Americans with Disability Act.

257.    As alleged herein, by failing to implement a policy or procedure to provide appropriate medical and mental health services immediately upon entry to the State's jails, Defendants WVDOCR and Jividen have previously and continue to violate Title II of the ADA and its implementing regulations, through a pattern and practice of discrimination; inadequate and discriminatory methods of state-wide administration and supervision; a continuing pattern and practice of deliberate indifference; and violation of the reasonable accommodation requirement of federal law.

258.    Therefore, Defendants WVDOCR and Jividen have discriminated and continue to discriminate against plaintiffs and the absent members of the subclass in violation of 42 U.S.C. § 12132 and other substantive requirements and prohibitions of the ADA and its implementing regulations.

**WHEREFORE**, Plaintiffs, on behalf of themselves and other similarly situated individuals, respectfully request that this Court:

    (a)    Certify the subclass pursuant to Federal Rule of Civil Procedure 23;

    (b)    Declare defendants in violation of the federal laws as explained above;

    (c)    Enjoin defendants' illegal discrimination and continuing violations of law, and require implementation of policies and procedures that protect inmates' rights under the ADA, including but not limited to creating a fully staffed ADA compliance office within WVDOCR, which is tasked with monitoring and ensuring the rights of inmates with qualifying disabilities are being met;

    (d)    Award attorney's fees and costs incurred during the course of this litigation, pursuant to 42 U.S.C. § 1988; and

    (e)    Grant such other and further relief to which plaintiffs or the class or subclass members may be entitled in law or equity.

**COUNT III**
**VIOLATIONS OF THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE**
**UNITED STATES CONSTITUTION**
**PHYSICAL CONDITIONS OF CONFINEMENT**
**(42 U.S.C. § 1983)**

259.    Plaintiffs incorporate the proceeding paragraphs by reference.

260.    Plaintiffs Baxley, Jones, and Stout bring this claim on behalf of themselves and a class of all similarly situated individuals, i.e., all inmates admitted to Western Regional Jail from December 18, 2018 and prospectively.

261.    Defendants, while acting under the color of law, violated the Eight Amendment right of convicted inmates to be free from cruel and unusual punishment, and the Fourteenth Amendment right of pretrial detainees to be free of punishment without due process, by denying Plaintiffs and all similarly situated inmates the minimal civilized measure of life's necessities.

262.    As described herein, Plaintiffs and all similarly situated inmates at Western Regional have suffered and continue to suffer serious deprivations of basic human necessities, including sanitary living conditions, basic hygiene products such as soap and toilet paper, a bed to sleep on with basic bedding, and access to basic cleaning supplies and laundry facilities.

263.    Defendants imposed and/or permitted these conditions despite these conditions not being reasonably related to a legitimate non-punitive governmental objective.

264.    Defendants were deliberately indifferent to the health, safety, and other basic needs as described herein of Plaintiffs and all similarly situated inmates, having been notified of and having actual knowledge of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner.

265.    The actions of the Defendants were in violation of clearly established law.

266.    The Eighth Amendment to the United States Constitution prohibits the cruel and unusual punishment of inmates, including through depriving inmates of basic human needs.

267.    The Fourteenth Amendment to the United States Constitution forbids punishing pretrial detainees without due process of law, including by imposing arbitrary conditions which are not reasonably related to a non-punitive governmental purpose.

268.    During the time period at issue, it was clearly established that the serious deprivation of basic human needs as described herein violated the Eighth and Fourteenth Amendments to the United States Constitution.

269.    As a direct or proximate result of the Defendants' unconstitutional actions or inactions, Plaintiffs and other similarly situated inmates suffered harm including physical pain; loss of sleep; development of medical conditions, including septic infections, due to the unsanitary conditions; and embarrassment, humiliation, anxiety, and emotional distress.

270.    The actions of the Defendants were committed under the color of state law, and were unreasonable, deliberate, and deprived Plaintiffs and other similarly situated inmates of clearly established constitutional rights of which a reasonable prison administrator should have known.

**WHEREFORE,** Plaintiffs, on behalf of themselves and other similarly situated inmates, request that the Court:

(a)    Certify the class pursuant to Federal Rule of Civil Procedure 23;

(b)    Declare that Defendants' actions and/or inactions as stated herein violate the Eighth and Fourteenth Amendments to the United States Constitution;

(c)    Enjoin Defendants from engaging in unconstitutional practices as set forth herein, and require Defendants to implement or enforce policies, procedures, and practices necessary to ensure the minimal civilized measure of life's necessities are provided to all inmates housed in Western Regional Jail;

(d)    Award attorney's fees and costs incurred during the course of this litigation, pursuant to 42 U.S.C. § 1988; and

(e)    Grant such other and further relief to which plaintiffs or the class or subclass members may be entitled in law or equity.

**Respectfully Submitted,**
**JOHN BAXLEY, JR., ERIC L. JONES, SAMUEL STOUT, AMBER ARNETT, EARL EDMONDSON, JOSHUA HALL, DONNA WELLS-WRIGHT, ROBERT WATSON, HEATHER REED, and DANNY SPIKER, JR., on behalf of themselves and others similarly situated,**

By Counsel:

/s/ Lydia C. Milnes
_____
Lydia C. Milnes (State Bar No. 10598)
Jennifer S. Wagner (State Bar No. 10639)
Mountain State Justice, Inc.
325 Willey Street
Morgantown, WV 26505
Phone: (304) 326-0188
Facsimile: (304) 326-0189
lydia@msjlaw.org
jennifer@mjslaw.org
*Counsel for Plaintiffs*