IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

JOHN BAXLEY, JR., ERIC L. JONES,
SAMUEL STOUT, AMBER ARNETT,
EARL EDMONDSON, JOSHUA HALL,
DONNA WELLS-WRIGHT,
ROBERT WATSON, HEATHER REED,
and DANNY SPIKER, JR.,
on their own behalf and on behalf
of all others similarly situated,

        Plaintiffs,

v.   Civ. Act. No. 3:18cv01526
   (Chambers, J.)

BETSY JIVIDEN, in her official capacity as
Commissioner of the WEST VIRGINIA
DIVISION OF CORRECTIONS AND
REHABILITATION, the WEST VIRGINIA
DIVISION OF CORRECTIONS AND
REHABILITATION, and SHELBEY SEARLS, in his
official capacity as the Superintendent of WESTERN
REGIONAL JAIL AND CORRECTIONAL FACILITY,

        Defendants.

**PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION
REGARDING DEFENDANTS'
<u>PREVENTION, MANAGEMENT, AND TREATMENT OF COVID-19</u>**

Plaintiffs, on behalf of themselves and all others incarcerated in WVDCR custody, respectfully request that the Court order Defendants to immediately develop and implement an appropriate plan for the prevention and management of COVID-19 in the State's prisons and jails, as well as order other appropriate relief to ensure that infection does not spread unabated to inmates, correctional staff, and others in WVDCR custody. Plaintiffs ask that the Court expedite the deadline for responsive briefing, if any, from Defendants, and that the Court set this matter for a telephonic hearing as soon as practicable.

**Factual Background**

"On March 11, 2020, the World Health Organization announced that the COVID-19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States." *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. On March 13, President Trump declared a national emergency, noting that "[t]he spread of COVID-19 within our Nation's communities threatens to strain our Nation's healthcare systems." *Id.* That same day, West Virginia Governor Jim Justice announced a statewide school closure plan as part of an "effort to protect all the people of West Virginia[.]" *See* "COVID-19 UPDATE," available at https://governor.wv.gov/News/press-releases/2020/Pages/COVID-19-UPDATE-Gov.-Justice,-Department-of-Education-issue-updated-guidance-on-school-closures-in-West-Virginia.aspx. Three days later, on March 16, Governor Justice declared a statewide state of emergency, under W. Va. Code § 15-5-2. *See* "A Proclamation," available at https://governor.wv.gov/Documents/2020%20Proclamations/State-of-Emergency-March-16-2020.pdf. In his declaration, Governor Justice noted that "it is of the utmost importance that [state officials] throughout the state have the ability to take measures necessary to ensure the safety of our citizens" during this epidemic which "constitutes a disaster under section two, article five, chapter fifteen of the Code of West Virginia" and which "has been deemed a pandemic by the World Health Organization[.]" *Id.* The same day, he announced that "correctional facilities . . . have halted all non-attorney visitation[.]" *See* "Gov. Justice Administration members, State officials provide updates on COVID-19 preparedness efforts," available at https://governor.wv.gov/News/press-releases/2020/Pages/Gov.-Justice-

2

Administration-members,-State-officials-provide-updates-on-COVID-19-preparedness-efforts.aspx. On March 22, 2020, the West Virginia Supreme Court of Appeals closed the West Virginia courts to all non-emergency business. *See Administrative Order*, available at http://www.courtswv.gov/covid19/JudicialEmergencyDeclared3-22-20.pdf. On March 23, 2020, Governor Justice issued an executive order directing that all West Virginia residents stay at home, other than in exceptional circumstances, to limit the transmission of the disease. *See Executive Order No. 9-20*, available at https://governor.wv.gov/Documents/2020%20Executive%20Orders/STAY-AT-HOME-ORDER-MARCH-23-2020.pdf.

