# EXHIBIT 4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

KARLENA DAWSON; ALFREDO
ESPINOZA ESPARZA; NORMA LOPEZ-
NUNEZ; MARJORIS RAMIREZ
OCHOA; MARIA GONZALEZ
MENDOZA; JOE HLUPHEKA
BAYANA; LEONIDAS PLUTIN
HERNANDEZ; KELVIN MELGAR
ALAS; JESUS GONZALEZ HERRERA,

             Petitioners-Plaintiffs,

                  v.

NATHALIE ASHER, Director of the Seattle
Field Office of U.S. Immigration and Customs
Enforcement; MATTHEW T. ALBENCE,
Deputy Director and Senior Official
Performing the Duties of the Director of the
U.S. Immigration and Customs Enforcement;
U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT; STEVEN LANGFORD,
Warden, Tacoma Northwest Detention Center,

           Respondents-Defendants.

Case No. 2:20-cv-409

**MOTION FOR TEMPORARY
RESTRAINING ORDER**

NOTE ON MOTION CALENDAR:
MARCH 16, 2020

## INTRODUCTION

    The novel coronavirus that causes COVID-19 has led to a global pandemic. In only a few

months, 153,517 people worldwide have received confirmed diagnoses of COVID-19, and over

MOT. FOR TEMP. RESTRAINING ORDER - 1
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

Case 2:20-cv-00409 Document 13 Filed 03/30/20 Page 3 of 25

5,735 of those people have died.[1] There is no vaccine against COVID-19 and there is no known cure. No one is immune. COVID-19 is most likely to cause serious illness and elevated risk of death for older adults and those with certain medical conditions or underlying disease. The COVID-19 virus can cause severe damage to lung tissue, sometimes leading to a permanent loss of respiratory capacity, and can damage tissues in other vital organs including the heart and liver. Patients with serious cases of COVID-19 require advanced medical support, including positive pressure ventilation and extracorporeal mechanical oxygenation in intensive care. Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage and loss of respiratory capacity. The only known effective measures to reduce the risk for vulnerable people from serious illness or death caused by COVID-19 are social distancing and improved hygiene, which have led to unprecedented public health measures around the world. According to preliminary data from China, 20 percent of people in high risk categories who contracted COVID-19 there died. Decl. of Dr. Robert Greifinger ¶ 5.

People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes. People who are confined in prisons, jails, and detention centers will find it virtually impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission, even with the best-laid plans. For this reason, correctional public health experts have recommended the release from custody of people most vulnerable to COVID-19. Release protects the people with the greatest

---

[1] World Health Organization, Coronavirus Disease 2019 (COVID-19) Situation Report-55, March 15, 2020, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200315-sitrep-55-covid-19.pdf?sfvrsn=33daa5cb_6.

MOT. FOR TEMP. RESTRAINING ORDER - 2
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

1  vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk

2  mitigation for all people held or working in a prison, jail, or detention center. Release of the most

3  vulnerable people from custody also reduces the burden on the region's limited health care

4  infrastructure, as it lessens the likelihood that an overwhelming number of people will become

5  seriously ill from COVID-19 at the same time.

6  Petitioners-Plaintiffs (hereinafter Plaintiffs) are people who are particularly vulnerable to

7  serious illness or death if infected by COVID-19. They are being held in civil detention by

8  Immigration and Customs Enforcement (ICE) at the Tacoma Northwest Detention Center

9  (NWDC) in Tacoma, Washington as they await the adjudication of their immigration cases.

10  Plaintiffs are older adults or have medical conditions that lead to high risk of serious COVID-19

11  infection, including lung disease, heart disease, diabetes, epilepsy, kidney disease, autoimmune

12  disorders, spinal cord injury, asthma, and hypertension. The NWDC is located in the Seattle,

13  Washington metropolitan area, the epicenter of the largest COVID-19 outbreak in the United

14  States, and one of the largest known outbreaks in the world. The danger posed by Plaintiffs'

15  detention during the current outbreak of COVID-19 is "so grave that it violates contemporary

16  standards of decency to expose *anyone* unwillingly to such a risk," and violates their

17  constitutional right to safety in government custody. *Helling v. McKinney*, 509 U.S. 25, 36

18  (1993). For these reasons, Plaintiffs request a temporary restraining order for their immediate

19  release from detention.

20  **Notice to Defendants**

21  Counsel for Plaintiffs called the U.S. Attorney's Office for the Western District of

22  Washington to advise it of the emergency reasons requiring them to seek a temporary restraining

23  order. In addition, Plaintiffs' Counsel e-mailed a copy of the Petition for a Writ of Habeas

24

MOT. FOR TEMP. RESTRAINING ORDER - 3
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

Corpus and Complaint and Motion for Temporary Restraining Order to Assistant U.S. Attorney

Micki Brunner, 206-553-5172, Micki.Brunner@usdoj.gov. Decl. of Matt Adams ¶¶ 2-4.

### FACTUAL BACKGROUND

I.  **COVID-19 Poses Grave Risk of Harm, Including Serious Illness or Death, to Older Adults People and Those with Certain Medical Conditions.**

COVID-19 is a disease caused by a coronavirus that has reached pandemic status. As of March 15, 2020, 153,517 people worldwide have confirmed diagnoses, including 1,678 people in the United States. 5,735 people have died after contracting COVID-19 worldwide, including 41 in the United States. *See supra* n.1. The transmission of COVID-19 is expected to grow exponentially. Decl. of Dr. Jonathan Golob ¶ 2.

