IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JOHN BAXLEY, JR.,
ERIC L. JONES,
SAMUEL STOUT,
AMBER ARNETT,
EARL EDMONDSON,
JOSHUA HALL,
DONNA WELLS-WRIGHT,
ROBERT WATSON,
HEATHER REED, and
DANNY SPIKER, JR.,
on their own behalf and
on behalf of all others similarly situated,

                  Plaintiffs,

v.                                    CIVIL ACTION NO. 3:18-1526
                                    (Consolidated with 3:18-1533 and 3:18-1436)

BETSY JIVIDEN, in her official capacity as
Commissioner of the West Virginia Division of
Corrections and Rehabilitation and
THE WEST VIRGINIA DIVISION OF
CORRECTIONS AND REHABILITATION, and
SHELBY SEARLS, in his official capacity as
the Superintendent of Western Regional Jail
and Correctional Facility,

                  Defendants.

**MEMORANDUM OPINION AND ORDER**

Presently pending before the Court is Plaintiffs' "Emergency Motion for Preliminary Injunction Regarding Defendants' Prevention, Management, and Treatment of COVID-19." *Mot. for Prelim. Inj.*, ECF No. 161. Defendants timely filed a Response in Opposition, *Resp. in Opp'n*, ECF No. 168, and Plaintiffs did the same with their Reply, *Reply*, ECF No. 173. The parties also provided supplemental information to the Court, which has all been filed under seal. *See Exs.*, ECF

No. 181. The Court held a hearing on Plaintiffs' Motion on April 6, 2020 and determined that the issues had been adequately presented through the parties' submissions and oral argument, and therefore dispensed with the need for further witness testimony. *Video Mot. Hr'g*, ECF No. 180. For the reasons set forth below—as well as for those announced on the record at the hearing—the Court **DENIES** Plaintiffs' Motion.

## I. BACKGROUND

This putative class action stems from allegations that the West Virginia Department of Corrections and Rehabilitation ("WVDCR") has "acted with deliberate indifference to serious medical needs of inmates at the time of admission to jails in West Virginia." *Second Am. Compl.*,[1] ECF No. 67, at ¶ 182. The plaintiffs are divided into two putative classes: Class A, which "includes all persons who were at any time on or after December 18, 2018, or who will be, admitted to a jail in West Virginia with a discernable, treatable medical and/or mental health problem," and Class B, which only "includes all persons who were at any time on or after December 18, 2018, inmates housed at Western Regional Jail and Correctional Facility, in Barboursville, West Virginia." *See id.* at ¶¶ 24–241.

As this action entered its second year, the COVID-19 pandemic began its rapid spread across the world and into West Virginia.[2] Elected officials reacted swiftly at the state and federal level, with both the President of the United States and the Governor of West Virginia declaring

---

[1] Though styled and docketed as the "First Amended Class Action Complaint for Injunctive and Declaratory Relief," it is really the *Second* Amended Complaint and is referred to as such throughout this Memorandum Opinion and Order. *See Mot. to File Second Am. Compl.*, ECF No. 62.

[2] *See* Phil Kabler, *Justice confirms WV's first case of coronavirus*, Herald-Dispatch (Mar. 17, 2020), *available at* https://www.herald-dispatch.-com/coronavirus/justice-confirms-wv-s-first-case-of-coronavirus/article_7e034a25-949e-5085-8494-87ae9b570016.html.

states of emergency in an attempt to slow the spread of the coronavirus pandemic.[3] Given the unique characteristics of both jails and the disease, commentators and public health officials have remarked upon the outsized danger it may pose to prisoners and pretrial detainees who are housed in confined spaces and who share many communal resources and spaces.[4]

In light of these concerns, Plaintiffs filed the instant Motion for a Preliminary Injunction on March 25, 2020. *See Mot. for Prelim. Inj.*, at 3. Plaintiffs sought two forms of injunctive relief. First, they moved for an order requiring Defendants to "develop, disclose, and implement a plan that undertakes all appropriate actions to protect Plaintiffs and others who are similarly situated." *Id.* at 12. Second, they requested the Court order "WVDCR to release a sufficient number of inmates [to] reduce overcrowding and allow for appropriate social distancing within the jails and prisons to protect medically vulnerable inmates." *Id.* at 13.

