# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

JOHN BAXLEY, JR., et al.

     Plaintiffs,

v.            CIVIL ACTION NO. 3:18-1526

BETSY JIVIDEN, in her official capacity
as Commissioner of the West Virginia
Division of Corrections and Rehabilitation and
WEST VIRGINIA DIVISION OF CORRECTIONS
AND REHABILITATION, et al.

     Defendants.

## MEMORANDUM OPINION AND ORDER

   Pending are Defendant's Motions for Summary Judgment as to John Baxley, Jr., Heather

Reed, Earl Edmondson, Danny Spiker, Donna Wells-Wright, and Joshua Hall. ECF Nos. 263, 267,

269, 271, 273, 277, and 328.[1] For the reasoning provided herein, the Court **DENIES, in part,** and

**GRANTS, in part,** the following motions: ECF No. 263, ECF No. 267, ECF No. 269, ECF No.

271, and ECF No. 277. The Court also **DENIES** the following motions. ECF No. 273 and ECF

No. 328.

## I.  BACKGROUND

   The present case is a class action[2] brought on behalf of pretrial detainees and convicted

inmates housed at West Virginia's regional jail facilities. In the Second Amended Complaint,[3]

---

[1] ECF No. 328 is a "Supplemental Motion for Summary Judgment" as to Plaintiff Donna Wells-Wright.
[2] Contemporaneous with this order, the Court is issuing a separate order granting in part the Plaintiffs' Motion for Class Certification, ECF No. 264.
[3] The Court notes that this Complaint is titled "First Amended Class Action Complaint," however, as it is the second amended complaint, the Court will refer to it as such.

Plaintiffs seek injunctive relief requiring the Defendant, Commissioner of the West Virginia Division of Corrections and Rehabilitation,[4] to "promptly provide appropriate and necessary medical and mental health treatment to inmates upon admission, as required under the Eighth and Fourteenth Amendments of the United States Constitution, and the Americans with Disabilities Act." Second Am. Compl. ¶ 1, ECF No. 67.[5]

Plaintiffs plead the following facts. West Virginia Division of Corrections and Rehabilitation ("WVDCR") is the government agency tasked with operating the jails and prisons in West Virginia. Defendant Betsy Jividen serves as the Commissioner of WVDCR. As Commissioner, she is responsible for "establishing, monitoring, and enforcing policy directives and procedures that ensure constitutional confinement and treatment of all people in the custody of the WVDOCR." *Id.* at ¶ 8. Accordingly, Defendant Jividen is responsible for "ensuring that inmates receive appropriate medical and mental health treatment upon admission to and while housed in any West Virginia Jail." *Id.*

In Count I, Plaintiffs assert that Defendant violated the Eighth and Fourteenth Amendments of the United States Constitution. Pursuant to 42 U.S.C. § 1983, they claim the Defendant, acting under the color of state law, has been "deliberately indifferent to the serious medical needs of Plaintiffs and other similarly situated inmates by failing to establish, monitor, and/or enforce policy directives and operational procedures to ensure that inmates admitted to jails in West Virginia receive prompt medical treatment for their medical and mental health conditions." *Id.* at ¶ 247. As a result of this deliberate indifference, Plaintiffs claim that they have suffered "physical, mental,

---

[4] The Second Amended Class Action Complaint originally included West Virginia Division of Corrections and Rehabilitation as a named Defendant. In Response to the Defendants' Motions for Summary Judgment, Plaintiffs voluntarily dismissed WVDCR as a party to this action. *See* Pl. Baxley's Resp. 1 n.1, ECF No. 302. They are proceeding "solely against Commissioner Betsy Jividen, in her official capacity." *Id.*
[5] The Complaint originally included a third claim that the conditions at Western Regional Jail violated the Eighth and Fourteenth Amendments. Second. Am. Compl. ¶¶ 259–70. On May 22, 2020, the parties submitted a Stipulation of Voluntary of Dismissal of this claim. Stipulation, ECF No. 223.

and emotional injuries, as well as being denied the ability to participate in the daily activities of jail life." *Id.* at ¶ 249. Plaintiffs seek only injunctive relief, and have asked the Court to "require Defendant[] to implement or enforce policies, procedures, and practices necessary to ensure prompt medical and mental health care is provided to all inmates admitted to a jail in West Virginia, and provide the training, equipment and supplies necessary to all relevant employees to ensure those policies and practices are implemented with fidelity." *Id.* at ¶ 250(c).

In Count II, Plaintiffs assert that Defendant's failure to "implement a policy or procedure to provide appropriate medical and mental health services" has violated the Americans with Disabilities Act ("ADA") "through a pattern and practice of discrimination; inadequate and discriminatory methods of state-wide administration and supervision; a continuing pattern and practice of deliberate indifference; and violation of the reasonable accommodation requirement of federal law." *Id.* at ¶ 257; *see* Pl. Baxley's Resp. 21, ECF No. 302 (Plaintiffs "assert that Defendant, through DCR's complete lack of policies, procedures, and oversight, has failed to provide them with reasonable accommodations for their disabilities, and as a result, that Plaintiffs have been excluded from participation in, and denied the benefits of, the services, programs, or activities, of jail life.").

To support their claims, the Named Plaintiffs plead these additional facts: [6]

## A. Plaintiff John Baxley, Jr.

Plaintiff Baxley has been diagnosed with depression, bipolar disorder, paranoid delusional disorder, schizophrenia, seizure disorder, asthma, and substance abuse disorder. Second Am. Compl. ¶ 28. When he entered Western Regional Jail, he informed the jail of his diagnoses, but was placed on suicide watch and taken off his medications, despite the risk of serious withdrawal

---

[6] In addition to the following facts, each of the Named Plaintiffs claim to be "qualified individuals with a disability" under the ADA. Second Am. Compl. ¶¶ 12, 16, 17, 18, 20, 21.

symptoms. *Id.* at ¶¶ 29–32, 35.[7] As a result he claims that he "fe[lt] suicidal and entered a psychotic state" and suffered from other physical side effects. *Id.* at ¶ 35. He reports that at least two more episodes followed where the Defendant failed to provide him with medication. *Id.* at ¶¶ 38, 41–42; Pl. Baxley's Resp. 2–3. Baxley also claims that he had "numerous seizures" in WVDCR custody and was not seen by an outside neurologist. Pl. Baxley's Resp. 3.

## B.  Plaintiff Heather Reed

Plaintiff Reed has multiple diagnoses including bipolar disorder, depression, anxiety, ADHD, type I diabetes, thyroid problems, rheumatoid arthritis, gastritis, and a heart condition. Second Am. Compl. ¶ 156. She takes multiple prescriptions daily, including insulin, Lamictal, Vistaril, Synthroid, Prilosec, Adderall, and a heart medication. *Id.* at ¶ 157. When she was transferred from an Ohio jail to Northern Regional, she claims that she was "denied all medications except her insulin, thyroid medication, and heart medication," even though she believed the medications were transferred to West Virginia with her. *Id.* at ¶¶ 159–60. Reed repeatedly asked to be put back on the medication needed to control her bipolar disorder, but WVDCR denied her requests for several months. *Id.* at ¶¶ 161–62.

Reed also claims that she witnessed a nurse at Tygart Valley mixing her insulins and has been having "episodes of passing out." *Id.* at ¶¶ 164–67. Despite reporting these episodes, Defendant did not conduct any testing or provide other appropriate care. *Id.* at ¶ 168. In response to Defendant's claims that she refused medication, Reed acknowledges that there are times when she has refused her insulin, but she states that she did so because they were offered infrequently or at incorrect times. Pl. Reed's Resp. 3, ECF No. 304.

## C.  Plaintiff Earl Edmondson

---

[7] Baxley also claims that his wife tried to bring medications to the jail but was not permitted to do so. Second Am. Compl. ¶ 30.

Plaintiff Edmondson suffers from Post-Traumatic Stress Disorder, has chronic sinus issues, has a bulging disc in his back, and needs false teeth. Second Am. Compl. ¶¶ 106, 108. He informed the WVDCR of his conditions but was still placed in an overcrowded cell where he was forced to sleep on the floor. *Id.* at ¶ 110. Additionally, Defendant failed to provide him medication for approximately three months to treat his PTSD, causing him to experience "flash backs, panic attacks, severe depression, insomnia, and low energy." *Id.* at ¶¶ 112–13. His sinus infection also remained untreated for approximately three months. *Id.* at ¶ 115.

Moreover, even though he informed the jail that false teeth had already been prepared for him, the jail refused to have his teeth delivered and that his ability to eat has been impaired as a result. *Id.* at ¶ 116. Finally, Edmondson asserts that before his incarceration, he underwent testing for bone cancer and was awaiting results when he was jailed. *Id.* at ¶ 107. He claims that the Defendant has "failed and refused to complete the testing necessary" for this cancer, despite Edmondson's fears that the cancer has progressed. *Id.* at ¶¶ 117–18.

### D.  Plaintiff Danny Spiker, Jr.

Plaintiff Spiker was suicidal when he entered the Defendant's care and that he informed them of the same. *Id.* at ¶¶ 47–48. Nevertheless, WVDCR did not complete a medical intake and instead placed him in holding with multiple other inmates where he had a panic attack and had to be transported to a hospital for evaluation. *Id.* at ¶ 50. When he returned to the jail with a head injury, he was identified as a suicidal inmate, but was not seen by medical professionals. *Id.* at 52–53. Instead, he was unsupervised to the extent that he was able to "pick at his wounds for over three hours" before he was discovered "lying face down on the floor surrounded by a large amount of blood." *Id.* at ¶¶ 54–56. He was again transported to the hospital for bandaging and returned to

the jail where he was restrained for several hours, placed in a "pickle suit,"[8] and put on suicide watch. *Id.* at ¶¶ 57–59.

Despite these events, when a mental health worker finally saw him, no evaluation was done, and he was placed into general population where he attempted suicide. *Id.* at ¶¶ 59–62. After his suicide attempt, Spiker was transferred to a hospital for treatment and then subsequently re-incarcerated as a pretrial detainee in the Defendant's jails. Pl. Spiker's Resp. 4–5, ECF No. 303. Although he claims that he reported the medication the hospital had prescribed him for treatment of his mental illness, Defendant's medical providers halved one of his medications and refused to provide another. *Id.* at 5.

Spiker has attempted suicide numerous times since his return. *Id.* "[R]ather than providing appropriate mental health treatment, DCR has responded to Mr. Spiker's mental health emergencies by spraying him with chemical agents, restraining him in a restraint chair, and placing him in a 'cage' the size of one person." *Id.*

Spiker asserts that he has "repeatedly requested adequate mental health treatment to no avail." *Id.* At the time counsel filed the response to the motion for summary judgment against him, Spiker remained on 24-hour suicide watch without access to a bed, clothing, or the commissary. *Id.* at 6. He "has only been let out of [his] cell just two to three times over a two month period for 'recreation' for around twenty to thirty minutes." *Id.*

**E.  Plaintiff Donna Wells-Wright**

Plaintiff Wells-Wright is a fifty-four year old woman who has emphysema, COPD, hiatal hernia, gastritis, high blood pressure, hypertension, muscle spasms, spinal stenosis, degenerative disc disease, a rare genetic bone deterioration disease, bipolar disorder, and schizoaffective

---

[8] A pickle suit is a green suit that is used to identify suicidal inmates. Second Am. Compl. ¶ 52.

disorder." Pl. Wells-Wright's Resp. 1–2, ECF No. 306; Second. Am. Compl. ¶ 69. She claims that she informed WVDCR of her many health diagnoses and prescribed medications when she entered Northern Regional Jail. Second Am. Compl. ¶¶ 68–70. Even so, she received no medication for the three days. *Id.* at 371–72. She was then transferred to North Central Regional where she once again provided information about her health conditions and prescriptions. *Id.* at ¶ 73. Wells-Wright "placed in a holding cell with approximately sixteen other women for seven days, while undergoing detox." *Id.* at 74.[9] In that cell, she was forced to sleep on the floor without only a blanket for bedding. *Id.* at 75.

Defendant continued to withhold her medications, and once she did start receiving her medications, they were at insufficient dosages to treat her medical conditions. *Id.* at ¶ 76. As a result, "[b]y the time she was moved from the holding cell, she was not able to lift herself up off the floor, and had to be lifted by other people." *Id.* at ¶¶ 77–78. Still, she was not given medical treatment and did not receive inhalers until 15 days after her transfer. *Id.* at ¶ 81.[10] She was soon transferred back to Northern Regional, but her medications were not transported back with her. *Id.* at ¶ 85. Even when her sister delivered the inhalers to Northern Regional, they were withheld for three days. *Id.* at ¶¶ 86–87. Wells-Wright states that she "never received meaningful treatment" for the chronic pain she reported. *Id*. at ¶ 88. Wells-Wright insists that Defendant's failure to maintain records of her conditions, medications, and treatments and failure to transport her medications each time she was transferred caused her to go for "days or weeks" without medication. Pl. Wells-Wright's Resp. at 2–3.

**F. Plaintiff Joshua Hall**

---

[9] Wells-Wright states that she was "detoxing in part from her pain medication, which is prescribed for her multiple chronic conditions." Second Am. Compl. ¶ 74.
[10] Wells-Wright claims that it was her sister, not WVDCR, who supplied her inhalers. Second Am. Compl. ¶ 81.

Plaintiff Hall "has a long history of mental health issues including severe anxiety and substance use disorder," in addition to medical diagnoses of tachycardia and high blood pressure. Second Am. Compl. ¶ 122. Upon his admission to North Central Regional Jail, he informed WVDCR of his diagnoses and the prescriptions he takes to treat his conditions. *Id.* at ¶¶ 121, 123–24. He asserts that he was placed into a crowded holding cell for four days and was not provided any medications. *Id.* at ¶¶ 124–28.

Although he began receiving his medications after he was released from holding, about one month later WVDCR "abruptly" stopped providing him with the medication for his anxiety for approximately twenty days. *Id.* at ¶¶ 128–29. Hall requested to see a psychiatrist many times but did not see one until 72 days after his admission. Pl. Hall's Resp. 3, ECF No. 308.

Hall also claims that medical staff failed to explain to him that his blood work showed extremely high potassium levels, and as a result, he refused secondary testing "assuming that it was a mistake, since he had just had his labs." *Id.* Since this time, he has not been re-evaluated despite the potentially "life-threatening risks" of high potassium levels. *Id.* at 3–4.

## G.  Unnamed Plaintiff R.H.

Plaintiffs assert that R.H., an anonymous inmate with HIV, has been denied his anti-retroviral medications. Second Am. Compl. ¶¶ 171–73. Once the jail started providing him medications, it only provided one of the drugs in his anti-retroviral regimen. *Id.* at ¶ 173. Although he eventually began receiving his needed medications, Plaintiffs claims that after each one-month prescription would run out, "he consistently went about a week without medications before he would begin to receive them again." *Id.* at ¶¶ 175–76.

## II.    LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III.    DISCUSSION

Defendant has moved for summary judgment based on several different arguments. First, she alleges that five of the six Named Plaintiffs should be dismissed based on mootness. Second, Defendant argues that all of the Plaintiffs have failed to exhaust under the Prison Litigation Reform Act. Third, Defendant argues that Plaintiffs have not presented sufficient evidence to support their claim for deliberate indifference in Count I of the Second Amended Complaint. Fourth, she claims that because the regional jails are certified by the National Commission on Correctional Health Care, the Court should conclude as a matter of law that Defendant was not deliberately indifferent under Count I. Fifth, Defendant argues that Count II should be dismissed because Plaintiffs have

not provided sufficient evidence to support their Americans with Disabilities Act claims. Finally, Defendant argues that Count I should be dismissed against WVDCR since it is not a person under Section 1983.[11]

Each argument is addressed in turn.

## A.  Mootness

Article III, section 2 of the United States Constitution limits the authority of the federal judiciary to "cases" and "controversies." To ensure courts are acting within their constitutional authority, the mootness doctrine asks courts to consider whether the issues before them are still "live" and if the parties before them retain a "legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969).

Mootness is often described as "standing set in a time frame." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (quoting Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973)). Generally, it requires that litigants have a personal stake in the litigation from start to finish. *Id.* By dismissing cases for mootness, courts "avoid an unnecessary ruling on the merits." *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 597 (1984) (Blackmun, J., dissenting).

In cases involving prison and jail conditions, courts frequently find that claims are moot when an inmate is released or transferred to a different facility. *See, e.g.*, *Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007) ("Mootness questions often arise in cases involving inmate

---

[11] Because the Plaintiffs dismissed WVDCR as a defendant in this action, the Court will not discuss this argument at length. Section 1983 provides, "[e]very person" who acts under color of law to deprive another of their rights, is liable in an action at law, equity, or other proceeding for redress. 42 U.S.C. § 1983. It is well established that neither the state nor a state agency is a "person" under Section 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Va. Off. for Prot. & Advoc. v. Reinhard*, 405 F.3d 185, 189 (4th Cir. 2005). Accordingly, had Plaintiffs not voluntarily dismissed WVDCR, the Court would have granted summary judgment in favor of WVDCR as to Count I of the Second Amended Complaint (deliberate indifference per Section 1983).

challenges to prison policies or conditions, and courts, including our own, have held that the transfer of an inmate from a unit or location where he is subject to the challenged policy, practice, or condition, to a different unit or location where he is no longer subject to the challenged policy, practice, or condition moots his claims for injunctive and declaratory relief . . ..”); *S.M.B. v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, No. CV 3:17-1300, 2017 WL 4849221 (S.D.W. Va. Oct. 26, 2017) (“In prisoner cases, specifically, . . . a prisoner challenging a specified prison policy [must] have a ‘present interest affected by that policy’ in order to be heard.”) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 148 (1975)).

The judiciary, nonetheless, has recognized a small number of exceptions to the mootness doctrine. In civil cases, courts have applied a mootness exception in cases that are “capable of repetition, yet evading review.” *See, e.g.*, *Murphy v. Hunt*, 455 U.S. 478, 481 (1982). In order for this exception to apply, the plaintiff must show both that the injury is of the type that is likely to happen to the same plaintiff again and that the challenged conduct or activity is too short in duration “to be fully litigated prior to its cessation or expiration.” *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975).

A similar exception applies exclusively to class actions. There are some class action claims that “are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative’s individual interest expires.” *Geraghty*, 445 U.S. at 399 (citing *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)). The “inherently transitory” exception “was developed to address circumstances in which the challenged conduct was effectively unreviewable, because no plaintiff possessed a personal stake in the suit long enough for litigation to run its course.” *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013).

In this case, Defendant moved for summary judgment based on mootness for five of the six remaining Named Plaintiffs. The Court will briefly discuss mootness of the Plaintiffs in two categories (1) Plaintiffs who are still in WVDCR custody and (2) Plaintiffs who have been transferred or released from WVDCR custody.

i.   Plaintiffs in WVDCR Custody

Two Named Plaintiffs in this case are still incarcerated at a West Virginia regional jail facility: Joshua Hall and Danny Spiker, Jr.

1.   *Joshua Hall*

Regarding Plaintiff Hall, Defendant asserts that his claims should be dismissed as moot because his transfer to a prison is "imminent." Def.'s Mot. Summ. J. (Hall) 2, ECF No. 277. Despite this assertion, Plaintiff Hall is in WVDCR custody. He is currently incarcerated at Potomac Highlands Regional Jail, and before a transfer to that facility, he was housed at North Central Regional Jail from October 1, 2019 to February 26, 2020. Huffman Aff. 4, ECF No. 263-1;[12] Hall Dep. 8, ECF No. 277-2; Pl. Hall's Resp. 1. Plaintiff Hall is a convicted inmate who is currently serving a 1–5 year sentence for strangulation. Hall Dep. 8. Defendant suggests that but for the COVID-19 pandemic, Plaintiff Hall would have already been transferred to a prison, mooting his claims. Def.'s Mot. Summ. J. (Hall) 2; Huffman Aff. 4.

Plaintiffs couch this argument as "creative," but without merit. Pl. Hall's Resp. 4. The Court agrees. Although Defendant claims Hall's transfer to a prison is imminent, she provided nothing to support this claim. A vague statement that he is "scheduled for a transfer to a prison," Def.'s Mot. Summ. J. (Hall) 5, is an insufficient basis upon which to dismiss a Plaintiff's claim as moot. As long as Plaintiff Hall remains within the Defendant's custody, he is subject to the policies

---

[12] Jonathan E. Huffman is employed by WVDCR as the Assistant Director for Records and Interstate Compact. Huffman Aff. ¶ 1, ECF No. 263-1.

that the Plaintiffs challenge. Plaintiff Hall's claims were live at the time the Second Amended Class Action Complaint was filed, when the Plaintiffs filed their First and Second Motions for Class Certification, and to the Court's knowledge, to this date.

### 2. Danny Spiker, Jr.

To date no motion has been filed regarding mootness of claims brought by Plaintiff Danny Spiker, Jr. To the Court's knowledge, Spiker is still in WVDCR custody and retains live claims against the Defendant.

### ii. Plaintiffs Who Were Transferred to a State Prison or Released from WVDCR Custody

The four remaining Named Plaintiffs have either been transferred to a state prison or have been altogether released from custody. Defendant argues that the claims of these Plaintiffs are now moot because the Plaintiffs are no longer subject to the policies that they are contesting. *See, e.g.*, Def.'s Mot. Summ. J. (Baxley) 2.

Plaintiffs assert that the inherently transitory exception to mootness applies in this case. Since *Gerstein*, courts have held that in order for the exception to apply, two requirements must be met: (1) "the injury [must] be so transitory that it would likely evade review by becoming moot before the district court can rule on class certification," and (2) "it is certain other class members are suffering the injury." *Wilson v. Gordon*, 822 F.3d 934, 945 (6th Cir. 2016); *Olson v. Brown*, 594 F.3d 577, 582 (7th Cir. 2010); *Genesis Healthcare*, 569 U.S. at 76. The inherently transitory exception is "invariably focused on the fleeting nature of the challenged conduct giving rise to the claim, not on the defendant's litigation strategy." *Genesis Healthcare*, 569 U.S. at 76–77 (citing *Swisher v. Brady*, 438 U.S. 204, 214, n.11 (1978); *Spencer v. Kemna*, 523 U.S. 1, 17–18 (1998)).

If the exception applies, it allows the court's ruling on a motion for class certification to "relate back" to the date the class action complaint was filed. *Id.* at 76; *Stein v. Buccaneer Ltd.*,

772 F.3d 698, 707 (11th Cir. 2014). Accordingly, if the claims are inherently transitory, a plaintiff's claim will be saved so long as he or she had a live claim when the complaint was filed.

Here, the claims brought by the Plaintiffs are the type that would likely evade review by becoming moot before the Court could rule on class certification. *See Genesis Healthcare*, 569 U.S. at 76. Given the nature of WVDCR incarceration, inmates would not likely be able to seek certification before their claims become moot. According to WVDCR's 2018 Annual Report, West Virginia Regional Jails house "both pre-trial defendants and persons sentenced to terms of one year or less." 2018 Ann. Rep. 4, ECF No. 302-15. The jails may also house convicted inmates who are "awaiting transfer to the state correctional system." *Id.* In response to the Plaintiffs' Motion for Class Certification, Defendant noted that the majority of inmates spend less than 13 days in WVDCR custody. Def.'s Resp. Mot. Class Cert. 4 n.3, ECF No. 307. ("Also, it should be noted 65% of inmates in 2018 and 70% of all inmates in 2019 stayed at the regional jail on average for less than 13 days.").

Defendant suggests that the inherently transitory doctrine is inapplicable to this case because the plaintiff class is made up of both pretrial detainees and convicted inmates. *See, e.g.*, Def.'s Reply (Wells-Wright Suppl. Mot.) 7–12, ECF No. 342.[13] Relying on *Ward v. Galdieux*, the Defendant argues that the inherently transitory exception only applies where the plaintiffs cannot estimate how long they will remain in jail. *Id.* at 8 (citing *Ward v. Gladieux*, No. 1:16-CV-43, 2017

---

[13] Defendant presents two other arguments against application of the exception that the Court declines to address at length. First, Defendant argues that the exception is inapplicable because the class should not be certified. *See* Def.'s Reply (Baxley) 3–4, ECF No. 321. Regarding this argument, the Court directs the Defendant to the Court's order on class certification.

Defendant also suggests that Plaintiffs were not diligent in filing their Motions for Class Certification. *See* Def.'s Reply (Wells-Wright Suppl. Mot.) 11–12. The Court wholly rejects this argument. There is no rule in the Fourth Circuit prescribing the timeframe in which a Motion for Class Certification can be filed. More importantly, the Plaintiffs filed their first motion for certification only two months after the Second Amended Complaint was filed.

WL 1954109 (N.D. Ind. May 11, 2017)). In *Ward*, the court found that the "essence of the 'inherently transitory' exception is uncertainty about the length of time a claim will remain alive." *Ward*, 2017 WL 1954109, at *3 (quoting *Moreno v. Napolitano*, No. 11 C 5452, 2012 WL 5995820, at *6 (N.D. Ill. Nov. 30, 2012)). The *Ward* Court determined that the inherently transitory exception did not apply to a mixed class of pretrial and convicted inmates, because the convicted inmates "*can* estimate how long they are going to be imprisoned." *Id.* (emphasis in original).

Although this case involves both pretrial detainees and convicted inmates, the record here shows that the confinement in the regional jails is inherently unpredictable in length for all of the Plaintiffs. Half the Named Plaintiffs—Baxley,[14] Wells-Wright, and Spiker—brought their claims as pretrial detainees who, by the nature of their pretrial status, could not predict how long they would remain in WVDCR custody. *See Gerstein*, 420 U.S. at 110 n.11. ("The length of pretrial custody cannot be ascertained at the outset, and it may be ended at any time by release on recognizance, dismissal of the charges, or a guilty plea, as well as by acquittal or conviction after trial. It is by no means certain that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class.").

The Named Plaintiffs who have been convicted, similarly, could not be expected to estimate how long they would remain in the care of WVDCR. Each of the convicted Plaintiffs— Edmondson, Reed, and Hall—either remained in a regional jail for only a short period of time before being transferred to a prison or is currently slated for transfer in the near future. Edmondson remained at a regional jail for only six months before he was transferred to a prison. Huffman Aff.

---

[14] Although Baxley has since been convicted of a crime, he was a pretrial detainee when he filed his complaint. *See* Def.'s Mot. Summ. J. (Baxley) 3 ("Mr. Baxley was in jail *facing charges* . . .."). Baxley was not convicted until January 2, 2020. Pl. Baxley's Resp. 22 n.18. Notably, even if the Court is to consider Baxley a convicted inmate, as Defendant suggests it should, Baxley was transferred to a prison soon after his conviction, again highlighting the short and unpredictable nature of post-trial incarceration at the regional jails. *See* Huffman Aff. 3.

4. Reed was incarcerated at two different regional jails for only three to five months each before she was transferred to a prison. *Id*. Hall had only been in custody for approximately four months when the Plaintiffs first moved for class certification. *Id.* Most persuasively, Defendant's own motion suggests that if not for the COVID-19 pandemic, Hall, as a convicted inmate, would have be transferred out of the jail system. Def.'s Mot. Summ. J. (Hall) 2.

The length of detention at the WVDCR's jails "generally cannot be determined at the outset and is subject to a number of unpredictable factors, thereby making it inherently transitory." *Olson*, 594 F.3d at 582. The frequent transfers and short periods of incarceration in the instant case, in conjunction with the Defendant's policy of only housing convicted inmates for short periods of time, make it extremely unlikely—if not almost impossible—for any inmate to challenge the conditions of his or her confinement before the claim becomes moot. This is precisely the type situation for which the inherently transitory exception exists. *See Genesis Healthcare*, 569 U.S. at 76.

Additionally, Plaintiffs have established that "the constant existence of a class of persons suffering the deprivation is certain." *See Gerstein*, 420 U.S. at 110 n.11. This can be seen by looking at WVDCR's own reported numbers. According to WVDCR's 2019 Annual Report, the regional jails admitted 47,051 inmates and released 44,696 inmates in 2019. 2019 Ann. Rep. 4, ECF No. 302-14. The class of persons incarcerated is ever changing but ever present. Each newly admitted inmate is subjected to the health care policies that the Plaintiffs are seeking to challenge in this case.

Having determined that the claims are inherently transitory because they would likely evade review before a trial court could rule on a motion for class certification and that a continuing class of individuals is allegedly subject to the policies the plaintiffs seek to challenge, the Court

must determine whether the Plaintiffs had live claims when the class action complaint was filed. *See Stein*, 772 F.3d at 707. Each Plaintiff is discussed individually.

### 1. *John Baxley, Jr.*

Plaintiff Baxley was admitted to WVDCR custody sometime between August 14, 2018 and August 16, 2018.[15] Baxley was admitted to Western Regional jail as a pretrial detainee. Def.'s Mot. Summ. J. (Baxley) 3. He filed a personal complaint on December 18, 2018, challenging the conditions at Western Regional Jail. Compl., ECF No. 1. That complaint was eventually consolidated with others as this class action. During the pendency of this litigation, Baxley was convicted of robbery. Huffman Aff. 3. He remained in WVDCR custody until March 11, 2020, when he was transferred to Salem Correctional Center, a medium security prison. *Id.*

The Court finds that Baxley had a live claim when the First Amended Class Action Complaint was filed on April 25, 2019, and when the Second Amended Class Action Complaint was filed on December 19, 2019. *See* First Am. Compl., ECF No. 18; Second Am. Compl. The Court also finds that he retained a live claim when the Plaintiffs filed their first Motion for Class Certification on February 3, 2020. *See* Prelim. Mot., ECF No. 88. Accordingly, his claims are not moot under the class action inherently transitory exception.

### 2. *Earl Edmondson*

Plaintiff Edmondson was admitted to Northern Regional Jail on July 15, 2019. Second Am. Compl. ¶ 109; Huffman Aff. 4. Edmondson remained at Northern Regional until January 17, 2020, when he was transferred to a prison. Huffman Aff. 4. The Court finds that Edmondson was in

---

[15] The exact date of Baxley's admission is contested by the parties. Second Am. Compl. ¶ 27 (August 15, 2018); Def.'s Mem. Supp. (Baxley) 1, ECF No. 265 (August 16, 2018); Pl. Baxley's Resp. 2 n.3 (August 14, 2018); Def.'s Reply (Baxley) 1 n.1 (August 15, 2018). The Court finds the exact date of Baxley's arrival is not significant.

WVDCR custody on December 19, 2019, when the Second Amended Class Action Complaint was filed. Therefore, his claims are not moot under the inherently transitory exception.

### 3. Heather Reed

Plaintiff Reed entered WVDCR custody at Northern Regional Jail as a convicted inmate on April 10, 2019. Huffman Aff. 3. On July 29, 2019, she was transferred to Tygart Valley Regional Jail where she remained until November 20, 2019. *Id.* On November 20, 2019, Reed was transferred to Lakin Correctional Center to serve the remainder of her sentence. *Id.* Although Reed was not in the Defendant's custody when the Second Amended Class Action Complaint was filed, she was in custody when the First Amended Class Action Complaint was filed on April 25, 2019. *See* First Am. Compl. While Reed was not named in the First Amended Class Action Complaint, she was undoubtedly an unnamed class member and was subject to the policies that the Plaintiffs are challenging. Moreover, according to the facts plead by Reed, by the time the First Amended Complaint was filed, she was being denied the medications she was prescribed to treat her mental illness. Second Am. Compl. ¶¶ 158–70. The Court is satisfied that her claims are saved by the inherently transitory exception.

### 4. Donna Wells-Wright

Plaintiff Donna Wells-Wright was admitted to Northern Regional Jail on August 25, 2019. *Id.* at ¶ 68. From the various memoranda provided by the parties, the Court was able to deduce the following timeline. Wells-Wright was initially incarcerated from August 25, 2019 until November 2019. *Id.* at ¶¶ 18, 68. She was then reincarcerated on January 7, 2020 until March 2020, when she was released for a second time. Def.'s Suppl. Mot. Summ. J. 1. Finally, she was rearrested and detained for a third time from June 26, 2020 until July 29, 2020. *Id.* at 1–2.

The Defendant submits that the inherently transitory exception does not apply to Wells-Wright because she had already been released from custody when the Second Amended Complaint was filed. Def.'s Reply (Wells-Wright Suppl.) 4–5. It is undeniable that the exception "cannot salvage a suit that was never justiciable to begin with." *Gomez v. Trump*, No. 20-CV-01419 (APM), 2020 WL 3429786, at *10 (D.D.C. June 23, 2020) (citing *J.D. v. Azar*, 925 F.3d 1291, 1308, 1310 (D.C. Cir. 2019)). The Court finds, however, that it does not need to relate Wells-Wright's claims back to the class complaint; her claims were live when both of the Plaintiffs' Motions for Class Certification were filed on February 2, 2020 and July 17, 2020.

Generally, the inherently transitory exception preserves claims that would otherwise be moot by relating the motion for class certification back to the Amended Complaint. *See Stein*, 772 F.3d at 707. The purpose behind the exception is similarly served by retaining claims that would otherwise be moot but were live at the time the motion for class certification was filed. Having found that the nature of the claims is inherently transitory, it is clear to the Court that even if Wells-Wright was not in custody when the Second Amended Complaint was filed, she was certainly incarcerated at WVDCR jails after litigation in this case started, she was subject to the same policies the Plaintiffs challenge, and she was undoubtedly an unnamed class member whose claims could have been added at any time by the Plaintiffs. It is not as though she never had a justiciable claim. Instead, because of the inherently transitory nature of her pretrial incarceration, she was released before the Court could certify the instant class. Accordingly, Well-Wright's claims are not moot, and she may proceed as a Named Plaintiff.

iii.   Conclusion Regarding Mootness

Accordingly, the Court denies Defendant's motion for summary judgment against Plaintiffs based on mootness.

### B.  Failure to Exhaust

i.  <u>The Prison Litigation Reform Act</u>

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Failure to exhaust "is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) (citing *Jones v. Bock*, 549 U.S. 199, 212–13 (2007)). However, if a defendant makes "a threshold showing of failure to exhaust, the burden of showing that administrative remedies were unavailable falls to the plaintiff." *Creel v. Hudson*, No. 2:14-cv-10648, 2017 WL 4004579, at *4 (S.D.W. Va. Sept. 12, 2017).

ii.  <u>WVDCR Grievance Process</u>

While it is the PLRA that requires exhaustion, prisons and jails establish the actual exhaustion process. *See Jones*, 549 U.S. at 218; *Woodford v. Ngo*, 548 U.S. 81, 95 (2006) (noting that "proper exhaustion" only occurs when "the grievant complies with the system's critical procedural rules"). The West Virginia Code provides that the Commissioner of WVDCR and the Executive Director of the Regional Jail Authority "are authorized to establish procedures for ordinary administrative remedies according to their respective authority for issuance of policies governing the conduct of inmates." W. Va. Code § 25-1A-2(b).

Defendant states that WVDCR's grievance process is set forth in its "Inmate Handbook" ("Handbook"). *See* Def.'s Mem. Supp. (Baxley) 8. According to the Defendant, "[u]nder Grievance Procedures outlined in the Inmate Handbook, an inmate may file a grievance to an Administrator and, if unsatisfied by the response, the inmate may appeal to the Chief of Operations.

Again, if the inmate is not satisfied with the response received or does not receive a timely response, a third level of administrative oversight is included in the policy: an appeal to the Commissioner of DCR." *Id.* at 8–9.

The grievance process as listed in the Handbook provides:

Any inmate may file a grievance if they believe they have a serious complaint or a significant problem. The following grievance procedure shall be used:
1) If an inmate wishes to use the grievance procedure, jail personnel will provide the inmate with an inmate grievance form.
2) The inmate shall complete the form, addressed to the Administrator; the form, as completed by the inmate shall be transmitted to the Administrator's office by jail personnel without being read or altered and within a reasonable time, not later than the end of the shift.
3) The Administrator upon receipt of the grievance may reject the grievance if it appears on its face to have been filed in bad faith.
4) The Administrator, if the grievance is not rejected pursuant to Paragraph 3, shall provide the inmate an opportunity to be heard before a decision is made on the grievance. The Administrator may assign a staff member to investigate the complaint and report written findings within forty-eight hours and shall inform the inmate of such action.
5) The Administrator shall provide a written decision with regard to the grievance to the grieving inmate within twenty-four (24) hours of the receipt of the investigation report. Such written decision shall include a statement of the action taken concerning the grievance, the reasons for such action, and procedures for appeal of the decision.

Inmate Handbook, 5–6, ECF No. 263-4. The Handbook further provides:

1) An inmate, dissatisfied with the Administrator's decision, may appeal such decision to the Chief of Operations. Such appeal must be filed, in writing, within five days of the receipt of the Administrator's decision and must include a copy of the initial complaint and the Administrator's decision to the inmate within five days of receipt of all information relating to the grievance, excluding weekends and holidays.
2) Inmate appeals and grievances shall be mailed in accordance with procedures applying to legal correspondence.
3) Reasonable amounts of postage will be provided to indigent inmates who wish to mail a grievance to the Chief of Operations; whenever possible, such appeals may be included in the interdepartmental mail sent to the Central Office by the jail.
4) Within five (5) days of receipt of the Level Two Decision, an inmate may request a review of the office of the Executive Director. The inmate must mail copies of the original Complaint and copies of all responses to the office of the

Executive Director, Regional Jail Authority.

*Id.* at 6.

### iii.   Availability of Grievance Process

The text of the PLRA makes clear that exhaustion is only required to the extent that administrative remedies are actually available to an inmate. The availability of administrative remedies under the PLRA and exhaustion itself are both questions of law. *See Ray v. Kertes*, 130 F. App'x 541, 543–44 (3d Cir. 2005); *Ballenger v. Hill*, No. 3:15-CV-12558, 2018 WL 4655709, at *3 (S.D.W. Va. Sept. 27, 2018). Accordingly, any disputes of facts regarding exhaustion will be resolved by the Court.

Determining what administrative remedies or procedures are available requires courts to look beyond what procedures are "on the books." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). The procedure provided must be "capable of use to obtain relief." *Id.* An administrative procedure is not considered "available" if (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation." *Id.* at 1859–60.

Defendant moved to dismiss each of the Named Plaintiffs in this action for failure to exhaust. Defendant claims that the grievance procedure was available to each Plaintiff. Plaintiffs, however, have provided evidence that suggests the procedure was not truly available. *See* Pl. Baxley's Resp. 9–19.

### *1.  Defendant's Arguments Regarding Failure to Exhaust*

#### a)  Baxley

According to Defendant, Plaintiff Baxley filed 46 grievances on jail kiosks and 11 handwritten grievances during his time in the regional jails. Def.'s Mem. Supp. (Baxley) 10. She claims that none of the grievances filed pertained to Baxley's requests for relief in this case. *Id.* She also asserts that his use of the grievance system for other matters demonstrates that the grievance process was "available" to him. *Id.*

b) Reed

Defendant concedes that Plaintiff Reed filed grievances relating to her diabetes, medications, and clothing issues, but claims that Reed failed to exhaust her administrative remedies because she did not appeal any of the grievances. Def.'s Mem. Supp. (Reed) 9, ECF No. 268. Defendant suggests the process was available to Reed because she viewed the Handbook on the kiosk, "at least once." *Id.* at 10.

c) Edmondson

Defendant argues that Plaintiff Edmondson filed approximately 119 grievances, but that he did not appropriately appeal them. Def.'s Mem. Supp. (Edmondson) 9–10, ECF No. 270 (citing Edmondson Dep. 12, ECF No. 292-2). According to the Defendant, Edmondson's deposition testimony revealed that he was "aware of the 'appeal button'" and knew what the word "appeal" meant, therefore making the process was available to him. *Id.* at 10.

d) Spiker

Defendant says Spiker failed to file any grievances related to his medical care or his disability before this suit began, even though he filed what she considers to be an unrelated grievance. Def.'s Mem. Supp. (Spiker) 9, ECF No. 272. Defendant further states that Spiker did not appeal any grievances, even though he admitted he was aware of the appeal process. *Id.* (citing Spiker Dep. 56, ECF No. 271-3). Finally, she argues that the process was available to Spiker

because he was shown the kiosk and the Handbook, which provides the method for exhaustion, at orientation. *Id.*

### e)   Wells-Wright

Defendant asserts that Plaintiff Wells-Wright filed at least 21 grievances but that she never appealed any of them. Def.'s Mem. Supp. (Wells-Wright) 9, ECF No. 274. Defendant also notes that Wells-Wright admitted she knew about the Handbook, including its grievance instructions, and that she "understood how to file an appeal." *Id*. (citing Wells-Wright Dep. 54, 58, ECF No. 273-1).

### f)   Hall

Defendant claims that Hall did not file any grievances related to this case. Def.'s Mem. Supp. (Hall) 9, ECF No. 278. Additionally, Hall admitted he had a "'general idea' that he could do an inquiry or grievance using the kiosk system." *Id.* (citing Hall Dep. 39–40, ECF No. 277-2). Defendant also provided evidence that Hall viewed the Inmate Handbook at least once. *Id.* (citing Kiosk Log, ECF No. 277-4).

### 2.   *Plaintiffs' Arguments Regarding Exhaustion: General Unavailability*

Plaintiffs argue that the process described by the Defendant in her Motions for Summary Judgment and in the WVDCR's Inmate Handbook is not the actual process the Defendant expects inmates to follow. The "on the books" procedure requires inmates to request a written form, fill it out, and give it to a jail personnel who will transmit it to an "Administrator." *See* Pl. Baxley's Resp. 11. In reality, there is no one with the title of "Administrator," and inmate grievances must be completed on electronic kiosks. *Id.* The written procedure further indicates that inmates will be given an opportunity to be heard before a decision is made regarding the grievance. Plaintiffs maintain that even when inmates are taught, or are otherwise able to deduce, the "correct"

procedure for filing a grievance, no such opportunity to be heard is provided. *Id.* Moreover, they note that the Defendant failed to comply with WVDCR's own grievance timeline, which guarantees that an inmate will receive a written decision within 72 hours of filing a grievance (as 48 hours are permitted for investigation, plus an additional 24 hours for the "Administrator" to make a decision). *Id.* at 11–12. Additionally, the procedure specifically states that the inmate will be told the reasons for the actions taken and the "procedures for appeal of the decision." *Id.* at 12. Plaintiffs declare that neither occurs. *Id.* Finally, Plaintiffs argue that the grievance procedure is "not understandable by anyone, let alone inmates." *Id.*[16]

3. *Plaintiffs' Arguments Regarding Exhaustion: Unavailability as to Each Named Plaintiff*

a)  Baxley

Baxley testified that he was not informed about the grievance process when he was admitted to Western Regional. Baxley Dep. 69, ECF No. 302-16.[17] When questioned about his familiarity with the grievance process, Baxley attested on May 29, 2020, that he only "recently" learned how to use it. *Id.* at 43. Baxley further testified that when he did file requests and grievances, he had others help him and that he was not aware of the appeals process. *Id.* at 45–46, 54–55, 62–64, 65–70. When questioned about whether he read the handbook, he insisted that he has "a reading disorder and spelling disorder." *Id.* at 71.

Baxley also testified that the kiosk system was rarely available to him when he was in segregation. *Id.* at 45–46, 69 (testifying that there was only one "hole" with a kiosk in it and that

---

[16] To this end, Plaintiffs cited conflicting testimony of jail employees. *See, e.g.*, Straughan Dep. 39, ECF No. 302-5 (testifying that inmates can only have "so many" grievances open and that they have to "empty them out" to use the grievance procedure); Wood Dep. 63, ECF No. 302-26 (inmates "can files as many grievances and have as many open grievances as they want.").

[17]       Q. Okay. You don't think you ever read anything -- you didn't go through any orientation in August of '18 when you came in about the kiosks.
          A. No.

kiosks were turned off when he was in segregation). When counsel for Defendant asked him about the availability of paper grievances while he was in segregation, Baxley stated that corrections staff would simply throw the forms away. *Id.* at 49–50.

b) Reed

Plaintiff Reed insists that she has intellectual disabilities and has trouble reading and writing. Pl. Reed's Resp. 4. She testified that she did not know how to file a grievance or what the word "appeal" means. Reed Dep. 74, 133–34, ECF No. 302-17.[18] Reed also testified that while she had others help her file grievances at times, she often verbally told medical staff her complaints. *See id.* at 78, 80, 134.

c) Edmondson

Plaintiff Edmondson claims that in addition to filing grievances, he "attempted to appeal some, but received no instruction on the appeal process." Pl. Edmondson's Resp. 3–4, ECF No. 305. During his deposition, he agreed that he could read the word "appeal" and that he knew what it meant, but he said that nothing happened when he pressed the appeal button on the kiosk. Edmondson Dep. 102, ECF No. 302-18. Additionally, Edmondson claims that his grievance history shows that some grievances were closed by someone else, rendering them unappealable. Pl. Edmondson's Resp. 10 (citing Edmondson Grievances 8, 21, 23, ECF No. 269-3).

d) Spiker

Plaintiff Spiker maintains that he did not have access to the kiosks in segregation (the first week he was incarcerated), and that even when he had access to a kiosk, he was not taught how to grieve. Pl. Spiker's Resp. 8–9. Additionally, although Defendant claims that Spiker did not file

---

[18] Defendant attempts to rebut Reed's claims of illiteracy by noting that she was able to read the word "appeal" during her deposition. Def.'s Mem. Supp. (Reed) 10, ECF No. 268. Defendant does not address Reed's claim that she does not know what the word meant.

any grievance related to his claims against the Defendant, the allegedly unrelated grievance specifically stated that Spiker was having "mental health issues" and needed help. *Id.* at 17; Spiker Grievances 2, ECF No. 271-2.

While he did not appeal that grievance, the records indicate that the grievance was closed by Superintendent Lanham a mere two seconds after it was accepted. Spiker Grievances 2. Spiker also suggests that "[e]ven if [he] had been given the opportunity to appeal his grievance, the appeal would have been to the same person who initially responded, the Superintendent, such that the original grievance served 'as his appeal that was acted upon.'" Pl. Spiker's Resp. 12 (quoting *Ray v. Attao*, No. 1:18-CV-00017, 2018 WL 6837746, at *8 (D. N. Mar. I. Dec. 31, 2018)).

e) Wells-Wright

Plaintiff Wells-Wright states that there is sufficient evidence to suggest she "strived to learn the grievance process." Pl. Wells-Wright's Resp. 4. Her grievance history shows that she sought instructions on how to appeal from the kiosk when she was unable to figure it out on her own. *See* Wells-Wright Grievances, ECF No. 273-2. Grievances filed by Well-Wright include the following:

> I AM FILING AN APPEAL GRIEVANCE IN RE: LACK OF MEDICAL CARE. WHAT IS THE PROPER PROCEEDURE?

*Id.* at 14.

> HAVE ASKED FOR GRIEVENCE APPEAL FORMS BUT HAVE RECEIVED NONE. I HAVE FIVE DAYS TO APPEAL AND IT HAS ALREADY BEEN 4 DAYS. IT MUST BE A HANDWRITTEN APPEAL TO THE CHIEF OF OPERATIONS. I'M INDIGENT AND I'M SUPPOSED TO BE PROVIDED WITH THE FORM, PEN, ENVELOPE AND POSTAGE ACCORDING TO THE INMATE HANDBOOK….

*Id.* at 17.

> I'VE ASK THE ROVERS REPEATEDLY FOR GRIEVENCE APPEAL FORMS AND I'M YET TO GET ANYTHING.

*Id.* at 18. Wells-Wright was eventually told "You can write a grievance right here for it to be reviewed by the appropriate staff." *Id.* at 18. Based on this instruction, Wells-Wright states that she continued to file grievances rather than appeals. Pl. Wells-Wright's Resp. 5.

   f)   Hall

Plaintiff Hall claims that he was never taught how to file grievances and that he did not have an opportunity to file them while he was in holding. Pl. Hall's Resp. 7. Regarding Defendant's claim that he viewed the Handbook, Hall states that he did not truly view the Handbook but was instead told to "skip through the handbook and go straight to the video so you can get done with it." *Id.*; Hall Dep. 20, ECF No. 302-20.

Additionally, although he did not file grievances, he testified that that he repeatedly requested to see a psychiatrist. Pl. Hall's Resp. 7 (citing Hall Dep. 16–17). Eventually, another inmate showed him how to file something on the kiosk system, and he filed an "inquiry" stating, "I need to see the psyc doctor." *Id.* at 2, 8 (quoting Hall Inquiry, ECF No. 302-23). In response, he was told to fill out a nurse sick call. *Id.* He maintains that there was no option to appeal. *Id.* 10. Finally, Hall also testified that he did not know the difference between an inquiry and a grievance, and that he did not know about the appeals process. Hall Dep. 20–21.

   iv.   <u>Analysis</u>

Even assuming that the Defendant has made a threshold showing of failure to exhaust and that the Plaintiffs bear the burden of showing the process was "unavailable," *see Creel*, 2017 WL 4004579, at *4, Plaintiffs have met that burden. The Court is not persuaded by Defendant's argument that the Plaintiffs should, or even could, have complied with the grievance procedure laid out in the Inmate Handbook. *See Ross*, 136 S. Ct. at 1859 ("When rules are so confusing that no reasonable prisoner can use them, then they're no longer available.") (internal quotation marks

and citations omitted).

There is simply no way that an "ordinary prisoner can discern or navigate" the Defendant's grievance process. *See id.* at 1850. Evidence presented by Plaintiffs establishes that the system is not navigable. Plaintiffs testified that they were not instructed on how to grieve. Instead, the Defendant expected them to learn how to use the grievance procedure using the Inmate Handbook.[19] If the inmates were able to access and read the Handbook, however, they would learn about a process that is entirely different from the one that the Defendant expected them to follow. This, on its own, is likely sufficient to make the process "unavailable" under *Ross. See Ray v. Attao*, No. 1:18-CV-00017, 2018 WL 6837746 (D. N. Mar. I. Dec. 31, 2018) (finding process unavailable when it referenced officials that did not exist, there was no evidence inmates were given instructions on how to use the procedure, and the appellate procedure was not explained to inmates); *Albino v. Baca*, 747 F.3d 1162, 1175–76 (9th Cir. 2014) (finding administrative remedies not available when plaintiff testified he was not informed of complaint process, did not have access to manual that described the process, and frequently sought help from staff).

Still, additional barriers existed. Although WVDCR's procedure ostensibly requires inmates to appeal denials,[20] the written procedure specifically states that inmates will be provided with the "procedures for appeal." Inmate Handbook 6. Despite this, no such instructions were

---

[19] For example, in Defendant's Memorandum of Law in Support of Motion for Summary Judgment as to Heather Reed, Defendant implies that the grievance process is available because it is "outlined in the Inmate Handbook," and suggests that the process cannot be considered "unavailable" because Reed accessed the Handbook "at least once." Def.'s Mem. Supp. (Reed) 10.

[20] The Court does not see how the procedure as written could be read to *require* the first or second appeals. The written procedure plainly states that inmates *may* appeal unfavorable decisions:

> An inmate, dissatisfied with the Administrator's decision, *may* appeal such decision to the Chief of Operations.
> …
> Within five (5) days of receipt of the Level Two Decision, an inmate *may* request a review of the office of the Executive Director.

Inmate Handbook 6 (emphasis added).

provided.[21] *See Williams v. Marshall*, 319 F. App'x 764, 768 (11th Cir. 2008) (finding process may not be available when the grievance form did not explain exhaustion process and when it was not clear that plaintiff was aware he "could or should appeal" an unfavorable decision).

The unavailability of the process is supported by Plaintiffs' claims that they were instructed not to file grievances,[22] were told their concerns would be taken care without use of the grievance procedure,[23] or were explicitly told that their concerns were non-grievable.[24] Moreover, the record shows that grievances were regularly closed by someone other than the Plaintiff, apparently leaving them unappealable.[25]

It is unlikely that any inmate or detainee could have followed the grievance procedure to the Defendant's satisfaction. So unlikely in fact, that of the approximately 5,034 grievances[26] filed on the electronic kiosks, Plaintiffs claim that during the discovery process Defendant was only able to produce ten separate appeals. Pl. Baxley Resp. 15. Significantly, two of these were appealed through counsel, two were handwritten letters claiming that kiosks and paper grievance forms were unavailable, two were from inmates at prisons (not the regional jails), and the remaining four were (1) an appeal of a disciplinary action, (2) a Prison Rape Elimination Act complaint, (3) an administrative segregation appeal, and (4) a letter requesting access to the law library. *Id.* The Court finds it doubtful that none of the inmates who filed the remaining 5,024 grievances would

---

[21] The Court is particularly surprised that the Defendant alleged Wells-Wright failed to exhaust her remedies based on a failure to appeal, when the record indicates she repeatedly asked for instructions and/or forms to effectuate an appeal.

[22] *See, e.g.,* Edmondson Grievances 18, 23, 25, 28 (Edmondson told to file medical grievance as "sick call" or "inquiry").

[23] Reed testified that when she told medical staff that she could not read or spell, they said "Okay. I've gotcha. You don't have to do it. We'll put it in for you." Reed Dep. 48.

[24] When Well-Wright filed a medical grievance, she was told "You need to enter this as a sick call not a grievance." Wells-Wright Grievances, 20.

[25] *See, e.g.,* Reed Grievances, 2, 3, 4, 5, 6, 7, 8, 10 (examples of grievances filed by Plaintiff Reed that were closed by others). The Court notes that this occurred with grievances filed by multiple Plaintiffs and has only cited to a sampling from Plaintiff Reed's grievances.

[26] According to an interrogatory answered by the Defendant. Def.'s Answer Third Set of Interrog. 4–5, ECF No. 264-13.

have wanted to file an appeal. It seems much more likely that they just were not aware the process existed or were discouraged from appealing. As such, the Court finds the Defendant's exhaustion procedure was simply unavailable. *See Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1115–17 (M.D. Ala. 2016) (finding administrative procedure was unavailable when the written procedure was unclear and when "even those who run it cannot manage to accurately and consistently describe how it works."). Consequently, the Court denies the Defendant's motions for summary judgment against the Named Plaintiffs based on failure to exhaust under the PLRA.

## C.  Failure to State a Claim – Section 1983 Claim of Deliberate Indifference

Our "Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations and quotation marks omitted). Undeniably, incarcerated persons have no choice but to surrender "[m]any of the liberties and privileges enjoyed by other citizens." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). Still, when individuals are jailed by their government, they must rely on it to meet their basic needs.

The Eighth Amendment of the United States Constitution prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This "Amendment proscribes more than physically barbarous punishments." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). The cruelty prohibited by the Eighth Amendment is defined by "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958); *Estelle*, 429 U.S. at 102.

While the Eighth Amendment provides that convicted persons may not be subjected to cruel and unusual punishment, a "detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Pretrial detainees

have not been convicted, yet so long as sufficient cause of their arrest and detention has been established, they may be detained and subjected "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536–37.

Since *Bell*, the Supreme Court has not provided much guidance as to the standards that govern the conditions of pretrial detention beyond noting that due process requires arrestees be given protections "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Accordingly, since the early 1990s, this Circuit has held that the Eighth Amendment's deliberate indifference standard also applies to inadequate medical care claims brought by pretrial detainees under the due process clause of the Fourteenth Amendment. *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992).

More recently, however, the Supreme Court has "cast doubt on the viability of this rigorous test as applied to those not yet tried or convicted of any crime." *Seth v. McDonough*, 461 F. Supp. 3d 242, 259 (D. Md. 2020). In *Kingsley v. Hendrickson*, the Court decided an excessive force case brought under the Fourteenth Amendment. 576 U.S. 389 (2015). It held that the plaintiff detainee did not have to show the defendant officer acted with subjective intent. *Id.* at 391. The Court cited *Bell* for the proposition that pretrial detainees can prevail on Due Process claims "by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 398.

Plaintiffs in this case argue that *Kingsley* commands this Court to apply only the objective prong of the deliberate indifference analysis to the claims of the Named Plaintiffs who are detainees. *See* Pl. Baxley's Resp. 22. Defendant, on the other hand, submits that *Hill* is still the Fourth Circuit standard for inadequate medical care claims. Def.'s Reply (Baxley) 12.

The Court recognizes that many other courts have analyzed *Kingsley* and its application to deliberate indifference claims brought by pretrial detainees and come to differing conclusions. *See Seth*, 461 F. Supp. 3d at 259–60; *compare Miranda v. Cty. of Lake*, 900 F.3d 335, 351–52 (7th Cir. 2018) ("[M]edical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*."), *and Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018) ("While *Kingsley* did not necessarily answer the broader question of whether the objective standard applies to all Section 1983 claims brought under the Fourteenth Amendment against individual defendants, logic dictates extending the objective deliberative indifference standard . . . to medical care claims.") (internal quotation marks and citations omitted), *with Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (finding *Kingsley* does not change the Eighth Circuit's standard for deliberate indifference), *and Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (noting that *Kingsley* does not abrogate or conflict with the Eleventh Circuit's deliberate indifference standard).

*Bell* and *Kingsley* surely emphasize the notion that the "Eighth Amendment and Due Process analyses are not coextensive." *Miranda*, 900 F.3d at 352. Logic indeed suggests that *Kingsley*'s reasoning extends to deliberate indifference claims brought by pretrial detainees. *See Gordon*, 888 F.3d at 1124. Nevertheless, the Court finds that it need not make that determination today, as the Plaintiffs have sufficiently stated a claim under the Eighth Amendment deliberate indifference standard. Accordingly, the following analysis applies the Eighth Amendment standard to all of the Plaintiffs' claims.

The Eighth Amendment of the United States Constitution is violated when a corrections official is deliberately indifferent "to a substantial risk of serious harm to an inmate." *Farmer*, 511

U.S. at 828. To state a Section 1983 claim for deliberate indifference under this Amendment, a plaintiff must satisfy a two-prong test showing (1) the injury or deprivation was "objectively, 'sufficiently serious'" and (2) the official has acted with "'deliberate indifference' to inmate health or safety." *Id.* at 834. "Deliberate indifference" under the Eighth Amendment "require[es] a showing that the official was subjectively aware of the risk" of serious harm. *Id.* at 829. Courts often refer to these as the "objective" and "subjective" prongs of deliberate indifference. *See, e.g.*, *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

In this case, the Defendant asserts three different arguments suggesting Plaintiffs have failed to state a claim for deliberate indifference: (1) Plaintiffs have failed to satisfy the objective prong of the deliberate indifference analysis; (2) Plaintiffs have failed to satisfy the subjective prong of the analysis; and (3) WVDCR's accreditation by the National Commission on Correctional Health Care ("NCCHC") precludes a finding of deliberate indifference. *See, e.g.*, Def.'s Mot. Summ. J. (Baxley) 3. Each of these arguments are addressed in turn.

   i.   Objective Prong

Under the objective prong, a deprivation is sufficiently serious if it is "extreme." *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511 U.S. at 834). A deprivation is extreme if it presents "a serious or significant physical or emotional injury resulting from the challenged conditions," or it "demonstrate[s] a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citations omitted). In inadequate medical care cases, the Fourth Circuit has "require[d] plaintiffs to demonstrate officials' deliberate indifference to a 'serious' medical need that has either 'been diagnosed by a physician as mandating treatment or . . . is so obvious that

-34-

even a lay person would easily recognize the necessity for a doctor's attention.'" *Scinto*, 841 F.3d at 225 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

Defendant asserts that each of the Named Plaintiffs have failed to produce sufficient evidence to support their claims of deliberate indifference. However, because Plaintiffs challenge "systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and ill prisoners . . . to 'substantial risk of serious harm,'" the Court need not consider whether each of the individual Plaintiffs' claims result in a constitutional violation. *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011) ("Because plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay—or any other particular deficiency in medical care complained of by the plaintiffs—would violate the Constitution under *Estelle v. Gamble* if considered in isolation.") (internal citation omitted).

Consistent with *Brown*, courts across the country have recognized that "[i]n institutional level challenges to prison health care[,] . . . systemic deficiencies can provide the basis for a finding of deliberate indifference." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *see, e.g.*, *Postawko v. Mo. Dep't of Corr.*, No. 2:16-CV-04219-NKL, 2017 WL 3185155 (W.D. Mo. July 26, 2017), *aff'd,* 910 F.3d 1030 (8th Cir. 2018); *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1123 (M.D. Ala. 2016). In cases challenging the policies of jails and prisons, "[d]eliberate indifference to inmates' health needs may be shown, for example, by proving that there are 'such systemic and gross deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care.'" *Harris*, 941 F.2d at 1505 (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

Plaintiffs challenging systemic deficiencies need to show "they have been subjected to the harmful policies and practices at issue, not (necessarily) that they have already been harmed by these policies and practices." *Dunn*, 219 F. Supp. 3d at 1123; *Parson v. Ryan*, 289 F.R.D. 513, 521 (D. Ariz. 2013), *aff'd* 754 F.3d 657 (9th Cir. 2014) (holding that a plaintiff seeking injunctive relief "need not wait until he suffers an actual injury because the constitutional injury *is* the exposure to the risk of harm.") (emphasis in original).

It is well established that "a prisoner's mere preference for a different treatment over the one that was provided is insufficient to establish an Eighth Amendment violation." *Dunn*, 219 F. Supp. 3d at 1124. But Plaintiffs have provided much more. "Repeated examples of delayed or denied medical care may indicate a deliberate indifference by prison authorities to the suffering that results." *Rogers v. Evans*, 792 F.2d 1052, 1059 (11th Cir. 1986).

All of the Named Plaintiffs claim they have serious medical and/or mental health diagnoses that they reported when they arrived at the relevant regional jail. Each of the Named Plaintiffs reports that the Defendant failed to provide necessary medical treatment in a timely manner. Notably, all of the Plaintiffs claim that jails failed to provide the Plaintiffs with necessary medication, for periods of time ranging from days to months. Even if it were the case that each of the Named Plaintiffs could not establish deliberate indifference on their own, their evidence supports a viable claim that there are systemic deficiencies in the mental and medical health care provided to the inmates and detainees in the regional jails.

Additionally, although the Court recognizes that Defendant contests some of the Plaintiffs' claims and insist that the jails provided Plaintiffs with timely medical treatment, viewing the facts in the light most favorable to the Plaintiffs, the Court finds Plaintiffs produced sufficient evidence such that a question of material fact exists regarding the objective factor of the deliberate

indifference analysis. [27]

    ii.   <u>Subjective Prong</u>

The subjective prong of deliberate indifference under the Eighth Amendment requires plaintiffs to make a showing of something greater than negligence, but it does not require "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. This Circuit has stated that the subjective prong "requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm." *De'Lonta*, 330 F.3d at 634; *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) ("[D]eliberate indifference in this context lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law."). The requisite state of mind can be established by showing that the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he … draw[s] the inference." *Farmer*, 511 U.S. at 837; *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990) ("Failure to respond to an inmate's known medical needs raises an inference that there was deliberate indifference those needs.").

The subjective prong is also satisfied if plaintiffs can establish "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it." *Scinto*, 841 F.3d at 226 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)).

---

[27] The Plaintiffs' individual claims are supported by the reports of their experts, Dr. Cheryl Wills and Dr. Homer Venters, who both made conclusions that there were substantial deficiencies in the care provided by the Defendant. Wills Rep. 3–4, ECF No. 264-3; Venters Rep. 4–5, ECF No. 264-2.

Plaintiffs claim that Defendant's lack of oversight over the medical and mental healthcare providers has resulted "in system-wide constitutionally deficient medical and mental health care for inmates in DCR's jails." Pls.' Mem. Supp. Mot. Class Cert. 11, ECF No. 279. Defendant urges the Court to find that she is entitled to avoid liability because she herself was not the doctor providing care to the inmates in the regional jails. *See* Def.'s Mem. Supp. (Baxley) 14 (citing *Greene v. Ballard*, No. 2:17-CV-02897, 2020 WL 3055459 (S.D.W. Va. Feb. 25, 2020), *report and recommendation adopted,* No. 2:17-CV-02897, 2020 WL 1482568 (S.D.W. Va. Mar. 27, 2020), *appeal dismissed,* 823 F. App'x 204 (4th Cir. 2020)).

While Defendant's argument may have been persuasive if this case was about the individual medical care of the Plaintiffs, here the alleged violation is the Defendant's policy or practice of providing deficient medical and mental health care to persons housed in the regional jails. The relevant question is not whether Defendant Jividen was subjectively aware of the individual medical decisions made regarding each Plaintiff, but whether she was subjectively aware of WVDCR's healthcare practices and the substantial risk of harm those practices pose to inmates. Subjective awareness can be inferred via circumstantial evidence. *See Farmer*, 511 U.S. at 843.

Lack of action in the face of a substantial risk of harm can evince a cognizant disregard for the risk of harm to the health and wellness of inmates. *See Madrid v. Gomex*, 889 F. Supp. 1146, 1160 (N.D. Cal. 1995). Plaintiffs have provided sufficient evidence to raise a genuine dispute of material fact regarding whether Defendant was aware of and willfully disregarded "an objectively serious . . . risk of harm" to the plaintiff class. *De'Lonta*, 330 F.3d at 634.

Despite Defendant's claim that she has "no role in the delivery of health care in the Regional Jails," *see* Def.'s Mem. Supp. (Wells-Wright) 13, it is well established that a government

is constitutionally obligated to provide medical care for the persons it incarcerates or detains. *See Estelle*, 429 U.S. at 103 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (holding that prison officials have a constitutional duty to maintain "humane conditions of confinement, including the provision of adequate medical care and … 'reasonable measures to guarantee the safety of the inmates.'").[28] The fact that WVDCR contracts out medical care does not permit Defendant Jividen to assume she has met her constitutional duty.

In the many memoranda filed in this case, the Plaintiffs have provided evidence that could support a finding that Defendant abdicated her duty to provide adequate medical care and in doing so has willfully turned a blind eye to evidence that WVDCR's current health care policies leave inmates at risk of harm. *See, e.g.*, Hissom Dep. 52, ECF No. 264-4 (WVDCR does not conduct site inspections); Hissom Dep. 53 (WVDCR does not review contractors' manuals and protocol); Hissom Dep. 54 (WVDCR does not receive utilization review for regional jails); Hissom Dep. 59 (WVDCR does not regularly ask for statistical summaries); Hissom Dep. 105 (WVDCR does not review receiving screenings); Hissom Dep. 120 (WVDCR does not review licensure of individual contracted staff); Hissom Dep. 130 (WVDCR does not receive or ask for reports regarding timely completion of health assessments); Gray[29] Dep. 54, ECF No. 264-8 (Wexford does not share audits or chart reviews with WVDCR); Gray Dep. 56–57 (WVDCR does not formally monitor Wexford); Gray Dep. 76 (Wexford does not provide formal reports to WVDCR's Director of Correctional Health Care); Weber[30] Dep. 19, ECF No. 264-6 (WVDCR has not reviewed PrimeCare's services

---

[28] This duty is further supported by the deposition of the Director of Correctional Healthcare for the Defendant, Debbie Hissom, who testified that as Commissioner, Defendant Jividen must sign off on any changes to the health care policies in the jail system. Hissom Dep. 18, ECF No. 263-4.
[29] James Gray is a Health Service Administrator for Wexford Health Services, Inc.
[30] Thomas Weber is the Chief Executive Officer of PrimeCare Medical.

to make sure it is "meeting or exceeding the standard of care" required under its contract); Weber Dep. 115 (WVDCR does not review personnel files); Searls[31] Dep. 142, ECF No. 265-5 (Superintendent of Western Regional Jail does not track what issues are raised in grievances).

Accordingly, Plaintiffs have provided sufficient evidence to support a finding that Defendant was subjectively aware of the risk of harm WVDCR's policies and procedures pose to jail inmates.

iii.   <u>National Commission on Correctional Health Care Certification</u>

Defendant urges the Court to "rule as a matter of law that meeting NCCHC's standards are substantial evidence of compliance with constitutional standards of deliberate indifference." Def.'s Mem. Supp. (Baxley) 15. Defendant testified that both of WVDCR's medical contractors are required to maintain accreditation by the NCCHC. Jividen Aff. ¶ 5, ECF No. 263-8. She further stated that all nine facilities serviced by PrimeCare "have met NCCHC standards," and that the tenth jail, Northern Regional, "received contingent approval from NCCHC." *Id.* ¶¶ 6–7. She suggests that this accreditation, in addition to the evidence presented in this case, should lead the Court to dismiss the deliberate indifference claims. Def.'s Mem. Supp. (Baxley) 15–16; Def.'s Reply (Baxley) 18–19.

Defendant relies heavily upon *Grayson v. Peed*, in which the Fourth Circuit found that summary judgment was appropriate in a deliberate indifference case. *See* Def.'s Reply (Baxley) 19. To support its finding that a sheriff could not be held liable for the possible constitutional violation of his employees, the *Grayson* Court noted that the plaintiff's own experts had "conceded" that the Sheriff's policies were in compliance with standards set forth by the Virginia Board of Corrections and the American Correctional Association. *Grayson v. Peed*, 195 F.3d 692,

---

[31] Shelby Searls is the Superintendent of Western Regional Jail.

697 (4th Cir. 1999). While this case establishes that accreditation may be considered by a court as a factor in favor of summary judgment, it hardly supports Defendant's claim that "NCCHC accreditation is clear, uncontradicted evidence that Commissioner Jividen had no reasonable basis to doubt the efficacy and adequacy of the policies at issue or the medical treatment of the inmates." Def.'s Reply (Baxley) 17.

NCCHC accreditation is simply not a sufficient basis upon which the Court can grant summary judgment in this case, particularly where it is indisputable that first, not all of the jails were actually fully accredited by NCCHC[32] and second, despite the accreditation status of the jails, Defendant admits the jails are not in 100 percent compliance with NCCHC standards. Jividen Aff. ¶¶ 6–7.

NCCHC reports show that, despite accreditation, the Defendant's jails did not "fully meet" standards that are relevant in the instant case. *See, e.g.*, NCCHC Rep. 14–16, ECF No. 302-11 (showing Western Regional Jail "partially met" compliance standard in the following categories (1) reviewing receiving screening results within 14 days and (2) ensuring that all inmates receive an initial health screening no later than 14 days after admission); NCCHC Rep. 23 (same score for Northern Regional Jail); NCCHC Rep. 26 (finding Northern Regional Jail was only partially compliant with performing mental health screenings within 14 days); NCCHC Rep. 29 (finding Northern Regional only "partially met" compliance indicator that face-to-face encounters for a health care request be conducted within 24 hours).

The Court declines to wholly cede to NCCHC's judgment in this case. As Plaintiffs argue, NCCHC infrequently visits Defendant's jails, and when it does, it pre-announces its visit and samples only a small number of cases. *See, e.g.*, NCCHC Rep., ECF No. 263-8 (NCCHC

---

[32] Defendant Jividen testified that while the nine health care facilities operated by PrimeCare met NCCHC standards, Northern Regional Jail only had "contingent approval" from NCCHC. Jividen Aff. ¶¶ 6–7.

Accreditation Report for one jail indicating that they reviewed 14 health records and interviewed only 11 inmates). The Court does not suggest that NCCHC accreditation is not evidence that the Defendant may present in her defense at trial. Instead, the Court finds that a material question of fact remains as to whether Defendant Jividen was deliberately indifferent in this case.

    iv.   Conclusion Regarding Deliberate Indifference

Viewing the facts in the light most favorable to the Plaintiffs, the Court finds that a reasonable factfinder could find that the Defendant's actions (and omissions) amounted to deliberate indifference toward the mental and medical health care needs of inmates at West Virginia Regional Jails. The Court denies the Defendant's Motions for Summary Judgment on this basis.

**D.  Failure to State a Claim – Americans with Disabilities Act[33]**

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under the ADA, a "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(2). Additionally, a "qualified individual with a disability" is a defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42

---

[33] Defendant raised sovereign immunity as a defense in each of the motions for summary judgment. *See* Def.'s Mot. Summ. J. (Baxley) 16. Because Plaintiffs have dismissed WVDCR from the case and because this class action seeks only injunctive relief, the Court finds that the defense is not applicable. *See Ex parte Young*, 209 U.S. 123 (1908) (holding Eleventh Amendment does not bar suits against state officials for injunctive relief).

U.S.C. § 12131(2).

To establish a prima facie case under this Title, the Fourth Circuit has held that a plaintiff must establish: (1) he or she has a disability; (2) he or she is "otherwise qualified to receive the benefits of a public service, program, or activity;" and (3) he or she was "denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502–03 (4th Cir. 2016) (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)).

In addition to prohibiting intentional discrimination based on disability, the ADA also imposes an affirmative obligation on public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i); *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017); *Constantine*, 411 F.3d at 488. This obligation, however, is not without limits. *See Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004) Title II "requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service." *Id.*

State correctional facilities are "public entities" under Title II of the ADA. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("State prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" (quoting 42 U.S.C. § 12131(2)).[34] Nonetheless, courts have repeatedly found that the "a prisoner may not state a claim under the

---

[34] The supporting regulations to the ADA make clear that correctional facilities have an affirmative duty to ensure that inmates and detainees are not "subjected to discrimination." 28 C.F.R. § 35.152(b)(1).

ADA for a lack of medical treatment." *Mondowney v. Balt. Cty. Det. Ctr.*, No. CV ELH-17-1538, 2019 WL 3239003, at *21 (D. Md. July 18, 2019); *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996) ("[T]he Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners.").

Plaintiffs claim that their ADA claim rests not on intentional discrimination but upon a failure to provide reasonable accommodations to the Plaintiffs, resulting in their exclusion from jail services, programs, and activities. S*ee* Pl. Baxley's Resp. 29.

The Court finds that only one of the Named Plaintiffs in this action has plead a sufficient claim for failure to accommodate under the ADA. To explain this finding, the Court will discuss Plaintiffs' ADA claims in three categories: (1) Plaintiffs whose ADA assertions amount to inadequate medical care claims; (2) Plaintiffs who asserted failure to accommodate claims regarding the grievance process; and (3) Plaintiffs who sufficiently stated claims under the ADA.

i. Inadequate Medical Care

Each of the Named Plaintiffs complained that WVDCR denied providing them with reasonable accommodations, which caused them to be excluded from or denied access to WVDCR's "programs, services, and activities." *See* Pl. Baxley's Resp. 30; Pl. Spiker's Resp. 27–38; Pl. Reed's Resp. 19–20; Pl. Edmonson's Resp. 19; Pl. Wells-Wright's Resp. 18–20; Pl. Hall's Resp. 20.[35]

---

[35] Notably, the Plaintiffs largely fail to articulate *which* programs, services, and activities the Plaintiffs were denied access to, which is distinguishable from other cases where Courts found viable class action "failure to accommodate" claims under the ADA in the correctional context. *See Jarboe v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. CIV.A. ELH-12-572, 2013 WL 1010357 (D. Md. Mar. 13, 2013) (denying summary judgment where deaf and hearing impaired inmates claimed they were denied accommodations that would allow them to communicate with others); *Phipps v. Sheriff of Cook Cty.*, 681 F. Supp. 2d, 899, 904 (N.D. Ill. 2009) (denying summary judgment when class of paralyzed detainees claimed they were denied the accommodation of wheelchair-accessible toilets, sinks, and showers); *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1217–18 (9th Cir. 2008) (finding jails failed to accommodate disabled detainees by denying them physical access to wheelchair accessible toilets and sinks and excluding disabled inmates from rehabilitative and vocational opportunities).

It appears to the Court, however, that it is the inadequate medical care underlying the Section 1983 deliberate indifference claim in Count I that is actually causing the Plaintiffs to be deprived of, or excluded from, jail services, programs, and activities. For example, Plaintiff Baxley states his "rights were violated under the ADA when he was placed on suicide watch and segregation, and thereby denied access to programs, services, and activities of jail life, as a result of being denied a reasonable modification for his disability, i.e., mental health treatment." Pl. Baxley's Resp. 30. Here, it was not Defendant's "failure to accommodate" Baxley as a qualified individual with a disability under the ADA that denied him access to jail programs, services, and activities. Instead, it was Defendant's alleged failure to provide adequate medical treatment that has caused Baxley's mental condition to deteriorate, which led to him being placed in segregation and ultimately deprived him of the ability to participate in jail life. The Court fails to see the distinction between this claim and Plaintiffs' claim of deliberate indifference.

The same holds true for assertions made by Plaintiffs Spiker, Reed, Edmondson, and Hall. *See* Pl. Spiker's Resp. 17–28 (Spiker claims that he was denied the ability to participate in daily activities because he was not provided appropriate treatment for his mental illness and because he was placed on suicide watch); Pl. Reed's Resp. 19 (Reed claims that she was denied access to "DCR's services, programs, and activities" when she was placed on lock down after her mental illnesses went untreated and that she was similarly denied access to "normal programs, services, and activities of jail life" because of WVDCR's failure to properly treat her diabetes); Pl. Edmondson's Resp. 19 (Edmondson claims that Defendant failed to provide him with a reasonable accommodation in the form of treatment for his chronic sinus infection causing him to "withdraw from activities and programs at NRJ"); Pl. Hall's Resp. 19–20 (Hall claims that as a result of the Defendant's failure to provide necessary medical treatments he "could not participate in daily

activities"). The acts (or omissions) that harmed the Plaintiffs in each of these allegations were not failures to accommodate the individual Plaintiffs' disabilities but the Defendant and WVDCR's failure to appropriately treat their medical conditions.

Because the ADA cannot be used to assert a claim of inadequate medical care, *see Mondowney*, 2019 WL 3239003, at *21, Plaintiff Baxley, Spiker, Reed, Edmondson, and Hall's broad assertions that Defendant's failure to accommodate their medical and mental health care needs denied them access to jail services, programs, and activities fail.

ii.   Failure to Accommodate & the Defendant's Grievance Process

In addition to the broader failure to accommodate allegations described above, Plaintiffs Baxley and Reed do claim a more specific accommodation denial. They claim that they were denied modifications when they had to enlist the help of others to file grievances. Pl. Baxley's Resp. 30; Pl. Reed's Resp. 19. As a consequence of these alleged denials, they claim they were denied access to the Defendant's grievance process. The Court is hesitant to find that Plaintiffs Baxley and Reed have presented sufficient evidence to state a claim of discrimination under the ADA for the three following reasons.

First, as a threshold issue, it is not clear to the Court that illiteracy is necessarily a protected disability under the ADA. While in *E.E.O.C. v. Randstad*, the Fourth Circuit recognized that in an employment context literacy requirements may be discriminatory because they are disadvantageous to individuals with learning disabilities, 685 F.3d 433, 444 (4th Cir. 2012), the inability to read is not necessarily tied to a disability. Whether an individual's inability to read and write is a disability under the ADA would need to be determined on an individual basis.

Second, even if Baxley and Reed's inability to read is in fact due to a disability, the record does not reflect that Baxley[36] or Reed[37] informed the Defendant that they had such a disability or that they asked for an accommodation for the grievance process. While there may be times where an individual does not have to expressly ask for an accommodation, such an exception only applies where it is apparent that one is needed. *See Cadena v. El Paso Cty.*, 946 F.3d 717, 723–24 (5th Cir. 2020) ("For this type of claim, a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious.") (citing *Windham v. Harris Cty., Tex.*, 875 F.3d 229, 236 (5th Cir. 2017)). Without such a requirement, "it would be impossible for the provider to ascertain whether an accommodation is needed at all, much less identify an accommodation that would be reasonable under the circumstances." *Windham*, 875 F.3d at 236; *Hedberg v. Ind. Bell Tele. Co.*, 47 F.3d 928, 924 (7th Cir. 1995) ("The ADA does not require clairvoyance.").

Finally, in the instant Order, the Court has found that the grievance process was unavailable at the time the Second Amended Class Action complaint was filed—even to those Plaintiffs who could read and write. Therefore, even if Baxley and Reed had informed the Defendant of a disability that hindered their ability to use the grievance system and were denied an

---

[36] Although Baxley testified that he has a spelling and reading "problem," *see* Pl. Baxley's Resp. 20 (citing Baxley Dep. 65–66 ("I have a spelling problem, and I have a reading problem.")), this testimony is not a sufficient basis for the Court to find that the Defendant or the WVDCR was aware of his problem.

[37] Similarly, Reed claims that she has "difficulty reading and writing." Pl. Reed's Resp. 19 (citing Reed Dep. 11–12, 23, 103 (". . . my IQ is really low, I can't read or spell that much.")). Additionally, an expert for the Plaintiffs states that "Heather Reed is well known to DCR based [on] more than a dozen admissions" and that the "DCR medical and mental health teams are familiar with her complex medical history that includes . . . [i]lliteracy . . . along with other intellectual limitations . . . ." Wills Rep. 10. Neither Reed's statements in her deposition nor Dr. Wills's conclusions are sufficient to impute knowledge to the Defendant in this case, without pleading a more specific basis upon which the Court could find the Defendant knew of this specific disability. *See Shields v. Prince George's Cty.*, No. GJH-15-1736, 2016 WL 4581327, at *10–11 (D. Md. Sept. 1, 2016) (granting motion to dismiss where plaintiff failed to allege a specific basis upon which the defendant should have been aware of the plaintiff's disability).

accommodation, the Court does not believe any accommodation would have made the system available or functional.

Accordingly, the Court finds that Baxley and Reed have not stated a claim that the Defendant violated the ADA by failing to provide accommodations that would have assisted them with the grievance process.

### iii. Plaintiffs Pleading Sufficient ADA Failure to Accommodate Claim

Plaintiff Donna Wells-Wright has adequately stated a claim under the ADA. As noted above, a plaintiff can establish a prima facie case under Title II of the ADA by showing (1) she has a disability; (2) she is "otherwise qualified to receive the benefits of a public service, program, or activity"; and (3) she was "denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Nat'l Fed'n of the Blind*, 813 F.3d at 502–03. The third prong may be satisfied by showing the defendant failed to make reasonable accommodations when the qualified individual with a disability has either asked for an accommodation or where the need for one is "open and obvious." *Cadena*, 946 F.3d at 724.

As to the first prong, while the Defendant has not conceded that Wells-Wright is a qualified individual under the ADA, Def.'s Reply (Wells-Wright) 19, ECF No. 324, she also has not provided any evidence to refute Wells-Wright's claim that she has disability under the Act. Wells-Wright, on the other hand, pleaded that she has "emphysema, COPD, hiatal hernia, gastritis, high blood pressure, hypertension, muscle spasms, spinal stenosis, degenerative disc disease, a rare genetic bone deterioration disease, bipolar disorder, and schizoaffective disorder," Pl. Wells-Wright's Resp. 1–2; Second Am. Compl. ¶ 69, and that she informed WVDCR of her many health diagnoses when she was admitted to Northern Regional Jail. Second Am. Compl. ¶¶ 68–70. Additionally, her grievances show complaints of chronic pain; "spinal, lumbar, cervical stenosis,

[deteriorating] bone disease, arthritis, and degenerative disc disease"; and a need for pain management. Wells-Wright Grievances 3, 10, 19, 21, 23. As such, Wells-Wright has, at a minimum, raised a question of material fact as to whether she has a disability under the ADA.

As to the second prong, Wells-Wright would need to show that she is "otherwise qualified to receive the benefits of a public service, program, or activity." *See Nat'l Fed. of the Blind*, 813 F.3d at 502. Because jails are required to provide all basic services to the individuals they house, the Court is satisfied that Wells-Wright is entitled to appropriate housing and sleeping arrangements. *Raynor*, 817 F.3d at 127 (finding that the duties of correctional officials include "maintaining humane conditions of confinement").

Finally, at least one grievance shows that Wells-Wright raised the fact that she had "only 1 mat to sleep on." Wells-Wright Grievances 10. This grievance can be read in a way that suggests only having one mat exacerbated the pain she experienced due to her disabilities. Another grievance stated that she was being forced to sleep on the floor. *Id.* at 20. In her deposition, Wells-Wright testified that she was initially assigned to a cell on the first floor but that it was occupied, and when she reported it to a corrections officer she was told to "figure it out." Wells-Wright Dep. 71–72. Most significantly, she specifically stated that she remembered requesting accommodations in the form of an extra mat and a bottom bunk. *Id.* at 79.

Given Wells-Wright's grievances and deposition testimony, and viewing the facts in the light most favorable to the nonmovant, the Court finds a question of material fact remains as to whether she sought reasonable accommodations from the Defendant. As a consequence, a question of material fact remains as to whether the Defendant discriminated against her on the basis of her disability by failing to provide reasonable accommodations in the form of a second mat, a bottom bunk, or some other reasonable modification that would accommodate her disability and allow her

to sleep with reduced pain. *See Dee v. Md. Nat. Capitol Park & Plan. Comm'n*, No. CIV.A. CBD-09-491, 2010 WL 3245332, at *5 (D. Md. Aug. 16, 2010) (noting that reasonableness of an accommodation request is a question of fact); *cf. Reyazuddin v. Montgomery Cty., Md.*, 789 F.3d 407, 416 (4th Cir. 2015) (finding reasonableness of accommodation under Title I of ADA is a question of fact). Accordingly, the Court declines to grant summary judgment in favor of the Defendant on Wells-Wright's ADA claim.

### iv.  Conclusion

Based on the memoranda and evidence available to the Court, all but one Plaintiff have failed to state a failure to accommodate claim under the Americans with Disabilities Act. Accordingly, the Court grants the Defendant's Motions for Summary Judgment as to the ADA claim in Count II with regard to Plaintiffs Baxley, Spiker, Reed, Edmondson, and Hall.[38] Plaintiff Wells-Wright may proceed on her ADA Claim in Count II of the Second Amended Class Action Complaint.

## IV.    CONCLUSION

In Conclusion, the Court **DENIES, in part,** and **GRANTS, in part,** ECF No. 263, ECF No. 267, ECF No. 269, ECF No. 271, and ECF No. 277. The Motions are denied to the extent that the Court finds the Named Plaintiffs' claims are not moot; the Plaintiffs did not fail to exhaust

---

[38] The Court is not without concerns about these Plaintiffs' allegations that Defendant and WVDCR have failed to comply with the ADA. The Plaintiffs' memoranda, in conjunction with the testimony of WVDCR employees and the Defendant's responses to interrogatories, suggest that WVDCR may very well be failing to comport with the requirements of the ADA and its supporting regulations. For example, in response to interrogatories, the Defendant indicated that WVDCR does not track inmates with disabilities. Def.'s Answer Third Set of Interrog. 21. Similarly, Defendant could not provide any documentation to support her claim that WVDCR has a "designated responsible employee" who coordinates its efforts to comply with the ADA as required by 28 C.F.R. § 35.107. *See* Email 2, ECF No. 264-14; Def.'s Resp. Pl.'s Third Mot. Compel 15, ECF No. 251 (noting Defendant has no responsive documents to Plaintiffs ADA requests for production). Unfortunately, courts have consistently held that "Plaintiffs do not enjoy a private right of action to enforce implementing regulations which impose 'an obligation beyond the statutory mandate.'" *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 555 (D. Md. 2019) (quoting *Iverson v. City of Bos.*, 452 F.3d 94, 98 (1st Cir. 2006)).

their administrative remedies; and the Plaintiffs have not failed to state a claim of deliberate indifference in Count I of the Second Amended Complaint. The Motions are granted to the extent that Plaintiffs Baxley, Spiker, Reed, Edmondson, and Hall have failed to state a claim under the ADA. Accordingly, their claims in Count II are dismissed. The Court further **DENIES** Defendant's Motion for Summary Judgment as to Donna Wells-Wright and Defendant's Supplemental Motion for Summary Judgment as to Donna Wells-Wright. ECF No. 273 and ECF No. 328. Plaintiffs' Motion for Leave to File a Surreply, ECF No. 336, is **DENIED AS MOOT**. Finally, Pursuant to Plaintiffs' voluntary dismissal, WVDCR is **DISMISSED** as a party to this action.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        December 21, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE