IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

JOHN BAXLEY, JR., et al,
on their own behalf and on behalf
of all others similarly situated,

        Plaintiffs,

v.                                                   Civ. Act. No. 3:18cv01526
                                                              (Chambers, J.)

BETSY JIVIDEN, in her official capacity as
Commissioner of the WEST VIRGINIA
DIVISION OF CORRECTIONS AND
REHABILITATION,

        Defendant.

**PLAINTIFFS' RENEWED EMERGENCY MOTION FOR PRELIMINARY
INJUNCTION REGARDING DEFENDANTS'
PREVENTION, MANAGEMENT, AND TREATMENT OF COVID-19**

In light of striking deficiencies found during expert Dr. Homer Venters's inspections of Defendant's facilities on September 27 through 29, 2021, Plaintiffs, on behalf of themselves and all others incarcerated in WVDCR custody, respectfully renew their prior motion to seeking an order compelling Defendants to immediately engage in adequate prevention and management of COVID-19 in the State's prisons and jails, as well as other appropriate relief to ensure that infection does not spread unabated to inmates, correctional staff, and others in WVDCR facilities. As Dr. Venters—who has conducted reviews of COVID-19 in congregate settings around the country, visiting more than thirty facilities—sets forth in his report, WVDCR's

> departmental practices are causing more cases than would be occurring with adherence to CDC guidelines, and the lack of testing is masking the true extent of these outbreaks. This is the **most dangerous approach to medical isolation I have encountered** since the outset of the pandemic, when the mixing of people with and without COVID-19 occurred in the early weeks of response.

(Venters Dec., attached as Ex. A.) In order to avoid additional needless infection, illness, and death, Plaintiffs ask that the Court expedite this matter and grant Plaintiffs' request for an

emergency preliminary injunction.

## Facts

In March 2020, a state of emergency was declared nationally and in the State of West Virginia regarding the COVID-19 pandemic. [*See* Doc. 183 at 2-3.] As the parties to this matter recognized, this outbreak of a highly contagious and deadly infectious disease posed particular risk to people in congregate settings, including prisons and jails. [*Id.* at 3.]

In light of Defendant's failure to identify any plan to prevent or treat the disease, Plaintiffs filed an emergency motion for preliminary injunction on March 25, 2021. [Doc. 161.] The matter was briefed, evidence submitted, and a hearing held by this Court. On April 8, 2021, the Court issued its ruling.

In the Court's ruling, the Court rejected Defendant's arguments and found that that Plaintiffs could seek an injunction without an exhaustion bar [Doc. 183 at 6-7] and that the COVID-19 pandemic was relevant to this case [*id.* at 7-8]. The Court further found absence of meaningful action by Defendants would lead to a likelihood of irreparable harm. [*Id.* at 11-12.] However, the Court found that Plaintiffs did not meet their burden of demonstrating a likelihood of success on the merits, due to the fact that there were no reported COVID-19 cases in Defendant's facilities at the time, and that by the time of the hearing Defendant has presented a plan to prevent and address a possible outbreak. [*Id.* at 13-16.] In regard to the balance of interests, the Court held:

> As the Court has noted at several points, evidence of an outbreak and the insufficiency of Defendants' plan could alter this calculus. Yet, for the moment, Plaintiffs have failed to show that their interest in fending off COVID-19—which is tempered by Defendants' plan to aid them in doing so—outweighs Defendants' strong interest in managing state prisons.

[*Id.* at 17.] Finally, the Court denied the motion, but made clear that this decision might be altered at a later date, explaining:

> [I]t is worth reiterating that the coronavirus pandemic is an ever-changing crisis that evolves by the hour more often than by the day. **If Defendants' plan is unable to adequately address the spread of COVID-19 in state prisons, Plaintiffs will likely have a much stronger likelihood of succeeding on the merits of their claims.**

[*Id.* at 18 (emphasis added).]

Now, eighteen months later, it has become abundantly clear that Defendant has utterly failed in her obligation to prevent and treat COVID-19 in West Virginia's prisons and jails. Indeed, Defendant's own counsel has stated their fear for their lives in setting foot in Defendant's facilities due to COVID-19 outbreaks. On September 24, 2021, Defendant filed an emergency motion to halt inspections of the jails by Plaintiffs' expert, due to extreme outbreaks of COVID-19 in the facilities. [Doc. 444.] Defendant explained in her motion that there has been a "surge" in COVID cases at Defendant's jails, including "serious outbreaks" at several facilities. [*Id.* at 2.] Defendant admitted that much of the inmate population had not even been tested for COVID-19, but were nonetheless exhibiting symptoms of the disease. [*Id.*] At North Central Regional Jail, at the time of filing, nearly *one half* of the inmate population was symptomatic for COVID-19 or being quarantined due to exposure to the virus. [*Id.*] Shortly after filing the Court held an emergency hearing. At said hearing, counsel for Defendant stated that they were concerned about the risk associated with merely entering the facilities, due to the dramatic outbreaks of COVID-19.

Pursuant to the Court's order, the inspections were held nonetheless, although Plaintiffs were not permitted to inspect North Central Regional Jail, where the most serious of the outbreaks was occurring. Defendant decided to send younger counsel to limit the risk to her attorneys. Of course, the inmates at WV jails have no such luxury; those with high risk factors for disease or death from COVID-19 remain in these facilities.

The inspections, which were conducted on September 27-29, 2021, revealed that

Defendant is failing to follow basic, minimum standards set forth in her own policies and by the U.S. Centers for Disease Control,[1] leading to COVID-19 outbreaks as well as substantially underreported infections, disease, and death from COVID-19. (*See* Ex. A, Dec. of Dr. Homer Venters.) Specifically, Plaintiffs' expert, Dr. Homer Venters—a recognized national expert on prevention and management of COVID-19 in congregate settings [*see* Doc. 445-1]—observed substantial issues with the basic elements of medical isolation, quarantine, and testing.

In regard to isolation, Dr. Venters observed that "WVDCR is simply ignoring the need for medical isolation, which is causing a dramatic increase in the number of infections." (Ex. A at D.1.) Rather than isolating inmates with known or suspected COVID-19, DCR is routinely returning these infected to their cells that they share with often several other inmates, where they proceed to infect their cellmates and others in the dorm. (*Id.* at D.) Due to this practice, inmates often do not report their symptoms, given that they are aware that no action will be taken to protect them or others. (*Id.* at D.4.) Further, staff at certain facilities were observed entering units with confirmed COVID-19 cases without full personal protective equipment and then moving to previously uninfected units, thereby dramatically increasing the possibility of transmission between units. (*Id.* at D.9.)

Dr. Venters further observed inconsistent and problematic quarantine measures. (*Id.* at E.) At Northern Regional Jail, he learned that inmates often were in close contact with people outside of quarantine during their quarantine period, thus breaking the quarantine and potentially spreading infection either back to their quarantine cells or out to the rest of the population. (*Id.* at E.2.) Dr. Venters also observed numerous inmates crowded into small booking/intake cells and suicide watch cells for days on end, creating extremely high risk of infection to all in those

---

[1] Despite multiple requests DCR has failed to provide Plaintiffs' counsel with the current, unredacted, version of its COVID-19 policy. Counsel has located said policy—containing redactions of essential portions—at https://dhhr.wv.gov/COVID-19/Documents/DCR_COVID19%20Response%20Plan_Policy_337-vers2021_02-

cells. (*Id.* at E.3-4.) Inmates are further placed in so-called "quarantine" with inmates who arrives days after or before them at the facility, such that the quarantine measures are insufficiently long for some of the inmates involved, and that movements of other inmates are improperly restricted. (*Id.* at E.2.)

Third, Dr. Venters observed grossly inadequate COVID-19 testing in total contravention of CDC guidelines. (*Id.* at F.) Specifically, inmates are *not* routinely tested for COVID-19 on entrance to facilities; nor when an inmate in the housing unit tests positive for COVID-19, such that there is clear close exposure; nor when an inmate is released from quarantine. (*Id.*) As the result, Dr. Venters reports that any data reported by WVDCR regarding positive cases and related deaths is grossly under-representative of the actual numbers of infections, illnesses, and deaths due to COVID-19. (*Id.*) Indeed, the total number of "pending" tests—that is the total number of tests that had been done recently in the *entire regional jail system* housing 5,373 inmates—was 72 as of October 1, 2021 (the date of the most recent data available from DCR). (*See* Ex. B, also available at https://dhhr.wv.gov/COVID-19/Documents/COVID19_DCR_2021_10-01.pdf.) This consisted of seventy outstanding tests at North Central Regional Jail, one at Tygart Valley, and one at South Central. (*Id.*) In other words, "on any given day, officials are only aware of the COVID-19 status of 1.6% of the more than 10,000 people incarcerated in West Virginia." Experts Don't Trust State's 'Artificial' COVID-19 Data for Correctional Facilities, Dragline (Oct. 6, 2021), https://dragline.substack.com/p/experts-dont-trust-states-artificial/. Indeed, Defendant's own filing in the instant matter highlights that DCR inadequately tests the inmate population, setting forth that a "significant portion of the non-tested population is symptomatic." [Dkt. 444-1.]

Finally, Dr. Venters found that WVDCR's COVID policy inaccurately states that there is

---

15_redacted.pdf. The CDC recommendations can be found at https://www.cdc.gov/coronavirus/2019-

no known treatment for COVID-19, indicating that no approved treatment is being provided to COVID-positive inmates.[2] (*Id.* at G.) In fact, both the medication remdesivir and monoclonal antibodies has been approved for treatment of COVID-19. These life-saving treatments are effective but are apparently not being provided by WVDCR. (*Id.*)

Dr. Venters' recommendations are simple and consistent with Defendant's own policy and CDC guidance:

   a. **Medical Isolation**: . . . .
      i. Any person with known or suspected COVID-19 should immediately be transferred to a separate medical isolation unit, with physical separation between people with known and suspected COVID-19.
      ii. No person with known or suspected COVID-19 should ever be placed into a cell or other living space with a person who is not similarly known or suspected of having COVID-19.
      iii. Officers working in these settings must utilize appropriate PPE, even when their time on the unit is limited to several minutes.
   b. **Quarantine:** . . . .
      i. An intake quarantine should be established within 24 hours of arrival at the facility, and this quarantine should not be broken by transfer of newly arrived people into close contact with the person under quarantine or by movement of the person under quarantine into such contact. If a person requires suicide watch or other increased level of observation and care for a non-COVID-19 reason, they should be housed in a cell or room by themselves so as to complete their quarantine period.
      ii. In housing areas where people are under quarantine they should not be in close contact with people who are not under quarantine. In the case of new admission quarantine, people should not be in close contact with other newly detained people with quarantine dates more than 48 hours from their own.
   c. **Testing:** . . .

---

ncov/community/correction-detention/index.html.
[2] Notably, despite that the CDC has updated its guidelines in light of the Delta variant of COVID-19, DCR has not updated its policy since February 15, 2021, prior to access to vaccinations for inmates and before the Delta variant became prevalent. *Compare* DCR Policy 337, available at https://dhhr.wv.gov/COVID-19/Documents/DCR_COVID19%20Response%20Plan_Policy_337-vers2021_02-15_redacted.pdf *with* CDC recommendations, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html. Since that time, the CDC has updated its recommendations several times, including on February 19, May 6, June 1, June 7, June 9, and August 31. These updates are not included in the DCR policy, which Dr. Venters notes is woefully outdated.

      i. Test all people arriving in the jail before they are placed into housing areas and within 24 hours of arrival.
     ii. Test all people who are close contacts of a new COVID-19 case, including all people in the housing area and other people who were within 6 feet for a cumulative exposure of 15 minutes over 24 hours. Testing for the housing area placed into quarantine, as well as for newly admitted people should be conducted at a minimum twice during the 14-day period.
    iii. When ongoing transmission is occurring in a facility, all staff and detained people should be tested at least once every two weeks.

(Ex. A at D.10, E.5, F.2.) In addition, Dr. Venters notes that DCR should be utilizing all available treatments to prevent morbidity and mortality among individuals who have contracted COVID-19. (*Id.* at G.)

Defendant's failure to consistently abide by basic requirements for the prevention and treatment of COVID-19 has dramatic, real-world impact: People in Defendant's custody are sick and dying as the result of these failures. As the result, Plaintiffs now renew their motion for emergency relief on behalf of the certified class of inmates in Defendant's custody, to protect their lives and health.

## **Argument**

"The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). "Mandatory preliminary injunctions generally do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d at 526 (alterations omitted).

In deciding whether to grant a preliminary injunction, "court[s] should consider (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the

likelihood of harm to the defendant if the injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003). "In applying this four-factor test, the irreparable harm to the plaintiff and the harm to the defendant are the two most important factors." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003) (alterations omitted). "Emphasis on the balance of these first two factors results in a sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003).

As outlined above, and as this Court has previously found, this global pandemic is exactly the kind of extraordinary circumstance that warrants mandatory injunctive relief because of the grave risk of serious illness and death to the Plaintiff class due to the conditions of confinement in WVDCR custody. We now know that COVID-19 not only can cause immediate severe illness and death, but that it can also cause long term effects on health for those who survive, the extent of which is currently unknown, but which can include multi-organ effects, autoimmune disorders, and multisystem inflammatory syndrome. *See* CDC, Post COVID Conditions, https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects/. And it is that same grave risk that means that the likelihood of—and indeed the current ongoing existence of—irreparable harm to the Plaintiff class, is unacceptably high.

Conversely, Defendant will simply be required to abide by very straightforward prevention methods, limited to implementation of appropriate quarantine, isolation, and testing—much of which is already included in Defendant's own policy and all of which has been effectively implemented by similar systems around the country. Indeed, Defendant has demonstrated its ability—if it so desires—to implement these measures. As Dr. Venters notes,

8

Defendant has largely already done so at one of the facilities he toured. (Ex. A at D.8.) Defendant thus will suffer little to no harm if the injunction is granted. Indeed, preventing the spread of COVID-19 protects not only the inmate population, but all WVDCR employees, their families, and the community at large. Ultimately, undertaking these basic measures will reduce spread of the virus and death of people in Defendant's custody and care. It is in the best interest of Plaintiffs, Defendants, and the public for Defendants to abide by these very basic measures to address COVID-19. Therefore, factors one, two, and four of the preliminary injunction analysis all weigh heavily in favor of granting the requested relief.

With respect to the third factor, the likelihood of success on the merits, Defendant's failure to implement basic processes to prevent and address COVID-19 in the West Virginia jail facilities violates the constitutional rights of the Plaintiff class, which includes individuals who are currently suffering from COVID-19 and those who are or will be exposed to infection by the virus due to Defendant's failures. Specifically, as in this case in general, Defendant's failure to provide appropriate prevention and treatment for COVID-19 constitutes deliberate indifference to Plaintiffs' medical needs, under the Eighth and Fourteenth Amendments of the United States Constitutions. In proving deliberate indifference, as to pretrial detainees, who constitute the majority of the class, Plaintiffs must show that the conduct is objectively unreasonable. *See Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015); *Brawner v. Scott Cty., Tennessee*, 14 F.4th 585 (6th Cir. 2021); *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Castro v. County of Los Angeles*, 833 F.3d 1060, 1069-71 (9th Cir. 2016) (finding *Kingsley*'s purely objective standard for excessive force claims extends to failure to protect claims by pretrial detainees); *see also Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (same). As to post-trial detainees, Plaintiffs must also satisfy the subjective prong. Both are easily done here.

9

This Court previously explained:

> Under the objective prong, a deprivation is sufficiently serious if it is "extreme." *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511 U.S. at 834). A deprivation is extreme if it presents "a serious or significant physical or emotional injury resulting from the challenged conditions," or it "demonstrate[s] a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citations omitted).

[Dkt. 358 at 34-35.] Here there is no question that the deprivation of preventative and treatment measures to address COVID-19 is "extreme." Dr. Venters has noted, in fact, that WVDCR's failures "has created an extremely dangerous situation," in fact, "the most dangerous . . . I have encountered since the outset of the pandemic." (Ex. A at H.) Despite wholly inadequate testing at the facilities, it is clear that there are substantial outbreaks, including an outbreak at North Central Regional Jail where nearly one-half of the population was recently symptomatic or in supposed quarantine. [Doc. 444.] It is clear that these outbreaks and resulting sickness and death could be limited, if DCR simply implemented current CDC guidance and its own policies in its facilities. DCR's practices are creating additional exposure, infection, illness and death of people who are within its custody and care. As the result, people are sick and dying when this could otherwise be prevented—although we cannot know how many due to Defendant's flawed practices. Members of the Plaintiff class easily meet the standard for a substantial risk of serious harm resulting from their exposure to the challenged conditions. *See De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).

As to the subjective prong, this Court has explained:

> This Circuit has stated that the subjective prong "requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm." *De'Lonta*, 330 F.3d at 634; *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) ("[D]eliberate indifference in this context lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law."). The requisite state of mind can be established by showing that the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he …

10

>draw[s] the inference." *Farmer*, 511 U.S. at 837; *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990) ("Failure to respond to an inmate's known medical needs raises an inference that there was deliberate indifference those needs.").
>
>The subjective prong is also satisfied if plaintiffs can establish "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it." *Scinto*, 841 F.3d at 226 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)).

[Dkt. 358 at 37.] Plaintiffs—to the extent that it is necessary—meet this standard as well. As another court in this context set forth: "Defendant cannot reasonably claim ignorance of the seriousness of COVID-19 at this stage in the pandemic, nor the consequences that could result from a failure to take necessary steps to prevent transmission in DPS facilities." *Chatman v. Otani*, No. CV 21-00268 JAO-KJM, 2021 WL 2941990, at *18 (D. Haw. July 13, 2021). Defendant's own filings demonstrate an infection rate in the jails and prisons that well exceeds that of the State at large, and—according to Defendant's clearly inadequate and outdated record keeping—between twenty and twenty-seven inmates have died from COVID-19 as of October 1, 2021. *See* COVID-19 testing, W. Va. Div. of Corr. & Rehab. (Oct. 1, 2021), https://dhhr.wv.gov/COVID-19/Documents/COVID19_DCR_2021_10-01.pdf; *see also* One in Nine People Housed at W. Va.'s Most Overcrowded, Under-vaccinated Jail Has COVID-19, Dragline (Sept. 20, 2021), https://dragline.substack.com/p/one-in-nine-people-housed-at-wvas. Notably, DCR suddenly stopped publishing its testing and death records after the outbreak at North Central Regional Jail became severe. Defendant is currently subject to this pending class action regarding medical treatment in the jails; she was on notice that Plaintiffs were concerned about her inadequate COVID-19 approach; and she has had ample time—nearly eighteen months since the start of the pandemic—to implement appropriate and well-accepted policies to prevent and limit outbreaks. Yet she has not done so. This clearly satisfies the subjective prong of the inquiry. *Chatman*, 2021 WL 2941990, at *19 ("Creating and successfully implementing a

11

workable policy to mitigate the spread of COVID-19 in a carceral setting is an unenviable task. But Defendant has had ample time to do so and the prior outbreaks should have served as cautionary tales. The Court finds that Plaintiffs have demonstrated, through the foregoing facts, that they have a strong likelihood of success on their Eighth Amendment claim.")

This Court previously deferred to Defendant's assurances that she would appropriately implement strategies to address COVID-19 and avoid outbreaks. As Dr. Venters' visit and report makes clear, WVDCR has drastically failed to live up to this obligation for the people in its care. As the direct result of WVDCR's failure to consistently implement basic protocols, it is placing people incarcerated in West Virginia jails at risk of serious illness and death that is wholly avoidable. A preliminary injunction requiring Defendant to implement Dr. Venters' recommendations—which simply restate CDC guidelines—thus should issue. *See, e.g.*, *Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020) (affirming grant of preliminary injunction in *Mays v. Dart*, 453 F. Supp. 3d 1074 (N.D. Ill. 2020)); *Fraihat v. Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020); *Banks v. Booth*, 468 F. Supp. 3d 101 (D.D.C. 2020) (granting preliminary injunction in similar circumstances); *Gayle v. Meade*, ---F. Supp. 3d---, No. 20-21553-CIV, 2020 WL 3041326, at *16-*21 (S.D. Fla. June 6, 2020), reconsideration denied, No. 20-21553-CIV, 2021 WL 1255627 (S.D. Fla. Mar. 24, 2021) (same); *U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709, 741-51 (C.D. Cal. 2020), order clarified, No. EDCV191546JGBSHKX, 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020) (same); *Chatman*, 2021 WL 2941990, at *12-*24 (same); *Criswell v. Boudreaux*, No. 120CV01048DADSAB, 2020 WL 5235675, at *17-*27 (E.D. Cal. Sept. 2, 2020) (same); *Carranza v. Reams*, No. 20-CV-00977-PAB, 2020 WL 2320174 (D. Colo. May 11, 2020) (same).

## Conclusion and Prayer for Relief

Class members—pretrial detainees and inmates in West Virginia regional jails—are

currently dying and suffering serious medical injuries due to Defendant's failure to implement basic, proven precautions and treatment eighteen months into the COVID-19 pandemic. Plaintiffs thus request that the Court order Defendants to comply with these basic protocols, including the following:

1. **Implementing Medical Isolation Protocols**:
    a. DCR must ensure that any person with known or suspected COVID-19 is immediately transferred to a separate medical isolation unit, with physical separation between people with known and suspected COVID-19.
    b. DCR must ensure that no person with known or suspected COVID-19 is ever be placed into a cell or other living space with a person who is not similarly known or suspected of having COVID-19.
    c. Officers working in isolation settings must utilize appropriate PPE, even when their time on the unit is limited.
2. **Implementing Quarantine Protocols:**
    a. DCR must establish and implement an intake quarantine at each facility, in which inmates are quarantined within 24 hours of arrival at the facility. This quarantine should not be broken by transfer of newly arrived people into close contact with the person under quarantine or by movement of the person under quarantine into such contact. If a person requires suicide watch or other increased level of observation and care for a non-COVID-19 reason, DCR should house the person in a cell or room by themselves so as to complete their quarantine period.
    b. In housing areas where people are under quarantine, they should not be in close contact with people who are not under quarantine. In the case of new admission quarantine, people should not be in close contact with other newly detained people with quarantine dates more than 48 hours from their own.
3. **Implementing Appropriate Testing:**
    a. DCR must test all people arriving in the jail before they are placed into housing areas and within 24 hours of arrival.
    b. DCR must test all people who are close contacts of a new COVID-19 case, including all people in the housing area and other people who were within 6 feet for a cumulative exposure of 15 minutes over 24 hours. Testing for the housing area placed into quarantine, as well as for newly admitted people should be conducted at a minimum twice during the 14-day period.
    c. When ongoing transmission is occurring in a facility, all staff and detained people should be tested at least once every two weeks.
4. **Treatment**
    a. DCR must establish a mechanism to identify individuals who are at high risk for serious injury or death from COVID-19.
    b. DCR must implement all available treatments to those who have been identified as high risk and/or are exhibiting COVID-19 symptoms.

In light of Defendant's prior representations and subsequent clear failures, Plaintiffs further

13

request that Defendant provide a comprehensive plan to this Court as to how these procedures are being implemented immediately and provide data and evidence to demonstrate said implementation and/or appoint a court monitor or special master to oversee implementation and ensure that the health and rights of inmates in Defendant's custody are being protected.

As Courts and public officials around the country have recognized, lives are at immediate and ongoing risk without appropriate meaningful action. As a result, Plaintiffs respectfully request that the Court grant the above relief, and such other relief as the Court deems equitable and just.

        **JOHN BAXLEY, JR., et. al., on behalf of themselves and other similarly situated inmates,**

        By Counsel:

/s/ Jennifer S. Wagner
Lydia C. Milnes (State Bar No. 10598)
Jennifer S. Wagner (State Bar No. 10639)
Mountain State Justice, Inc.
1029 University Ave., Suite 101
Morgantown, WV 26505
Phone: (304) 326-0188
Facsimile: (304) 326-0189
lydia@msjlaw.org
jennifer@msjlaw.org
*Counsel for Plaintiffs*