It is well recognized that the virus is likely to spread extremely quickly in incarcerated settings, especially where—as here—the setting is substantially overcrowded such that appropriate social distancing is not an option. *See Charleston Gazette*, "Seven out of 10 WV jails were over capacity Wednesday while the House passed a bill meant to cut jail population," available at https://www.wvgazettemail.com/news/legislative_session/seven-out-of-wv-jails-were-over-capacity-wednesday-while/article_20a9e35d-3282-55b1-a01c-5f8eba73381a.html. Indeed, hundreds of inmates are currently incarcerated in West Virginia jails beyond the jails' established bedding capacity. This has required Defendants to house multiple inmates in cells that were intended for fewer people, such that there is simply no ability to maintain an appropriate six foot distance between individuals to prevent the spread of infection.

Moreover, Plaintiffs in this matter are medically vulnerable, rendering them at high risk for severe complications or death from COVID-19. For instance, Plaintiff Baxley suffers from severe asthma, among other disorders. According to the Center for Disease Control, he may therefore "be at a higher risk of getting very sick from COVID-19." *See Center for Disease Control and Prevention*, "Are you at higher risk for severe illness?—Asthma," available at

https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/asthma.html. Plaintiff Wells-Wright suffers from Chronic Obstructive Pulmonary Disease and emphysema, among other things. These conditions put her at a higher risk of severe outcomes if she contracts COVID-19. *See Pulmonary Advisor*, "COVID-19 Preparation Recommendations from the COPD Foundation," available at https://www.pulmonologyadvisor.com/home/topics/lung-infection/copd-foundation-issues-advice-for-patients-concerned-about-coronavirus/. Plaintiff Edmondson is 75 years old and suffers from a chronic sinus condition. He is likely therefore to suffer severe consequences if he contracts COVID-19. *See Center for Disease Control and Prevention*, "Are you at a higher risk for severe illness?—Older Adults," available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications/older-adults.html. Plaintiff Hall suffers from tachycardia, among other things, making him especially susceptible to a severe case of COVID-19. *See Harvard Health Publishing*, "Coronavirus Resource Center," available at https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center. Plaintiff Watson has Chronic Obstructive Pulmonary Disease and diabetes, among other things, placing him at higher risk for a severe case of COVID-19. *See id.* Plaintiff Reed suffers from diabetes and a heart condition, among other things, putting her at higher risk for a severe case of COVID-19. *See id.* And class member R.H. is HIV positive, putting him at risk of severe complications or death from COVID-19. *See id.*

As alleged in the First Amended Complaint, Defendants have persistently displayed deliberate indifference to the health, safety, and other basic needs of Plaintiffs. Even without demonstrated deliberate indifference to medical needs, incarceration in a jail or prison poses heightened health risks for inmates and correctional staff during this global pandemic. (*See* Declaration of Dr. Craig W. Haney, PHD, at 3-10, attached.) "The COVID-19 Pandemic presents penal institutions with an enormous challenge that they are ill-equipped to handle." (*Id.*

at 4.) Correctional facilities have little ability to implement the social distancing required to combat the spread of COVID-19 and are likely to resort to solitary confinement. (*See id.*) But "solitary confinement inflicts an additional set of very serious harmful effects that significantly undermine mental and physical health." (*See id.* at 5.) And "the Pandemic [itself] has traumatic psychological as well as physical consequences." (*See id.* at 9.) Respected health and correctional officials throughout the country have expressed grave concern about the risks to inmates, and have recommended release of inmates to ensure inmate health and safety as well as other immediate protective measures. (*See, e.g.*, Decs. of Drs. Beyrer, Meyer, Golob, Stern, Greifinger & Haney, attached hereto.)

In light of these circumstances, prisons and jails throughout the country have begun releasing thousands of inmates in an effort to prevent an outbreak of COVID-19 in crowded jails and prisons. *See The Wall Street Journal*, "Jails Release Prisoners, Fearing Coronavirus Outbreak," available at https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600. "[A]t least 15 states—including Texas, New York, California and Ohio—have taken to releasing low-level offenders as well as those in the elderly and sick categories and thus considered most vulnerable to being rendered in a critical condition if they contract the unique pathogen." *See Fox News*, "Concern grows for vulnerable prison populations and employees as coronavirus spreads through overstuffed facilities," available at https://www.foxnews.com/us/concerns-grow-for-vulnerable-prison-population-and-the-safety-of-employees-as-coronavirus-spreads-into-overstuffed-cells; *see also Prison Policy Initiative*, "Responses to the COVID-19 pandemic," available at https://www.prisonpolicy.org/virusresponse.html (collecting sources). Iowa, for example, has started to expedite release of 700 inmates who have already granted parole. *See Times Republic*, "Iowa's prisons will accelerate release of approved inmates to mitigate COVID-19," available at

5

https://www.timesrepublican.com/news/todays-news/2020/03/iowas-prisons-will-accelerate-release-of-approved-inmates-to-mitigate-covid-19/. New Jersey has plans to "release as many as 1,000 people from its jails" based on an order signed by New Jersey's Chief Justice "authorizing the release of inmates serving certain types of sentences in county jails[.]" *See New York Times*, "1,000 Inmates Will Be Released from N.J. Jails to Curb Coronavirus Risk," available at https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html?auth=login-email&login=email.

  Plaintiffs have requested from Defendants any plan that they have developed for managing the COVID-19 crisis, but Defendants have failed and refused to provide any such plan. No plan has been publicized by the Governor's Office or the WVDCR. The American Civil Liberties Union of West Virginia emailed a letter to the Division of Corrections and Rehabilitation on March 10, 2020, requesting information about any official plans the Division has for dealing with COVID-19. (*See* Ltrs. from ACLU to DCR, attached hereto.) Defendants responded on March 20, 2020, stating that DCR's plan is exempt from disclosure to the public under section 29B-1-4(19) of the West Virginia Code, but also attaching a letter that purports to outline the WVDCR's COVID-19 response plan, with sensitive security information removed. (*See* Ltr. from DCR to ACLU, attached hereto.) That letter provides little detail and fails to address most of the concerns of Plaintiffs outlined below. Likewise, Plaintiffs' counsel has requested such a plan from Defendants, which would be responsive to Plaintiffs' discovery requests in this matter and Defendants' ongoing responsibility to supplement their responses. (*See* Pl.'s 2d Set of Req,s for Prod. of Docs. to Defendants No. 11 ("Please produce copies of all policies, operating procedures, protocols, and/or directives governing the provision of medical and/or mental health care, including diagnosis and treatment, which have been in effect at any West Virginia Regional Jail facility since January 1, 2019.").) Defendants responded solely by

providing the WVDCR policy from 2016 regarding management of infectious diseases, but provided no additional information or documents related to efforts to address the current pandemic.

Defendants' lack of a transparent and comprehensive plan is alarming for its implications not just for inmates, but also for correctional staff and the community as a whole. Plaintiffs and all other people in the custody of West Virginia's Division of Corrections and Rehabilitation are highly vulnerable to outbreaks of contagious illnesses, and the risk is only heightened by the overcrowded and often unsanitary conditions in the prisons and jails, coupled with the already inadequate medical staffing and treatment across correctional facilities in the state. When COVID-19 enters West Virginia's correctional facilities, Plaintiffs in this case and others like them will suffer unnecessary pain and death. Failure to address COVID-19 in the state's correctional facilities also threatens the community at large, as hundreds of correctional, health care, and other staff interact with the incarcerated population every day, and then return to their homes and communities. Likewise, an outbreak within a jail or prison facility could quickly lead to overwhelming area hospitals with inmates who require ventilators or other significant medical interventions. Finally, many inmates only stay in jail for a few days—just long enough to contract COVID-19 and take it back to their communities when they are released, while not yet displaying any symptoms.

Further, West Virginia's correctional facilities are already significantly understaffed both in terms of custody staff and health care staff. *See WV News*, "Overcrowding, understaffing, inmate deaths continue to plague WV jails," available at https://www.wvnews.com/news/wvnews/overcrowding-understaffing-inmate-deaths-continue-to-plague-wv-jails/article_9a788e06-8f50-5907-bd53-40560a2d5f6f.html; *WV News*, "WV House bill would require PR bonds for misdemeanor offenses," available at

https://www.wvnews.com/news/wvnews/wv-house-bill-would-require-pr-bonds-for-misdemeanor-offenses/article_0a928d58-0275-5fda-9165-6353af6c4d26.html. As the result, staffing shortages created by infection and illness of staff need to be planned for and addressed.

To prevent the worst from happening, Plaintiffs request that this Court order that Defendants create, implement, and disclose an appropriate evidence-based, substantive, and detailed plan that can help prevent a COVID-19 outbreak, minimize its impact if an outbreak does occur, and contribute to broader efforts in the state and the country to "flatten the curve" of the outbreak. Plaintiffs request that such a plan include (but not be limited to):

- Inmate education;
- Staff education;
- Requiring staff who experience any COVID-19 symptoms to stay home until tested, or for a mandatory fourteen days;
- Health care and custody staffing plans for keeping the facilities running safely as staff stays home sick or quarantined;
- Staffing plans for services provided by inmates themselves as inmates get sick;
- Screening, testing, treatment, and housing of plaintiffs and similarly situated individuals;
- Plans for additional precautions to prevent the exposure of vulnerable populations within the facilities to the virus;
- Housing of inmates exposed to the virus;
- Provision of hygiene and cleaning supplies to all inmates;
- Enhanced plans for cleaning shared spaces and items (such as phones) in between each inmate's use;
- Coordination with community hospitals and among the correctional facilities in the state; and

- Plans for removal of charges for telephone calls or other methods of communication and psychological support for inmates while visitation is eliminated.

Plaintiffs further request that the Court issue an order requiring that sufficient inmates be released from custody to enable DCR to maintain safe distances between inmates to prevent the spread of COVID-19 and to permit appropriate quarantine and treatment of inmates in custody who ultimately contract the virus.

### Argument

"The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). "Mandatory preliminary injunctions generally do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d at 526 (alterations omitted).

In deciding whether to grant a preliminary injunction, "court[s] should consider (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003). "In applying this four-factor test, the irreparable harm to the plaintiff and the harm to the defendant are the two most important factors." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003) (alterations omitted). "Emphasis on the balance of these first two factors results in a sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir.

9

2003).

As outlined above, this global pandemic is exactly the kind of extraordinary circumstance that warrants mandatory injunctive relief because of the grave risk of serious illness and death to Plaintiffs and others similarly situated due to their conditions of confinement in WVDCR custody. And it is that same grave risk that means that the likelihood of irreparable harm to Plaintiffs here and others similarly situated, is unacceptably high. Conversely, Defendants will suffer no harm if the injunction is granted. Developing a plan to prevent the spread of COVID-19 in West Virginia's DCR facilities protects not only the inmate population, but all WVDCR employees, their families, and the community at large. Ultimately, an appropriate plan will reduce spread of the virus, death, and overwhelming the already limited correctional and community health care systems. It is in the best interest of Plaintiffs, Defendants, and the public for Defendants to establish a rigorous plan for dealing with COVID-19 and for the correctional institutions to maintain a limited population during this crisis. Therefore, factors one, two, and four of the preliminary injunction analysis all weigh heavily in favor of granting the requested relief.

With respect to the third factor, the likelihood of success on the merits, failing to develop contingencies to address the extremely likely event of COVID-19 outbreaks in one or more of the West Virginia jail facilities would violate the constitutional rights of Plaintiffs and others inmates housed in jail facilities. As the Supreme Court has explained, an inmate's constitutional rights are violated by conditions that pose an unreasonable *risk* of future harm, even if that harm has not yet come to pass.

> That the Eighth Amendment protects against future harm to inmates is not a novel proposition. The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is "reasonable safety." *DeShaney, supra,* 489 U.S., at 200, 109 S. Ct., at 1005. . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.

*Helling v. McKinney*, 509 U.S. 25, 33-34 (1993). The Court in *Helling* specifically recognized that communicable disease could constitute such an "unsafe, life-threatening condition:"

> In *Hutto v. Finney*, 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed 2d 522 (1978) we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. . . . *Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms*.

*Helling*, 509 U.S. at 33 (emphasis added); *see also id.* at 34 (citing with approval *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974), which held that prisoners were entitled to relief under the Eighth Amendment when they showed, *inter alia*, "the mingling of inmates with serious contagious diseases with other prison inmates").

COVID-19 has the potential to cause significant and life-threatening illness to inmates as well as barriers to medical care and to Defendants' ability to comply with the constitutional requirements for inmate care during incarceration. West Virginia's state-run correctional facilities are already significantly understaffed both in terms of custody staff and health care staff. Should staff be exposed either in the correctional facilities or in the community and show symptoms, they must be quarantined and/or treated, further reducing available staff to provide medical care or to facilitate such care by, for example, providing security and transportation services. Defendants' ability to rely on agency and as-needed medical staff may decrease as community demand for those services increases. For the same reason, the availability of community healthcare services, including for hospitalization and specialty appointments, may be substantially curtailed. When COVID-19 arrives in the prison system, demands on healthcare services generally—including medical and custody staff—will only increase as more patients require screening, isolation, testing, and clinical management.

**Conclusion and Prayer for Relief**

There is a real and immediate risk that potential class members and named plaintiffs incarcerated in West Virginia jails will die or suffer serious medical injuries if Defendants' fail to properly prepare for the COVID-19 pandemic. The Division of Corrections and Rehabilitation and its health care contractors have put forth no plan demonstrating their ability to address the tsunami that is likely already in the community and may soon crash through the prison gates (if it is not there already), swamping the Division and its contractors' ability to respond and protect the lives of those in its custody. All four factors for analyzing a request for preliminary injunction favor granting one here.

The Court should therefore order Defendants to develop, disclose, and implement a plan that undertakes all appropriate actions to protect Plaintiffs and others who are similarly situated. In particular, the Court should order Defendants to consult with correctional healthcare experts to immediately develop and implement a plan for the prevention and management of COVID-19 in the State's correctional facilities. Specifically, the plan should include the following components:

1. Inmate education;
2. Staff education;
3. Requiring staff who experience any COVID-19 symptoms to stay home until tested, or for a mandatory fourteen days;
4. Health care and custody staffing plans for keeping the facilities running safely as staff stays home sick or quarantined;
5. Staffing plans for services provided by inmates themselves as inmates get sick;
6. Screening, testing, treatment, and housing of plaintiffs and potential class members;
7. Plans for additional precautions to prevent the exposure of vulnerable populations within the facilities to the virus;

8. Housing of inmates exposed to the virus;

9. Provision of hygiene and cleaning supplies to all inmates;

10. Enhanced plans for cleaning shared spaces and items (such as phones) in between each inmate's use; and

11. Coordination with community hospitals and among the correctional facilities in the state; and

12. Elimination of charges for telephone calls and other methods of contact between inmates and their loved ones.

Plaintiffs ask that the Court order Defendants to immediately file this plan with the Court.

Finally, Plaintiffs respectfully request that this Court immediately issue an order directing WVDCR to release a sufficient number of inmates reduce overcrowding and allow for appropriate social distancing within the jails and prisons to protect medically vulnerable inmates as well as those who remain incarcerated and correctional staff.

As Courts and public officials around the country have recognized, lives are at immediate risk without appropriate meaningful action. As a result, Plaintiffs respectfully request that the Court grant the above relief, and such other relief as the Court deems equitable and just.

**JOHN BAXLEY, JR., et. al., on behalf of themselves and other similarly situated inmates,**

By Counsel:

/s/  Jennifer S. Wagner
Lydia C. Milnes (State Bar No. 10598)
Jennifer S. Wagner (State Bar No. 10639)
Rachel J. Kincaid (State Bar No. 13726)
Mountain State Justice, Inc.
325 Willey Street
Morgantown, WV 26505
Phone: (304) 326-0188
Facsimile: (304) 326-0189

lydia@msjlaw.org
jennifer@msjlaw.org
rkincaid@msjlaw.org
*Counsel for Plaintiffs*

14