People over the age of fifty and those with certain medical conditions face greater chances of serious illness or death from COVID-19. Certain underlying medical conditions increase the risk of serious COVID-19 disease for people of any age, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and pregnancy. Golob Decl. ¶ 3; Greifinger Decl. ¶ 7; Decl. of Dr. Marc Stern ¶ 5.

In many people, COVID-19 causes fever, cough, and shortness of breath. But for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe. Golob Decl. ¶ 5. COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a

MOT. FOR TEMP. RESTRAINING ORDER - 4
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

1   medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can

2   affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction

3   can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that

4   limits exercise tolerance and the ability to work. Emerging evidence also suggests that COVID-

5   19 can trigger an over-response of the immune system, further damaging tissues in a cytokine

6   release syndrome that can result in widespread damage to other organs, including permanent

7   injury to the kidneys and neurologic injury. Golob Decl. ¶ 7; Stern Decl. ¶ 6.  These

8   complications can manifest at an alarming pace. Patients can show the first symptoms of

9   infection in as little as two days after exposure, and their condition can seriously deteriorate in as

10  little as five days or sooner. Stern Decl. ¶ 4.

11          Even some younger and healthier people who contract COVID-19 may require

12  supportive care, which includes supplemental oxygen, positive pressure ventilation, and in

13  extreme cases, extracorporeal mechanical oxygenation. Most people in higher risk categories

14  who develop serious disease, however, will need advanced support. This level of supportive care

15  requires highly specialized equipment that is in limited supply, and an entire team of care

16  providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care

17  physicians. This level of support can quickly exceed local health care resources. Golob Decl.

18  ¶¶ 5-6; Greifinger Decl. ¶ 6; Stern Decl. ¶ 6.

19          The need for care, including intensive care, and the likelihood of death, is much higher

20  from COVID-19 infection than from influenza. According to recent estimates, the fatality rate of

21  people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even

22  in advanced countries with highly effective health care systems. For people in the highest risk

23  populations, the fatality rate of COVID-19 infection is about 15 percent. Golob Decl. ¶ 4.

24

MOT. FOR TEMP. RESTRAINING ORDER - 5
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

1   Preliminary data from China showed that 20 percent of people in high-risk categories who have

2   contracted COVID-19 there have died. Greifinger Decl. ¶ 5. Patients in high-risk categories who

3   do not die from COVID-19 should expect a prolonged recovery, including the need for extensive

4   rehabilitation for profound reconditioning, loss of digits, neurologic damage, and the loss of

5   respiratory capacity. Golob Decl. ¶ 4.

6           There is no vaccine against COVID-19 and there is no known medication to prevent or

7   treat infection from COVID-19. The only known effective measures to reduce the risk for

8   vulnerable people from injury or death from COVID-19 are to prevent them from being infected

9   in the first place. Social distancing, or remaining physically separated from known or potentially

10  infected individuals, and vigilant hygiene, including washing hands with soap and water, are the

11  only known effective measures for protecting vulnerable people from COVID-19. Golob Decl. ¶

12  8; Greifinger Decl. ¶¶ 4, 8; Stern Decl. ¶ 3. Projections by the Centers for Disease Control and

13  Prevention (CDC) indicate that over 200 million people in the United States could be infected

14  with COVID-19 over the course of the epidemic without effective public health intervention,

15  with as many as 1.5 million deaths in the most severe projections. Golob Decl. ¶ 10.

16  **II.    People Detained at the Northwest Detention Center Face an Elevated Risk of
            COVID-19 Transmission.**
17
            The NWDC is located in the Seattle, Washington metropolitan area, the epicenter of the
18
    largest COVID-19 outbreak in the United States at this time, and one of the largest known
19
    outbreaks in the world. Golob Decl. ¶ 9; Greifinger Decl. ¶ 9. As of March 15, 2020, there were
20
    769 confirmed cases of COVID-19 and 42 deaths from COVID-19 in Washington State.[2] The
21
    COVID-19 outbreak in Washington has resulted in unprecedented health measures to facilitate
22

23  ───────────────────
    [2] Washington State Department of Health, 2019 Novel Coronavirus Outbreak (COVID-19) (last updated
24  Mar. 15, 2020), https://www.doh.wa.gov/Emergencies/Coronavirus.

    MOT. FOR TEMP. RESTRAINING ORDER - 6             **American Civil Liberties Union**
    Case No. 2:20-cv-409                              915 15th St. NW, Washington, DC 20005
                                                      Tel: 202-393-4930
                                                      Fax: 202-393-4931

and enforce social distancing. Golob Decl. ¶ 12. Immigration courts and the ICE field office in

Seattle have already closed in the past month due to staff exposure to COVID-19. It is highly

likely, and "perhaps inevitable that COVID-19 will reach NWDC." Greifinger Decl. ¶ 9.

People who live in institutional settings, such as immigration detention centers, who are

over the age of 50 or are any age with certain specified medical conditions, "are at grave risk of

severe illness and death" if infected by COVID-19. Golob Decl. ¶ 14. Immigration detention

facilities are "congregate environments," or places where people live and sleep in close

proximity. Infectious diseases that are communicated by air or touch are more likely to spread in

these environments. This presents an increased danger for the spread of COVID-19 if and when

it is introduced into a facility. Stern Decl. ¶ 7. Enclosed group environments, like cruise ships or

nursing homes, have become the sites for the most severe outbreaks of COVID-19. The highest

known person-to-person transmission rate for COVID-19 took place in a skilled nursing home

facility in Kirkland, Washington and on afflicted cruise ships in Japan and off the coast of

California. Golob Decl. ¶ 11.

The conditions of immigration detention facilities pose a heightened public health risk for

the spread of COVID-19 that is even greater than in non-carceral institutions. Immigration

detention facilities have even greater risk of infectious spread because of crowding, the

proportion of vulnerable people detained, and often scant medical care resources. People live in

close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread

of COVID-19. They may be unable to maintain the recommended distance of 6.5 feet from

others, and may share or touch objects used by others. Toilets, sinks, and showers are shared,

without disinfection between each use. Food preparation and service is communal with little

opportunity for surface disinfection. Staff arrive and leave on a shift basis, and there is limited

MOT. FOR TEMP. RESTRAINING ORDER - 7
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

1　　ability to adequately screen staff for new, asymptomatic infection. Greifinger Decl. ¶¶ 10-11;

2　　Stern Decl. ¶ 7. Many immigration detention facilities lack adequate medical infrastructure to

3　　address the spread of infectious disease and treatment of people most vulnerable to illness in

4　　detention. Greifinger Decl. ¶ 12. During the H1N1 influenza epidemic in 2009, jails and prisons

5　　were sites of severe outbreaks. It is reasonable to expect COVID-19 will also readily spread in

6　　detention centers, especially when people cannot engage in proper hygiene and isolate

7　　themselves from infected residents or staff. Golob Decl. ¶ 13.

8　　**III.　　People Most Vulnerable to COVID-19 Should Be Released from ICE Detention.**

9　　　　　　Because risk mitigation is the only known strategy that can protect vulnerable groups

10　　from COVID-19, public health experts with experience in immigration detention and

11　　correctional settings have recommended the release of vulnerable detainees from custody.

12　　Greifinger Decl. ¶ 13; Stern Decl. ¶ 9. Dr. Marc Stern, a correctional health expert, has

13　　concluded that "[f]or detainees who are at high risk of serious illness or death should they

14　　contract the COVID-19 virus, release from detention is a critically important way to

15　　meaningfully mitigate that risk." Stern Decl. ¶ 9. For that reason, Dr. Stern recommends the

16　　"release of eligible individuals from detention, with priority given to older adults and those with

17　　underlying medical conditions most vulnerable to serious illness or death if infected with

18　　COVID-19." Stern Decl. ¶ 11. Dr. Robert Greifinger, a correctional health expert, has concluded

19　　that "even with the best-laid plans to address the spread of COVID-19 in detention facilities, the

20　　release of high-risk individuals is a key part of a risk mitigation strategy. In my opinion, the

21　　public health recommendation is to release high-risk people from detention, given the heightened

22　　risks to their health and safety, especially given the lack of a viable vaccine for prevention or

23　　effective treatment at this stage." Greifinger Decl. ¶ 13. In the event that vulnerable detainees

24

MOT. FOR TEMP. RESTRAINING ORDER - 8
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

have been exposed to COVID-19, these experts recommend testing where possible and the release of detainees to a quarantine setting outside of detention in coordination with local health authorities. Greifinger Decl. ¶¶ 14-15; Stern Decl. ¶ 12.

**IV.    Plaintiffs Are Vulnerable to Serious Illness or Death If Infected by COVID-19 and Should Be Released from Custody.**

All Plaintiffs have underlying medical conditions that increase their risk of serious illness or death if exposed to COVID-19. Stern Decl. ¶ 13. They are detained at the NWDC as they await adjudication of their civil immigration cases.

**Karlena Dawson** is a 48-year-old citizen of Jamaica. Dawson Decl. ¶ 1. Ms. Dawson has been detained by ICE at the NWDC since February of 2019. *Id.* ¶ 2. Ms. Dawson has been diagnosed with cholangitis, a progressive autoimmune liver disease. *Id.* ¶ 4; *see also* Maltese Decl. Ex. A. She has been informed that she has a life expectancy of 10-12 years. Dawson Decl. Ex. 4. She must take ursodiol twice a day to suppress enzymes because of her auto-immune disease. *Id.* She also has diabetes, which requires her to take insulin and metformin. *Id.* ¶ 5. Ms. Dawson is critically vulnerable to COVID-19 because of her autoimmune disease and diabetes. *Id.* ¶ 7.

**Alfredo Espinoza Esparza** is a 41-year-old citizen of Mexico. On or about January 16, 2020, while detained at the NWDC, he suffered acute chest pain that required hospitalization to receive treatment for a heart attack. *See* Maltese Decl. Ex. B. He was subsequently returned to the NWDC. He also suffers from a rectal hemorrhage which requires medication. *Id.* Mr. Espinoza is critically vulnerable to COVID-19 because of his significant health issues.

**Norma Lopez Nunez** is a 65-year-old citizen of Mexico. She is detained by ICE at the NWDC. Ms. Lopez has hypertension and heart disease, in addition to major depression and other

MOT. FOR TEMP. RESTRAINING ORDER - 9
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

mental health problems. Maltese Decl. Ex. C. Ms. Lopez is critically vulnerable to COVID-19 because of her age and her significant health problems.

**Marjoris Ramirez-Ochoa** is a 43-year-old citizen of Cuba. Ramirez-Ochoa Decl. ¶ 1. She is detained by ICE at the NWDC. Ms. Ramirez has kidney disease, epilepsy, and chronic high blood pressure. *Id.* ¶¶ 3-6; *see also* Maltese Decl. Ex. D. While detained, she has suffered five seizures, but has not been referred to medical care outside of the detention center. Ramirez-Ochoa Decl. ¶ 6. She also suffers from respiratory problems, and has contracted pneumonia in the past. *Id.* ¶ 9. Finally, she has depression, gastritis, and an ovarian cyst, among other conditions. *Id.* ¶¶ 7-8. Ms. Ramirez is critically vulnerable to COVID-19 because of her significant health problems. *Id.* ¶¶ 12-13.

**Maria Gonzalez Mendoza** is a 49-year-old citizen of Mexico. Ms. Gonzalez has diabetes, asthma, and high blood pressure. Gonzalez Decl. ¶¶ 3-5; *see also* Maltese Decl. Ex. E. Ms. Gonzalez is critically vulnerable to COVID-19 because of her significant health problems. Gonzalez Decl. ¶¶ 4, 8-11.

**Joe Hlupheka Bayana** is a 57-year-old citizen of Zimbabwe. Bayana Decl. ¶ 1. Mr. Bayana has type II diabetes. *Id.* ¶ 3; *see also* Maltese Decl. Ex. F. He takes insulin three times a day to treat his condition. Bayana Decl. ¶ 3. He receives medication to treat seizures, as well as depression. *Id.* ¶ 4. Mr. Bayana is critically vulnerable to COVID-19 because of his age and significant health conditions. *Id.* ¶¶ 5, 8-10.

**Leonidas Plutin Hernandez** is a 59-year-old citizen of Cuba. Plutin Hernandez Decl. ¶ 1. Mr. Plutin has chronic high blood pressure, for which he receives daily medication. *Id.* ¶¶ 3-4. Mr. Plutin is critically vulnerable to COVID-19 because of his age and chronic high blood pressure. *Id.* ¶ 10.

MOT. FOR TEMP. RESTRAINING ORDER - 10
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

1    **Kelvin Melgar Alas** is a 40-year-old citizen of El Salvador. Melgar Decl. ¶ 1. He has

2    been detained by ICE since July of 2018. *Id.* ¶ 7. Mr. Melgar has been confined to a wheelchair

3    since 1995, when he was shot in the spinal cord. *Id.* ¶ 4; *see also* Maltese Decl. Ex. G. In

4    addition, he requires a colonoscopy bag and a catheter. Melgar Decl. ¶ 6. While detained at the

5    NWDC he has been transferred for hospitalization on five separate occasions, including multiple

6    times for suspected pneumonia. *Id.* ¶ 7. Mr. Melgar is critically vulnerable to COVID-19 because

7    of his significant health problems. *Id.* ¶ 8.

8    **Jesus Gonzalez Herrera** is a 46-year-old citizen of Mexico. Gonzalez Herrera Decl. ¶ 1.

9    Mr. Gonzalez has diabetes and high blood pressure, which require him to take three different

10   types of medication daily. *Id.* ¶ 5; *see also* Maltese Decl. Ex. H. Mr. Gonzalez is critically

11   vulnerable to COVID-19 because of his significant health problems. Gonzalez Herrera Decl. ¶ 7.

12                                   **LEGAL STANDARD**

13   On a motion for a temporary restraining order, the plaintiff "must establish that he is

14   likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

15   preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

16   public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l*

17   *Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that preliminary

18   injunction and temporary restraining order standards are "substantially identical"). A temporary

19   restraining order may issue where "serious questions going to the merits [are] raised and the

20   balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632

21   F.3d 1127, 1131 (9th Cir. 2011) (citation omitted). To succeed under the "serious question" test,

22   plaintiffs must show that they are likely to suffer irreparable injury and that an injunction is in

23   the public's interest. *Id.* at 1132.

24

MOT. FOR TEMP. RESTRAINING ORDER - 11
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

**ARGUMENT**

I.      **Plaintiffs Are Likely to Succeed on the Merits.**

      a.  **Plaintiffs' Continued Detention Violates Their Constitutional Right to Reasonable Safety in Custody.**

          i.  **The Constitution Is Violated by an Unreasonable Risk of Future Harm from Contagious Disease.**

The government has an affirmative duty to provide conditions of reasonable health and safety to the people it holds in its custody. As the Supreme Court has made clear,

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment . . . .

*DeShaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189, 199-200 (1989).[3] Conditions that pose an unreasonable risk of future harm violate the Eighth Amendment's prohibition against cruel and unusual punishment, even if that harm has not yet come to pass.

> That the Eighth Amendment protects against future harm to inmates is not a novel proposition. The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is "reasonable safety." . . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.

*Helling*, 509 U.S. at 33 (quoting *DeShaney*, 489 U.S. at 200). The Court in *Helling* specifically recognized that the risk of contracting a communicable disease could constitute such an "unsafe, life-threatening condition":

> In *Hutto v. Finney,* 437 U.S. 678, 682 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis

---

[3] Many of the cases discussed in this Motion involve the protections of the Eighth Amendment, which applies to convicted prisoners. As explained below, *see infra* Sec. II.a.ii, the Plaintiffs here are civil detainees and are entitled to greater protections than are convicted persons or pretrial criminal detainees.

MOT. FOR TEMP. RESTRAINING ORDER - 12
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

and venereal disease. This was one of the prison conditions for which the Eighth
Amendment required a remedy, even though it was not alleged that the likely harm would
occur immediately and even though the possible infection might not affect all of those
exposed . . . . Nor can we hold that prison officials may be deliberately indifferent to the
exposure of inmates to a serious, communicable disease on the ground that the
complaining inmate shows no serious current symptoms.

*Id.* at 33; *see also id.* at 34 (citing with approval *Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974),

which held that prisoners were entitled to relief under the Eighth Amendment when they showed,

*inter alia*, "the mingling of inmates with serious contagious diseases with other prison inmates").

In this case, Plaintiffs are at serious risk of severe illness or death from COVID-19. *See*

Golob Decl. ¶ 14 (detained persons over age 50 or with pre-existing medical conditions like

Plaintiffs' "are at grave risk of severe illness and death from COVID-19"). Thus, as the Court

recognized in *Helling* and *Hutto*, the Constitution "require[s] a remedy" that ensures that

protection of Plaintiffs' safety. *Helling*, 509 U.S. at 33.

> ### ii. Plaintiffs, As Civil Detainees, Are Entitled to Conditions Superior to Those of Criminal Detainees, and Need Not Show Deliberate Indifference to Establish a Constitutional Violation.

Immigrant detainees, even those with prior criminal convictions, are *civil detainees* held

pursuant to civil immigration laws. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Their

constitutional protections while in custody are thus derived from the Fifth Amendment, which

provides protection even greater than the Eighth Amendment. The Eighth Amendment, which

applies to persons convicted of criminal offenses, allows punishment as long as it is not cruel and

unusual, but the Fifth Amendment's due process protections do not allow punishment at all. *Bell*

*v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be

punished.").

Following the Supreme Court's holding that civil detainees are entitled to "more

considerate treatment" than their criminal counterparts, *Youngberg v. Romeo*, 457 U.S. 307, 321-

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

22 (1982), the Ninth Circuit held that civil detainees, like Plaintiffs here, are entitled to conditions of confinement that are superior to those of convicted prisoners and to those of criminal pretrial detainees. *Jones v. Blanas*, 393 F.3d 918, 933-34 (9th Cir. 2004), *cert. denied*, 546 U.S. 820 (2005); *see also King v. Cty. of Los Angeles*, 885 F.3d 548, 557 (9th Cir. 2018) (finding presumption of punitive, and thus unconstitutional, treatment where conditions of confinement for civil detainees are similar to those faced by pre-trial criminal detainees). And while convicted persons must show "deliberate indifference" on the part of prison officials to establish a violation of the Eighth Amendment, *Farmer v. Brennan,* 511 U.S. 825, 828 (1994), there is no such requirement for civil detainees challenging their conditions of confinement. *Jones*, 393 F.3d at 934. A condition of confinement for a civil immigration detainee violates the Constitution "if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473-74 (2015)).

### iii. The Threat of COVID-19 Imposes a Harm that Significantly Exceeds the Inherent Discomforts of Confinement and Is Excessive in Relation to the Government's Interest.

The risk of serious illness or death from COVID-19 significantly exceeds "the inherent discomforts of confinement." *Unknown Parties*, 2016 WL 8188563, at *5. In normal times, crowding and close quarters, the sharing of toilets, sinks, and showers, and communal food preparation and service may be considered uncomfortable. But in light of COVID-19, these conditions present a deadly threat to Plaintiffs' lives. Plaintiffs are older adults and people with

MOT. FOR TEMP. RESTRAINING ORDER - 14
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

medical conditions who are at "grave risk of severe illness or death" if they contract COVID-19. Golob Decl. ¶ 14. Social distancing and hygiene measures are Plaintiffs' only defense against COVID-19. Golob Decl. ¶ 12; Greifinger Decl. ¶¶ 10-11; Stern Decl. ¶ 8. Like cruise ships and nursing homes, which have been the sites for the most severe outbreaks of COVID-19, immigration detention centers are "congregate environments" where people live, sleep, and eat in close quarters. These conditions pose even greater risk of infectious spread, and as a result, Plaintiffs face unreasonable harm from continued detention.

By the same token, the threat of serious illness and death from COVID-19 "is not reasonably related to" and vastly outweighs any government interest in Plaintiffs' confinement. *Unknown Parties*, 2016 WL 8188563, at *5. As the Supreme Court has emphasized, "[t]he proceedings at issue here are civil, not criminal, and we assume that they are nonpunitive in purposes and effect." *Zadvydas*, 533 U.S. at 690. Thus, "[t]here is no sufficiently strong special justification . . . for indefinite civil detention." *Id.* If the government's interest in effectuating removal and protecting the community cannot justify indefinite detention, it also cannot justify the similarly "potentially permanent" medical harm and death that Plaintiffs could face. *See id.* at 690-91; *cf. D'Alessandro v. Mukasey*, 628 F. Supp. 2d 368, 399 (W.D.N.Y. 2009) (considering immigrant's age and "constellation of serious, debilitating, and progressive health problems" to weigh against government's concern with flight risk and interest in continued detention).

### b. ICE Has the Authority to Release Detained People in Its Custody.

ICE both has the authority to exercise discretion to release individuals from custody and routinely exercises this discretion to release particularly vulnerable detainees like Plaintiffs. Decl. of Andrew Lorenzen-Strait ¶¶ 3-8; 8 U.S.C. §§ 1182(d)(5); 1226(a), 1231(a)(3); 8 C.F.R. §§ 212.5(b)(1), 236.1(c)(8). As former Deputy Assistant Director for Custody Programs in ICE

MOT. FOR TEMP. RESTRAINING ORDER - 15
Case No. 2:20-cv-409

1 | Enforcement and Removal Operations Lorenzen-Strait explains, "ICE has exercised and still

2 | exercises discretion for purposes of releasing individuals with serious medical conditions from

3 | detention," Lorenzen-Strait Decl. ¶ 3, and "ICE exercises humanitarian parole authority *all the*

4 | *time* for serious medical reasons." *Id.* ¶ 4 (emphasis added). Indeed, regulations governing ICE's

5 | release authority explicitly state that serious medical conditions are a reason to parole an

6 | individual, as "continued detention would not be appropriate." 8 C.F.R. § 212.5(b)(1). This

7 | exercise of discretion comes from a long line of authority and agency directives explicitly

8 | instructing officers to exercise favorable discretion in cases involving severe medical concerns

9 | and other humanitarian equities militating against detention. Lorenzen-Strait Decl. ¶¶ 4 n.1, 12

10 | (citing memoranda from former DHS Secretary DHS Jeh Johnson, former ICE Director John

11 | Torres, and former ICE Director John Morton).

12 |      Importantly, ICE's discretion applies regardless of the statutory basis for the noncitizen's

13 | detention. *Id.* ¶ 10 ("[I]ndividuals held under mandatory detention, pursuant to [8 U.S.C. §

14 | 1226(c)], were also eligible for release"). Thus, the agency's policy and practice has been to limit

15 | the detention of any individuals regardless of their status if they had particular vulnerabilities,

16 | such as those who are suffering from serious physical or mental illness, have disabilities, are

17 | pregnant, or whose detention was otherwise not in the public interest. *Id.* ¶ 4 (citing, *inter alia*,

18 | ICE's risk classification assessment tools). In particular, ICE has taken into consideration factors

19 | such as whether the detainees faced a heightened risk of medical harm in detention, *id.* ¶¶ 5-7,

20 | and would release individuals where appropriate medical care was not available in custody, *id.* ¶

21 | 9.

22 |      Plaintiffs, who are all at a high risk from suffering complications and/or death from

23 | COVID-19, are detainees with special vulnerabilities for whom detention is plainly dangerous

24 |

MOT. FOR TEMP. RESTRAINING ORDER - 16
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

and unjustified. *Id.* ¶ 8; *see supra* Factual Background Sec. II-IV. Considering ICE's well-

established authority and practice of exercising discretion in these circumstances, along with the

substantial medical and health care costs that ICE would otherwise bear from an outbreak,

Plaintiffs' immediate release would serve the interests of all detainees and the agency.

### c. The Court Has Authority to Order Plaintiffs' Release as the Sole Effective Remedy for the Constitutional Violation.

"Federal courts possess whatever powers are necessary to remedy constitutional

violations because they are charged with protecting these rights." *Stone v. City & Cnty. of San*

*Francisco*, 968 F.2d 850, 861 (9th Cir. 1992). As a result, "[w]hen necessary to ensure

compliance with a constitutional mandate, courts may enter orders placing limits on a prison's

population." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

This principle is well-established. For example, in cases involving prisons and jails,

federal courts have repeatedly ordered the release of detained persons when necessary to remedy

constitutional violations caused by overcrowding.  *See, e.g.*, *Duran v. Elrod*, 713 F.2d 292, 297-

98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (concluding that court did not exceed its

authority in directing release of low-bond pretrial detainees as necessary to reach a population

cap); *Mobile Cty. Jail Inmates v. Purvis*, 581 F. Supp. 222, 224-25 (S.D. Ala. 1984) (concluding

that district court properly exercised remedial powers to order a prison's population reduced to

alleviate unconstitutional conditions, and noting other cases); *Inmates of the Allegheny Cty. Jail*

*v. Wecht*, 565 F. Supp. 1278, 1297 (W.D. Pa. 1983) (order to reduce overcrowding "is within our

power to correct the constitutional violations"); *Brenneman v. Madigan*, 343 F. Supp. 128, 139

(N.D. Cal. 1972) ("If the state cannot obtain the resources to detain persons . . . in accordance

with minimum constitutional standards, then the state simply will not be permitted to detain such

MOT. FOR TEMP. RESTRAINING ORDER - 17
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

1   persons."); *Herrera v. Pierce Cty.*, No. C-95-5025 (W.D. Wash. Oct. 31, 1995) (stipulated

2   order).[4]

3   In this case, the release of Plaintiffs from detention is the only effective remedy for the

4   constitutional violation they face. Preventive measures that may be effective in the community,

5   such as maintaining a distance of six feet from other persons and frequent disinfection, are

6   simply not possible in the detention setting. *See supra* Factual Background Sec. II-III; Greifinger

7   Decl. ¶ 11; Stern Decl. ¶ 7. "The only viable public health strategy available is risk mitigation.

8   Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the

9   release of high-risk individuals is a key part of a risk mitigation strategy." Greifinger Decl. ¶ 13.

10  For the foregoing reasons, Plaintiffs are likely to succeed on the merits of their claim that

11  their continued detention violates their Fifth Amendment due process right to safety in

12  government custody.

13  **II.    The Remaining Factors Weigh Heavily in Favor of Granting a Temporary
           Restraining Order.**

14

15  **a.    Plaintiffs Are Likely to Suffer Irreparable Harm Absent the Temporary
             Restraining Order.**

16  The Ninth Circuit has made clear that "the deprivation of constitutional rights

17  'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th

18  Cir. 2012) (internal quotation marks omitted). Moreover, as at least one judge in this district has

19  recognized, the dangerous and unsafe conditions of detention that Plaintiffs face also constitute

20  
_____

21  [4] In 1996, Congress enacted the Prison Litigation Reform Act (PLRA) which, *inter alia*, imposed a
    heightened standard for "prisoner release orders." 18 U.S.C. § 3626(a)(3). Applying those heightened
22  standards, the Supreme Court affirmed an order directing California to reduce crowding in its prisons
    where overcrowding was the "primary cause" of "severe and unlawful mistreatment of prisoners through
    grossly inadequate provision of medical and mental health care." *Brown v. Plata*, 563 U.S. 493, 502
23  (2011). The PLRA does not apply to cases brought by detained immigrants challenging the conditions of
    their confinement. *Agyeman v. I.N.S.*, 296 F.3d 871, 886 (9th Cir. 2002).

24  

MOT. FOR TEMP. RESTRAINING ORDER - 18
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

1    irreparable harm supporting injunctive relief. *Padilla v. U.S. Immigration & Customs*

2    *Enforcement*, 387 F. Supp. 3d 1219, 1231 (W.D. Wash. 2019) (recognizing that "substandard

3    physical conditions, [and] low standards of medical care" in immigration detention constitute

4    irreparable harm justifying injunctive relief). The Ninth Circuit also has recognized that

5    irreparable harm exists where government actions threaten to worsen an individual's health. *See*

6    *M.R. v. Dreyfus*, 663 F.3d 1100, 1111 (9th Cir. 2011), *as amended by* 697 F.3d 706 (9th Cir

7    2012); *see also, e.g.*, *Indep. Living Cent. of S. California, Inc. v. Shewry*, 543 F.3d 1047, 1050

8    (9th Cir. 2008) (recognizing that Medi-Cal beneficiaries would suffer irreparable harm where

9    new policy would limit beneficiaries' access to "much-needed pharmaceuticals").

10          Each of these reasons support immediate relief here. Plaintiffs are older adults or people

11    with underlying medical conditions that increase their likelihood of severe illness or death if they

12    contract COVID-19. Stern Decl. ¶ 13. As discussed above, the fatality rate for people infected

13    with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced

14    countries with highly effective health care systems. Golob Decl. ¶ 4. The fatality rate is estimated

15    to be about 15 percent for people in the highest risk populations. *Id.* Patients in high-risk

16    categories who do not die from COVID-19 should expect a prolonged recovery, including the

17    need for extensive rehabilitation for profound reconditioning, loss of digits, neurologic damage,

18    and the loss of respiratory capacity. *Id.* For these reasons, public health experts have concluded

19    that people with these characteristics in institutional settings such as immigration detention

20    centers "are at grave risk of severe illness and death." *Id.* ¶ 14.

21

22

23

24

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

### b. The Public Interest and Balance of Equities Weigh Heavily in Plaintiffs' Favor.

Both the balance of equities and the public interest heavily favor the Plaintiffs. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quotation omitted).

Furthermore, Plaintiffs will suffer irreparable harm without immediate relief, including unreasonable risk of long-lasting medical harm or death if infected by COVID-19. *See supra* Sec. II.a. Plaintiffs are civil detainees who are at grave risk of serious illness or death if exposed to COVID-19. Golob Decl. ¶ 14; Greifinger Decl. ¶¶ 7-10; Stern Decl. ¶¶ 3-6, 13. Whatever interest that the government asserts in their continued detention cannot be outweighed by such irreparable harm. "Faced with . . . preventable human suffering, [the Ninth Circuit] ha[s] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

Moreover, it is in both the *Defendants'* and the broader public interest to release detainees with particular medical vulnerabilities. The release of people most vulnerable to COVID-19 reduces the overall health risk for detainees and facility staff alike at the NWDC. Stern Decl. ¶ 9. ICE has an interest in preventing any potential spread of COVID-19 in its detention facility, particularly because detainees face great difficulty engaging in proper hygiene and social distancing in a detention environment. *Id.* ¶¶ 7-9. Immigration detention facilities face greater risk of infectious spread because of crowding, the high percentage of detained people vulnerable to serious illness in the event of COVID-19 transmission, and limited availability of medical care. Golob Decl. ¶ 13; Greifinger Decl. ¶¶ 10-12. Public health officials have testified that even with the best-laid plans, the release of vulnerable individuals is key to the risk

MOT. FOR TEMP. RESTRAINING ORDER - 20
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

mitigation strategy of any detention facility because it reduces the total number of detainees, allows for greater social distancing, and prevents overloading the work of detention staff. Stern Decl. ¶¶ 9-11; Greifinger Decl. ¶ 13. Plaintiffs' release not only imposes minimal harm to the government, but also *furthers* ICE's interests in maintaining a healthy and orderly environment at the NWDC. Stern Decl. ¶ 9; Greifinger Decl. ¶ 13.

Lastly, releasing Plaintiffs is clearly in the broader public's interest. Here, "the impact of [a temporary restraining order] reaches beyond the parties, carrying with it a potential for public consequences." *Hernandez*, 872 F.3d at 996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)). An outbreak of COVID-19 could put significant pressure on or exceed the capacity of local health infrastructure. Stern Decl. ¶ 6. The COVID-19 outbreak in Seattle has already resulted in the need for unprecedented public health measures and caused a strain on the local health care system. Golob Decl. ¶ 12; Greifinger Decl. ¶ 9. The release of people most vulnerable to serious illness from COVID-19 reduces the health and economic burden on the local community and health infrastructure at large. Greifinger Decl. ¶¶ 8, 13; Stern Decl. ¶¶ 9-11; Golob Decl. ¶ 14; *see also Hernandez*, 872 F.3d at 996-97 ("[T]he general public's interest in efficient allocation of the government's fiscal resources favors granting [relief]").

### III. The Court Should Not Require Plaintiffs to Provide Security Prior to Issuing a Temporary Restraining Order.

Federal Rule of Civil Procedure 65(c) provides that "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*" *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks and citation omitted). District courts routinely

MOT. FOR TEMP. RESTRAINING ORDER - 21
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931

1  exercise this discretion to require no security in cases brought by indigent and/or incarcerated

2  people. *See, e.g.*, *Toussaint v. Rushen,* 553 F. Supp. 1365, 1383 (N.D. Cal. 1983) (state

3  prisoners); *Orantes–Hernandez v. Smith,* 541 F. Supp. 351, 385 n. 42 (C.D. Cal. 1982) (detained

4  immigrants). This Court should do the same here.

5                                         **CONCLUSION**

6          For the foregoing reasons, Plaintiffs' motion for a temporary restraining order should be

7  granted.

8  Respectfully submitted on this 16th of March, 2020.

9  s/ David C. Fathi                                     s/ Matt Adams
    David C. Fathi, WSBA No. 24893**            Matt Adams, WSBA No. 28287
10  dfathi@aclu.org                                     matt@nwirp.org

11  s/ Eunice H. Cho                                     s/ Aaron Korthuis
    Eunice H. Cho, WSBA No. 53711**             Aaron Korthuis WSBA No. 53974
12  echo@aclu.org                                     aaron@nwirp.org

13  American Civil Liberties Union Foundation,     Northwest Immigrant Rights Project
    National Prison Project                            615 Second Ave., Suite 400
14  915 15th Street N.W., 7th Floor                Seattle, WA 98104
    Washington, DC 20005                           Tel: (206) 957-8611
15  Tel: (202) 548-6616
                                                       s/ Tim Henry Warden-Hertz
16  Omar C. Jadwat*                                 Tim Henry Warden-Hertz, WSBA No. 53042
    ojadwat@aclu.org                                 tim@nwirp.org
17  Michael Tan*
    mtan@aclu.org                                   Northwest Immigrant Rights Project
18  American Civil Liberties Union Foundation,     1119 Pacific Ave., Suite 1400
    Immigrants' Rights Project                       Tacoma, WA 98402
19  125 Broad Street, 18th Floor                   Tel: (206) 957-8652
    New York, NY 10004
20  Tel: (212) 549-2600

21  My Khanh Ngo*
    mngo@aclu.org
22  American Civil Liberties Union Foundation,
    Immigrants' Rights Project
23  39 Drumm Street
    San Francisco, CA 94111
24  Tel: (415) 343-0774

MOT. FOR TEMP. RESTRAINING ORDER - 22              **American Civil Liberties Union**
Case No. 2:20-cv-409                                   915 15th St. NW, Washington, DC 20005
                                                           Tel: 202-393-4930
                                                           Fax: 202-393-4931

s/ Enoka Herat
Enoka Herat, WSBA No. 43347
eherat@aclu-wa.org

s/ John Midgley
John Midgley, WSBA No. 6511
jmidgley@aclu-wa.org

American Civil Liberties Union Foundation
of Washington
P.O. Box 2728

*Pro hac vice application forthcoming
**Not admitted in DC; practice limited to federal courts

*Attorneys for Plaintiffs*

MOT. FOR TEMP. RESTRAINING ORDER - 23
Case No. 2:20-cv-409

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on March 16, 2020, I electronically filed the foregoing document and

3   accompanying proposed order with the Clerk of the Court using the CM/ECF system. I further

4   certify that I have mailed Respondents-Defendants a copy of this document and the

5   accompanying proposed order via certified, first class mail. In addition, I have emailed copies of

6   these documents to the following email addresses at the U.S. Attorney's Office for the Western

7   District of Washington:

8           Micki.Brunner@usdoj.gov
        Kristin.B.Johnson@usdoj.gov

9

Dated: March 16, 2020            s/ Matt Adams

10                      Matt Adams
                   Email: matt@nwirp.org

11                      Northwest Immigrant Rights Project
                   615 Second Ave., Ste 400

12                      Seattle, WA 98104
                   (206) 957-8611

13

14

15

16

17

18

19

20

21

22

23

24

MOT. FOR TEMP. RESTRAINING ORDER - 24
Case No. 2:20-cv-409

**American Civil Liberties Union**
915 15th St. NW, Washington, DC 20005
Tel: 202-393-4930
Fax: 202-393-4931