Given the unprecedented nature of the COVID-19 pandemic, the Court ordered an accelerated briefing schedule in response to Plaintiffs' Motion. *Order*, ECF No. 165. Defendants timely filed their Response in Opposition, and raised several objections to Plaintiffs' Motion. *Resp. in Opp'n*, at 3–20. Plaintiffs responded to many of these points in their Reply filed days later. *Reply*, at 1–21. The parties and the Court participated in a telephonic status conference on April 1, 2020, during which Defendants agreed to provide redacted copies of their COVID-19 response

---

[3] *See* President Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/; Anthony Izaguirre, *Justice Declares Emergency as Virus Threatens*, Herald-Dispatch (Mar. 16, 2020), *available at* https://www.herald-dispatch.com/coronavirus/justice-declares-emergency-as-virus-threatens/-article_56b82394-6d70-5f0c-9b67-054200edb616.html.

[4] *See* German Lopez, A Coronavirus Outbreak in Jails or Prisons Could Turn Into a Nightmare, Vox.com (Mar. 17, 2020), *available at* https://www.vox.com/policy-and-politics/2020/3/17/21181515/coronavirus-covid-19-jails-prisons-mass-incarceration; *see also Beyrer Dec.*, ECF No. 161-1.

plan to opposing counsel and the Court for review. The Court issued an order reflecting these discussions that same day, *Order*, ECF No. 176, and Defendants provided a redacted copy of their response plan. Plaintiffs responded to this plan with a verified declaration from their expert witness, Dr. Homer Venters, *Venters Dec.*, ECF No. 9, and Defendants replied in turn with their own set of affidavits and their own memorandum addressing his concerns, *Second Jividen Aff.*, ECF No. 181-1, *Plumley Aff.*, ECF No. 181-2, *Hissom Aff.*, ECF No. 181-3. The Court proceeded with the hearing scheduled for April 6, 2020, and heard argument from counsel on the merits of their respective positions. After entertaining argument, the Court determined that Plaintiffs had not established a likelihood of success on the merits of their claim for deliberate indifference.

## II. LEGAL STANDARD

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal citations and quotations omitted). It follows that a court may not issue a preliminary injunction absent "a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. These factors are not weighted equally; instead, "the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued." *N.C. State Ports Auth. v. Dart Containerline Co.*, 592 F.2d 749, 750 (4th Cir. 1979). The burden of proof rests with the party seeking a preliminary injunction,

not with the party opposing its issuance. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 445 (1974).

High though this initial threshold may be for Plaintiffs, it perhaps understates the legal implications raised by the instant case. "[S]weeping intervention in the management of state prisons is rarely appropriate when exercising the equitable powers of the federal courts," and this "is especially true where mandatory injunctive relief is sought and only preliminary findings as to the plaintiffs' likelihood of success on the merits have been made." *Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). This makes sense, inasmuch as "[m]andatory injunctions alter the status quo" by requiring a party to take a particular action, whereas "prohibitory injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (internal citations and quotations omitted). In fact, mandatory preliminary relief "goes well beyond simply maintaining the status quo *pendent lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Taylor*, at 270 n.2 (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)). Indeed, "absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities." *Id.* at 268; *see also Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982) ("[J]udicial restraint is especially called for in dealing with the complex and intractable problems of prison administration."). Put succinctly: "it is not for the federal courts to . . . micromange the Nation's prisons." *O'Dell v. Netherland*, 112 F.3d 773, 777 (4th Cir. 1997).

## III. DISCUSSION

Both parties raise several arguments in support of their positions that warrant a careful and searching examination of the record. The Court will first consider Defendants' contentions that both exhaustion and the substance of Plaintiffs' operative Second Amended Complaint do not permit consideration of their Motion.[5] Having disposed of both arguments, the Court will turn to an analysis of the substance of Plaintiffs' Motion. With the evidence presently before the Court, it is clear that Plaintiffs cannot meet their burden and their Motion must be denied.

### A. Defendants' Arguments

#### 1. Exhaustion

Defendants first contend that the Prison Litigation Reform Act ("PLRA") imposes an exhaustion requirement that bars Plaintiffs' Motion. *See Resp. in Opp'n*, at 5–6. They point specifically to § 803 of the PLRA, which provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion is mandatory, regardless of the type of relief sought or offered through administrative channels. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

---

[5] Defendants also expend considerable energy in their Response in Opposition fixating on the fact that portions of Plaintiffs' Motion and supporting affidavits are drawn from documents filed in *Dawson v. Asher*, Case No. C20-0409JLR-MAT, in the Western District of Washington. *See Resp. in Opp'n*, at 9–11. This may well be the case, but it is of no import whatsoever for the purposes of resolving the pending Motion. The Court will carefully consider Plaintiffs' claims and supporting evidence as it would in any other case, and attaches no significance to the fact that some of Plaintiffs' arguments may be drawn from other material.

Here, Defendants' argument is belied by the plain text of the PLRA's exhaustion requirement. In pertinent part, the provision mandates that "no *action* shall be brought" with respect to prison conditions prior to exhaustion—not that no *motion* may be filed with respect to the same. *See* 42 U.S.C. § 1997e(a). To the extent Defendants are attempting to argue that this entire action is not properly before the Court for Plaintiffs' failure to exhaust administrative remedies, the Court reminds Defendants that "failure to exhaust available administrative remedies is an affirmative defense, not a jurisdictional requirement, and thus inmates need not plead exhaustion, nor do they bear the burden of proving it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)). It follows that Plaintiffs' purported failure to exhaust administrative remedies is an insufficient justification for denying their pending Motion.

**2. Relevance to this Case**

Defendants next point out that this action was initiated long before the COVID-19 pandemic reached the United States (and, indeed, likely long before the disease infected a single person). *Resp. in Opp'n*, at 11–12. They claim that "Plaintiffs are now improperly attempting to bootstrap claims related to the COVID-19 pandemic that have nothing to do with the claims previously pled and which claims did not even exist at the time the Amended Complaint was filed." *Id.* at 11. This is a bold argument, as Defendants themselves recognize that "this case as pled is about . . . statewide claims related to how inmates generally receive medical and mental health treatment upon admission." *Id.* The Court believes this language is sufficiently broad to encompass claims for medical treatment for COVID-19, but even if it were not the Court would grant leave for Plaintiffs to serve a supplemental pleading on Defendants pursuant to Rule 15(d) of the Federal

Rules of Civil Procedure.[6] Rather than tangle this timely Motion in avoidable procedural knots, the Court construes Plaintiffs' Second Amended Complaint—which, at bottom, seeks to address medical care available in West Virginia jails and prisons—as encompassing just the sort of claims raised by Plaintiffs' Motion.

### B. Merits Analysis

Having considered Defendants' procedural defenses, the Court turns to the merits of Plaintiffs' Motion. As part of doing so, it is worthwhile to review the significant amount of evidence that both parties put before the Court prior to oral argument. In responding to Plaintiffs' Motion, Defendants attached an Affidavit from Defendant Betsy Jividen detailing the actions that she and the WVDCR had so far taken with respect to the COVID-19 pandemic. *First Jividen Aff.*, ECF No. 168-1. Jividen affirmed that she issued a memorandum to all WVDCR employees on March 11, 2020 that provided information about the virus and issued instructions for responding to it. *Id.* at ¶¶ 2–12. She further explained that the WVDCR adopted a Policy Directive on March 20, 2020 that provided for a comprehensive response to COVID-19 in state prisons and jails. *Id.* at ¶¶ 13–23. Finally, she issued a memorandum on March 26, 2020 that included the Centers for Disease Control and Prevention's ("CDC's") guidance for correctional and detention facilities. *Id.* at ¶ 26.

In reply, Plaintiffs provided a "Sample COVID-19 Plan" that had been developed by VitalCore Health Strategies.[7] *See Sample COVID-19 Plan*, ECF No. 173-1. The forty-three page

---

[6] In pertinent part, Rule 15(d) provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). The COVID-19 pandemic is exactly the sort of occurrence or event that would justify service of a supplemental pleading.

[7] VitalCore is a private company that aims to improve health care services in correctional facilities. *See* https://vitalcorehs.com/ (last visited Apr. 7, 2020).

document provides clear instructions to prison staff for preventing and isolating the disease, as well as a series of worksheets for facilities to complete in order to gauge compliance with the plan. *Id.* Pursuant to this Court's order, Defendants subsequently produced a redacted copy of their COVID-19 response plan to the Court, Plaintiffs' counsel, and Plaintiffs' expert witness. *Policy Directive*, ECF No. 181-4; *CDC Guidance*, ECF No. 181-5. The plan—adapted from an earlier plan prepared by VitalCore—addressed many of the same issues as Plaintiffs' proposed plan, and included many of the same worksheets.[8] Plaintiffs' expert, Dr. Homer Venters, reviewed the plan and provided a declaration addressing its purported weaknesses. *Venters Dec.*, at ¶¶ 17–18. Many of his conclusions did not address the adequacy of the plan itself, but rather the adequacy of its implementation.[9] *See id.* at ¶ 18.

Nevertheless, the Court directed Defendants to provide a memorandum[10] responding to Venters' Declaration along with verified affidavits or declarations of their own. *Order*, ECF No. 179. Defendants did so, and their affidavits demonstrated that Defendants had already taken steps to implement the plan they had earlier provided to the Court.[11] *See generally Second Jividen Aff.; Plumley Aff.; Hissom Aff.* Two of these steps are of particular importance: the expanded use

---

[8] The CDC guidance—incorporated by reference into Defendants' plan—accounts for many of the subsequent changes in VitalCore's own plan that Plaintiffs submitted as a sample. *See Sample COVID-19 Plan*, at 1 ("Below are substantive updates primarily based on the new CDC guidance.").

[9] Indeed, Venters urged the WVDCR to fully implement the plan immediately. *Venters Dec.*, at ¶ 18(i).

[10] In their Memorandum, Defendants mention that they requested and reviewed notes of conversations with five inmates that formed the basis of Dr. Venters' expert opinions. *Resp. Mem.*, ECF No. 181-6, at 2 n.1. As Defendants point out, these notes revealed far from uniform condemnation of WVDCR's response to the COVID-19 crisis. *See, e.g.*, *id.* at 6 ("Plaintiff Edmondson . . . thought that his facility had '[r]eally done a good job with disinfectants' . . . . Plaintiff Baxley admitted that . . . the facility is 'pretty decent about getting them hygiene there.'").

[11] Lending further support to this finding are photographs of signs—and examples of the signs themselves—provided to the Court by Defendants in advance of the hearing.

of furlough programs to reduce crowding in West Virginia jails and prisons, *Second Jividen Aff.*, at 2, and the timely completion of the worksheets attached to Defendants' response plan, *Plumley Aff.*, at 1. All this demonstrates that Defendants are implementing the plan developed by the very sources Plaintiffs themselves have relied on for guidance in their submissions and expert declarations—namely, VitalCore and the CDC.

The probative weight of this evidence is what has permitted the Court to consider Plaintiffs' Motion without further witness testimony.[12] This is reinforced by the witnesses set to testify at the hearing; there is extremely limited probative value in calling several incarcerated witnesses to testify out of a system filled with thousands, and Plaintiffs' expert was permitted to respond to Defendants at whatever length and depth he chose. Moreover, much of what inmates could testify to—say, the crowded conditions in various state correctional facilities—is already apparent from the evidence the parties have provided. *See*, *e.g.*, *Occupancy Chart*, ECF No. 181-8 (showing over-capacity populations at five state jails). Any notes that Plaintiffs have collected regarding insufficient preparations for COVID-19 are not enough to outweigh Defendants' evidence of ongoing implementation of their plan, including posted signs and notices across jail facilities.

Turning again to the substance of that Motion, Plaintiffs are seeking two forms of injunctive relief: an order requiring Defendants to "develop, disclose, and implement a plan that undertakes all appropriate actions to protect Plaintiffs and others who are similarly situated," and an order directing "WVDCR to release a sufficient number of inmates [to] reduce overcrowding

---

[12] The Court recognizes that Plaintiffs have maintained their objection to its decision to end the hearing without entertaining testimony. Nevertheless, Court notes that Rule 65 of the Federal Rules of Civil Procedure "does not require an evidentiary hearing" if "the party opposing the preliminary injunction [has] a fair opportunity to oppose the application and to prepare for such opposition." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1311 (11th Cir. 1998). The Court afforded Defendants every opportunity to oppose Plaintiffs' Motion, and in any event has ruled in their favor.

and allow for appropriate social distancing within the jails and prisons to protect medically vulnerable inmates." *Mot. for Prelim. Inj.*, at 12–13. It bears repeating that this injunctive relief is sought in the context of a 42 U.S.C. § 1983 action alleging deliberate indifference to prisoners' medical needs under the Eighth and Fourteenth Amendments to the United States Constitution. *See Second Am. Compl.*, at ¶ 244. It is this legal and procedural framework that shapes the Court's approach to Plaintiffs' Motion.

### 1. Likelihood of Irreparable Harm

The Court begins its analysis by considering the likelihood of irreparable harm, as "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Samson v. Murray*, 415 U.S. 61, 88 (1974). "'Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)). High though this standard may be, the Court concludes that Plaintiffs have met it here.

The COVID-19 pandemic is unprecedented, both as a matter of public health and as a matter of societal disruption. The disease itself appears highly communicable, and evidence suggests that the immediate likelihood of infection is only elevated in prisons. *See*, *e.g.*, *Meyer Dec.*, ECF No. 161-4. That prisoners have not *yet* been infected with COVID-19 is no bar to a finding of irreparable harm; indeed, as the United States Supreme Court has clarified, prison officials may be deliberately indifferent "to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 34 (1993). The question for West Virginia prisons is not the current rate of infection—to date, there have been no reported cases of COVID-19 in West Virginia jails

or prisons—but rather the immediate likelihood of such infection. Given the rapidly-increasing numbers of infected individuals in West Virginia's general population,[13] the risk of transmission to prisoners is quite high.

Provided the likelihood of serious illness and even death accompanying the COVID-19 pandemic, the Court has little trouble concluding that the absence of a plan to mitigate its effects could result in irreparable harm to Plaintiffs. This reasoning aligns with that of many other courts that have confronted this issue in the context of the COVID-19 pandemic. *See*, *e.g.*, *Coronel v. Decker*, No. 20-cv-2472 (AJN), 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020); *Castillo v. Barr*, CV 20-00605 TJH (AFMx), 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Zhang v. Barr*, No. ED CV 20-00331-AB (RAOx), 2020 WL 1502607 (C.D. Cal. Mar. 27, 2020); *Basank v. Decker*, 20 Civ. 2518(AT), 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020). Even Defendants concede that the disease poses a degree of risk, though they characterize it as "low and certainly not any greater than the risk of the public at large."[14] *Resp. in Opp'n*, at 18. The possibility that Plaintiffs could face a life-threatening—or even deadly—infection in prison constitutes exactly the sort of irreparable harm that injunctive relief is intended to remedy. It follows that the Court finds that Plaintiffs have made a clear showing that irreparable harm will result from inaction on Defendants' part during the COVID-19 pandemic. As has already been discussed, however, Defendants have been far from inactive in preparing for the disease.

---

[13] *See* Fred Pace, *COVID-19 Cases Increase In West Virginia, Ohio, Kentucky*, Herald-Dispatch (Apr. 4, 2020), *available at* https://www.herald-dispatch.com/coronavirus/covid-19-cases-increase-in-west-virginia-ohio-kentucky/article_93faca28-6bd9-515f-b5a2-b44234c36e9a.html.

[14] As noted throughout this Memorandum Opinion and Order, Plaintiffs have presented substantial evidence suggesting that the risk of contracting COVID-19 is higher in prisons than within the general population. *See generally Meyer Dec*. The Court is persuaded by this evidence.

## 2. Likelihood of Success on the Merits

Having determined that Plaintiffs would likely suffer irreparable harm absent a plan to mitigate the spread of COVID-19 in state prisons, the Court next considers whether they are likely to succeed on the merits of their deliberate indifference claims. As an initial matter, the Court recognizes that "the Eighth Amendment's proscription of cruel and unusual punishments is violated by deliberate indifference to serious medical needs of prisoners." Deliberate indifference, in turn, "is a very high standard [and] a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). For a prisoner to state a claim for deliberate indifference to her medical needs under § 1983, she "must demonstrate (1) a deprivation of [her] rights by the defendant that is, objectively, sufficiently serious and (2) that the defendant's state of mind was one of deliberate indifference to inmate health or safety." *Carroll v. W. Va. Reg'l Jail & Corr. Facility Auth.*, No. 3:14-1702, 2015 WL 1395886, at *6 (S.D.W. Va. Mar. 25, 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (internal quotations omitted). Regarding the second prong in particular, a plaintiff must demonstrate that a defendant "actually knew of and disregarded a substantial risk of serious injury to the detainee." *Young v. City of Mount Rainer*, 238 F.3d 567, 575–76 (4th Cir. 2001). "The subjective component therefore sets a particularly high bar to recovery." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). It is this high bar that makes it unlikely that Plaintiffs could succeed on the merits of their claims.[15]

This is true for several reasons. First, the evidence before the Court suggests that Defendants have been anything but unresponsive to the threat posed by COVID-19. Although "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate

---

[15] For the purposes of this analysis, the Court assumes that COVID-19 is "sufficiently serious" to warrant medical attention. *See Iko*, 535 F.3d at 241.

indifference to those needs," *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), no such failure is apparent here. In fact, Defendants have produced what appears to be a comprehensive plan addressing the spread of COVID-19 in state jails and prisons. The plan addresses procedures to limit the entrance of COVID-19 into the corrections system, as well as methods to limit intra-facility transmission and to transport infected individuals to hospitals for medical care. *Policy Directive*, at 2–3. Of course, a legal education is not a medical education and the Court is cognizant of its own limitations in reviewing the Defendants' proffered plan. Yet Plaintiffs' medical expert was provided an opportunity to review Defendants' plan and comment upon it, and Defendants have provided what the Court considers adequate responses to each alleged shortcoming. The existence and ongoing implementation of Defendants' COVID-19 response plan makes it impossible to conclude that Defendants "actually knew of and disregarded a substantial risk of serious injury to the detainee." *Young*, 238 F.3d at 575–76. In fact, the opposite seems to be the case: Defendants have demonstrated actual knowledge of the risk of COVID-19, and regard it with the seriousness it deserves.

A second consideration for the Court is the intangibility of Plaintiffs' actual requests. The Court notes that this Motion was filed with the principal goal of obtaining an order that would require Defendants to develop and execute an adequate COVID-19 response plan. This goal has since somewhat evolved, as Plaintiffs now recognize that Defendants have adopted a COVID-19 response plan drawn from the same source as their own proposed response plan. Instead of focusing on the adequacy of the plan, Plaintiffs argue that its implementation has been ineffective and that an indeterminate number of prisoners and detainees must be released to provide for increased social distancing within prisons and jail facilities. With respect to the first contention, the Court is mindful that—even apart from questions of its own authority—it cannot act as an

administrator of state prison facilities to ensure that every element of Defendants' plan is implemented to the letter. With respect to the second contention, Plaintiffs have been unable to provide any clear guidance to the Court as to how it could begin to approach the process of reducing crowding in state prisons. The Court is unwilling (and potentially unable) to simply pick an arbitrary occupancy target that would allay Plaintiffs' concerns, and lacks the capacity to administer any sort of release or furlough policy based on "reasonableness" or another imprecise standard.[16] As Defendants' justifiably note, they are already attempting to reduce jail populations through the use of furlough programs. *Second Jividen Aff.*, at 2. Yet determinations regarding release and furlough must be made on a case-by-case basis, taking into account the seriousness of an inmate's underlying offense and the support network into which she will be discharged. Defendants have continually represented to the Court that they are already taking steps to reduce overcrowding and are considering others, and any order requiring them to do the same would be superfluous.

Finally, the timing of Plaintiffs' Motion factors into the Court's decision. At present, there have been no reported cases of COVID-19 in West Virginia prisons. This will likely change in the coming days and weeks, and Defendants' plan will be stress-tested by the virus. It is possible that the measures Defendants propose to implement will be insufficient in confronting the virus, and may eventually give rise to a finding that Defendants are acting with deliberate indifference to the medical needs of West Virginia inmates. Yet, at present, it is impossible to conclude that Defendants have acted with the sort of deliberate indifference that could give rise to a

---

[16] At the hearing, Plaintiffs suggested the appointment of a Special Master or an order directing the parties to engage in mediation as potential means for increasing the administrability of any injunction. The Court does not believe either option deals effectively with the problems inherent in making case-by-case determinations regarding the furlough or release of inmates.

constitutional violation under the Eighth and Fourteenth Amendments. As such, the Court finds that Plaintiffs have not demonstrated a substantial likelihood of success on the merits of their claims.

### 3. Balance of Equities

As Plaintiffs have succeeded in showing a likelihood of irreparable harm but failed in showing a likelihood of success on the merits, the Court is left to weigh the equities presented by this case. The threat of COVID-19 is the primary factor in the Court's analysis, and would likely be dispositive had Defendants not taken *any* action to plan for the arrival of the virus in the West Virginia correctional system. Of course, this is not the case here; as noted earlier, Defendants have prepared a plan that appears to mitigate the threat of the disease. And mitigation is all that can be demanded in this case, as no technology yet exists that can cure or entirely prevent COVID-19. The best scientists in the world have been unable to eliminate the risk of the disease, and the Court can expect no more of Defendants. This alters the Court's analysis significantly, and lessens the weight that Plaintiffs' risk of irreparable harm would otherwise carry.

On the opposite side of the scale, Defendants maintain a strong interest in promulgating their own policies for prison management outside the rare circumstances where the intervention of a court is absolutely necessary. *See O'Dell*, 112 F.3d at 777. There is also Defendants' obvious interest in ensuring that incarcerated individuals actually complete their terms of incarceration. Defendants have also already made use of various state-authorized furlough programs, which allow them to advance their interests alongside Plaintiffs' stated interest in increased social distancing. *Second Jividen Aff.*, at 2. Finally—and perhaps most importantly—it is readily apparent that COVID-19 is a fast-moving threat that requires efficient and efficacious responses from state authorities. Defendants will need to make rapid decisions and take immediate action to stem the

spread of the virus, and the Court's intervention in these considerations would only inhibit their ability to do so. It is likely that any injunction would leave Defendants unsure of precisely what actions they could take without notifying Plaintiffs and the Court, thereby slowing any response and making disease prevention more difficult.

As the Court has noted at several points, evidence of an outbreak and the insufficiency of Defendants' plan could alter this calculus. Yet, for the moment, Plaintiffs have failed to show that their interest in fending off COVID-19—which is tempered by Defendants' plan to aid them in doing so—outweighs Defendants' strong interest in managing state prisons.

### 4. Public Interest

The fourth and final factor for the Court's consideration asks whether a preliminary injunction would favor the public interest. This factor does not weigh heavily in either direction, as any injunction would likely be narrowly tailored to the West Virginia prison system rather than the public at large. Nevertheless, the Court sees obvious implications for public safety were it to issue a broader injunction and order the immediate release of a certain number of incarcerated individuals to allow for greater social distancing within prisons. On the other hand, public health is naturally a matter of public concern and limiting the spread of the COVID-19 virus is therefore well within the public interest. Preventing an outbreak within a prison from overwhelming local hospitals is another consideration in Plaintiffs' favor, though the Court is not entirely sure an injunction could do more to prevent any such outbreak than Defendants' current plan. It follows that, once again, Defendants' policy tempers public health worries and persuades the Court that a preliminary injunction is not in the public interest at this time.

### 5. Result

Plaintiffs are right to be concerned for their health the midst of an unprecedented pandemic that has already transformed American life in fundamental ways. The likelihood that Plaintiffs will face irreparable harm from the spread of COVID-19 is no small matter, and is one that will only grow in significance as this pandemic progresses. Yet the Court is not free to ignore the steps Defendants have already taken to address the virus, which are comprehensive and based on best practices promulgated by a source Plaintiffs already appear to trust. These facts make it exceedingly unlikely that Plaintiffs could succeed on the merits of their claim that Defendants have acted with deliberate indifference toward inmates' medical needs in light of COVID-19. It would be redundant for the Court to order relief that Defendants are in the midst of granting, and so the Court concludes that a preliminary injunction is not warranted here.

Nevertheless, it is worth reiterating that the coronavirus pandemic is an ever-changing crisis that evolves by the hour more often than by the day. If Defendants' plan is unable to adequately address the spread of COVID-19 in state prisons, Plaintiffs will likely have a much stronger likelihood of succeeding on the merits of their claims. As noted at the hearing, the Court believes that Defendants would be served well by consulting experts on disease transmission in prisons and taking their advice seriously. The Court similarly believes that exercising available furlough and other crowd-reduction policies available under West Virginia law is a prudent step in view of the recommendations contained in Defendants' own plan. Nevertheless, the Court will not "immerse [itself] in the management of state prisons" absent the most extraordinary circumstances. *Taylor*, 34 F.3d at 268. Given Defendants' actions, such circumstances do not exist in West Virginia jails or prisons at this time. Plaintiffs' Motion is therefore denied.

## IV. CONCLUSION

For the foregoing reasons and for those announced on the record at the hearing, the Court **DENIES** Plaintiffs' Motion, ECF No. 161, and **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER: April 8, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE