**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

**JOHN BAXLEY, JR., et al.,**
**on behalf of a class of similarly**
**situated individuals,**

    **Plaintiffs,**

**v.**            **Civil Action No. 3:18-cv-01526**
              **Honorable Robert C. Chambers**

**WILLIAM K. MARSHALL, III,**
**in his official capacity,**

    **Defendant.**

**MOTION TO ENFORCE SETTLEMENT AND FOR FEES**

   NOW COME Plaintiffs, by counsel, and respectfully move this Court to enforce the settlement agreement reached between them and Defendant William K. Marshall, III,[1] in his official capacity as Commissioner of the West Virginia Division of Corrections & Rehabilitation ("DCR"), because Defendant has failed to fulfill his duty with respect to certain portions of the Parties' agreement. Plaintiffs seek specific performance of certain portions of the agreement, as well as reimbursement for actual damages accrued as a result of Defendant's failure to timely fulfill its obligations under the agreement.

**STATEMENT OF FACTS**

**A. Summary of Class Action Settlement Implementation**

---

[1] When a public officer sued in their official capacity for prospective injunctive relief leaves office, the officer's successor "is automatically substituted as a party." Fed. R. Civ. Pro. 25(d). At the time the case was filed, the Commissioner of the Division of Corrections and Rehabilitation was Betsy Jividen. Following her official resignation on August 4, 2022, she was replaced by acting Commissioner Brad T. Douglas. On January 19, 2023, William K. Marshall III was appointed as Commissioner.

On May 24, 2022—after nearly four years of intensive litigation and discovery—the Parties reached a settlement in this matter. The settlement terms were set forth in the signed document entitled "General Terms." [ECF No. 653-1, Signed Settlement Agreement]. In broad terms, the settlement required DCR (1) to implement a new medical services contract; (2) to hire an internal medical review team to oversee compliance with that contract; and (3) to provide ongoing cooperation between DCR and Plaintiffs' counsel for a two-year settlement implementation period, during which time DCR agreed to provide Plaintiffs' counsel with extensive documentation and access to class members and agreed to collaborate with Plaintiff's counsel to ensure the terms of the settlement were being implemented. [*See* ECF No. 686 at 5-6].

On July 1, 2022, the parties filed their Joint Motion for Preliminary and Final Approval of Class Action Settlement and Notice to Class, [ECF No. 653], as well as their Joint Motion for Approval of Attorney Fees, [ECF No. 654]. On July 18, 2022, this Court granted the Parties' Motion for Preliminary Approval of Settlement. This order directed that notice be given to class members and set a fairness hearing for September 27, 2022. [ECF No. 658]. Following that hearing, this Court entered its Order Approving Class Action Settlement and Attorney Fees. [ECF No. 686]. That order approved a payment of $588,000 in reasonable attorney fees to Plaintiffs' counsel, "in resolution of class counsel's claim for an award of reasonable attorney fees." In so doing, the Court noted that this payment "will also enable Plaintiffs' counsel to continue to engage in the ongoing collaboration." [*Id*. at 6].

Beginning in July 2022, even before the settlement was finalized by the Court, Plaintiffs' counsel began meeting with DCR to develop metrics to use in collecting data from each jail facility to demonstrate compliance with the medical services contract. The Parties continued to work together for well over a year to develop appropriate and meaningful metrics with the goal of

obtaining data that can be relied upon to show trends and flag problems at facilities. Plaintiffs' counsel participated in numerous meetings with DCR, and sometimes with DCR's contractors, to address issues to ensure the validity of data.

Upon finalization of the settlement, Plaintiffs' counsel began making visits to the ten jail facilities across West Virginia. Prior to each facility visit, Plaintiffs' counsel requests a list of current class members at the facility fitting into certain metric categories (*e.g.*, had a dental visit in the past month; reported a non-formulary medication upon intake). From the names provided by DCR, class counsel compiles a list of approximately 40 class members and sends each a letter informing them of the date and purpose of class counsel's visit and that such visits are not mandatory. During the facility visit, class counsel completes one on one interviews with interested class members. After each visit, counsel sends a detailed report to DCR, providing information learned during that visit, both positive and negative. Counsel visits each jail at least once a year.

In addition, Plaintiffs' counsel regularly fields requests from class members for assistance with medical and mental health needs. When receiving such requests, and with permission from the class member, class counsel regularly reaches out to members of the DCR medical services team to ask them to review the patient's file and contact the medical care provider to ensure the patient's needs are being met.

As noted, a major component of the settlement agreement was DCR's commitment to hire a medical monitoring team, comprised of a medical doctor and at least two nurse surveyors, to monitor implementation of the medical contracts in DCR facilities. Among other things, the team is to conduct regular audits of the facilities and produce monthly reports. The settlement agreement provides that "[t]he parties will continue to collaborate pursuant to the provisions of this agreement for a period of two years beginning on the date of the issuance of the first report issued by the

nurse surveyors." In negotiating the settlement, all parties anticipated that the first report would be issued in or around September 2022. Accordingly, when this Court entered its Order Approving Class Action Settlement and Attorney Fees, [ECF No. 686], it placed the case "on the Court's inactive docket for the two-year implementation period set forth in the settlement agreement, which shall expire on August 31, 2024." [*Id*. at 10]. However, it took DCR a full year to hire the medical monitoring team, and the nurse surveyors did not issue their first report until August 2023. Because of this delay, the parties jointly moved this Court to extend this action's placement on the Court's inactive docket for an additional year, to allow the two-year settlement implementation period to be completed. [*See* ECF No. 702]. On April 1, 2024, this Court granted the joint motion, extending this case's placement on the inactive docket until August 31, 2025. [ECF No. 704].

Throughout this time, and even before beginning to receive nurse surveyor reports, counsel for the class has been reviewing voluminous documents and data provided from DCR, to ensure that the medical services being provided to the class meet the minimum contractual requirements. As detailed below, counsel has been diligent in attempting to collect the various documents and data points from DCR that it is entitled to review as part of the settlement implementation period. While certain documents have still never been provided, the amount of information reviewed by class counsel monthly is staggering. Counsel routinely reaches out to DCR following these reviews to discuss concerns, and until recently, counsel for the class and members of the DCR medical monitoring team also met regularly to discuss issues.

In total, class counsel has spent approximately 750 hours on the settlement implementation (the equivalent of approximately $200,000 in billed time) and has spent over $4,000 for travel to the ten facilities around the state, and there are five months left in the implementation period. A

timeline of class counsel's communications with DCR during the class implementation period is attached hereto as Exhibit 1.

**B.  Specific Areas of Non-compliance by DCR**

1. <u>**Failure to Provide Data and Information Owed to Class Counsel Under the Settlement Agreement**</u>

Under the terms of the Settlement Agreement, DCR is required to supply class counsel with the following documents on a monthly basis: policies, procedures, regulations, or rules impacting patient care implemented by either DCR or its contractors; contract amendments or change orders; audits or reviews conducted by ACA, NCCHC, DCR, or other accreditation entity; access to electronic medical records; documentation of the qualification of medical or mental health personnel; death investigations; mortality reviews; psychological autopsies; serious incident reports; and material provided to DCR by Wexford regarding Continuous Quality Improvement (CQI). [*See* ECF No. 653-1].

On December 12, 2022, approximately three months into the official settlement implementation period, Plaintiffs' counsel and DCR met in person to discuss the implementation to that point. Plaintiffs' counsel followed up with DCR shortly thereafter to clarify the list of all the documents that DCR was supposed to be providing to Plaintiffs' counsel on a monthly basis under the settlement agreement, which it had not been providing.

Through the end of 2022 and into 2023, class counsel corresponded regularly with DCR regarding changes in statistical reporting as the Parties worked together to create a more accurate and useful report. In February 2023, Plaintiffs' counsel contacted DCR with concerns about the integrity of the data in the monthly metric reports, as well as substantive concerns about the quality of care being provided in the facilities. As Plaintiffs' counsel made clear in this email, approximately five months into the official settlement period and six months into receiving

statistical reporting from DCR, "we are becoming increasingly concerned about the welfare and interests of our class members, given that we are unable to ascertain basic information about the provision of essential elements of the medical services contract." *Exhibit 2, Feb. 13, 2023, Email.* Class counsel also requested additional documents to which they were entitled under the settlement agreement, including Continuous Quality Improvement (CQI) documents, of which class counsel did not receive any until April 2023. When Plaintiffs' counsel finally received the first batch of CQI documents, they were incomplete.[2]

Class counsel continued to follow up with DCR in an attempt to obtain the documents to which they were entitled under the settlement, including Medical Audit Committee (MAC) documents, serious event incident reports (SEIRs), and mortality records. Under the settlement agreement, class counsel should be receiving the following documents for each death in a DCR jail: the SEIR; the Wexford mortality review; the DCR medical death review; the autopsy; and the DCR Central Investigation Unit (CID) death investigation for the death. On June 8, 2023, Plaintiffs' counsel received five medical death reviews from DCR. These were the first medical death reviews to be completed, nearly a year after the settlement agreement was reached. As of June 27, 2023, there had been 18 deaths in DCR jails since DCR began providing Plaintiffs' counsel with settlement documentation, but only five medical death reviews had been completed and provided to Plaintiff's counsel. *Exhibit 4, Jun. 27, 2023, Email.*

---

[2] "[O]ur understanding was that the CQI reporting would include monitoring activities, performance improvement strategies, and corrective action plans. There should also be chart reviews. Wexford has also stated there is a statewide CQI committee that reviews CQI minutes from all facilities. The MAC notes from SCRJ indicate there have been audits … [t]o the extent those audits have been performed at any of the jail facilities, we'd also expect to receive those documents." *Exhibit 3, Apr. 18, 2023, Email.*

On June 29, 2023, Plaintiffs' counsel sent DCR a list of questions and concerns related to the data in the April and May 2023 reports, which had been sent the previous week, including questions about data that either made no sense or was not being gathered, and about metrics that were below the quality required under the contract. *Exhibit 5, Jun. 29 to Jul. 21, 2023, Email, at 2-3*. Plaintiffs' counsel also reminded DCR that:

> [W]e should be receiving various documents on a monthly or at least regular basis. I know we've been getting MAC and QMP reports, mortality reviews, and the DCR medical investigations as they're completed. I think there should be some mortality reviews and medical-related SEIRs we're due from 2023. Additionally, we should also be receiving death investigations and any and all audits … related to medical care at the facilities.

*Id*. at 2. Nearly a month later, on July 21, 2023, having received no response to this email, Plaintiffs' counsel again reached out to DCR, requesting follow up.

On the same day, Plaintiffs' counsel sent an email to then-Acting DCR Commissioner, Brad Douglas, as well as DCR counsel Phil Sword and Brandolyn Felton-Ernest. This email was intended as "a check-in, not on the metrics or the reporting, but the actual process of contract and settlement implementation." *Exhibit 6, Jul. 21, 2023, Email at 1*. In this email, Plaintiffs' counsel laid out major concerns that essential elements of the settlement agreement remained unimplemented, stating:

> The metric report is still undergoing regular revision. There is, currently, no process in place for regular chart review, or (so far as we are aware) interviews with class members, which were both included as required elements of the auditing tools. Additionally, the settlement requires a 'contract and health auditing system … which will include at minimum one medical doctor/physician and two nurses to complete regular and [sic] ongoing auditing of the medical care in the facilities.' The auditing system we have in place in the settlement was proposed by DCR and, at this time, has not been fully implemented.
>
> […]
>
> Our biggest issue is the audit process itself. As proposed by DCR and outlined in the settlement agreement, there should be *at minimum*, a physician/medical doctor

and two nurses to audit contract compliance. We are obviously thrilled to have Dr. Amjad working on this. However, this is clearly too big of a project for her to tackle on her own, particularly if she is also reviewing contract compliance at the prison facilities. Even focusing only on contract compliance on the jail side, there is a massive amount of data that should be reviewed to ensure compliance, not taking into account the monthly reports/audit tool itself.

Regarding underlying data, Plaintiffs' counsel continued to outline its frustration and deep concern for its ability to ascertain the condition of medical services provided to class members:

> [T]he difficulty and long delay in receiving CQI documentation is very concerning to us. this data was highly relevant during the litigation of the case, and was specifically outlined in the settlement agreement as something that would be regularly provided to MSJ. Despite this, we did not receive any MAC documentation until April 2023, more than six months into the settlement implementation period. … This is frustrating to us for obvious reasons; under the settlement agreement, we are supposed to be receiving these (and other documents) monthly; instead, we have had to continuously request them for more than six months and, when we did begin to receive them, had to continue discussions for another two months to receive a portion of [these] documents. What is more concerning, however, is that DCR was either clearly not timely receiving or not timely reviewing these quality control documents from its medical services contractor. It is unclear how DCR is supposed to monitor Wexford's compliance with its contractual obligations if it is not receiving or reviewing the most basic of quality control and compliance documents.

*Id.* Plaintiffs' counsel did not receive a response to this email, despite making its position clear that "the full scope of the settlement is not being implemented. … While we certainly do not want to seek Court involvement in enforcing the settlement, we also need to see that DCR has plans in place to meet the terms." *Id*.

In early August 2023, Plaintiffs' counsel once again followed up on documents it should be receiving on a regular basis, including "mortality reviews, medical-related SEIRs, DCR death investigations, and any and all audits related to medical care at the jails. We haven't received SEIR reports in several months, and we have not received death investigations or audits at all during the implementation period." *Exhibit 7, Aug. 8, 2023, Email*.

On September 10, 2023, DCR sent Plaintiffs' counsel the third batch of SEIR reports. Plaintiffs' counsel responded, stating, "[a]fter reviewing these and checking on what we've received previously, there are some facilities we have many more SEIRs for than others. … Are we waiting on the other facilities to gather/review the SEIRs, or are these the numbers they're reporting?" *Exhibit 8, Sept. 2023 SEIR Emails*. DCR stated, "[t]hese are all the reports that have been reported by Wexford to us." *Id*. On September 13, 2023, Plaintiffs' counsel followed up again with DCR:

> [O]ur concern is why there is such a major discrepancy between Wexford reports from the various facilities. From my perspective, there are two options: (1) some facilities are doing SEIRs but not providing them to you, or (2) the facility staff are simply not completing SEIRs when they should. I suspect the second. … As we have all discussed many times, collecting data from Wexford is only valuable if the data itself is collected and produced with fidelity. … You (DCR) can't monitor the quality of care being provided at your facilities if they're hiding the ball from you. In this circumstance, it is DCR's job to tell Wexford that their SEIR reporting needs to be improved.

*Id.* On September 20, 2023, Plaintiffs' counsel again followed up with DCR on this issue, having received no response to the September 13 email. On September 22, 2023, Plaintiffs' counsel again followed up on the issue of SEIR reporting, stating, "there is clearly a large discrepancy between facilities in how serious incidents are being counted/reported, which is an issue not just for our piece of the implementation review, but also for DCR's oversight roles with these issues." *Id*. Later, on September 22, 2023, DCR stated it was "working on a policy [on SEIRs] to review with Wexford. Once this have been completed and approved, we will share the policy with you." *Id*.

After meeting with DCR on October 16, 2023, Plaintiffs' counsel again reminded DCR what documents should be regularly supplied under the settlement agreement, including "[a]ny internal, DCR, or outside audits," noting "I'm not certain what the audit schedule has been like, but we should be receiving these under the contract. I believe Wexford does its own audits, which

it should then provide to DCR. We are supposed to be receiving those as well." *Exhibit 9, Oct. 17, 2023, Email*. Plaintiffs' counsel once again requested documents related to class member deaths, noting, "as of 10/17/23, there are approximately 12 deaths for which we have either no documentation or no documentation other than an SEIR." *Id.*

On November 2, 2023, Plaintiffs' counsel reached out to DCR to raise the issue of delay in access to class member medical records, which were to be provided under the settlement agreement. As Plaintiffs' counsel laid out,

> It is particularly valuable for us to be able to promptly receive and review files when class members inform us that they are having a serious medical issue … Currently, however, there is often a period of several weeks or months between the time when we make the request and when we receive the files … The long delay in receiving these records also makes it more difficult for us to perform real-time review of suspected trends or specific issues of facilities, or to find documentary evidence of problems under the contract.

*Exhibit 10, Nov. 2, 2023, Email*.

On January 7, 2024, DCR shared eight additional medical death reviews, leaving 12 reviews outstanding for deaths between August 2022 and November 2023. On March 8, 2024, Plaintiffs' counsel reached out to DCR to follow up on outstanding death information, noting "I am also still waiting to receive investigations for all deaths since the beginning of the implementation period. Please let me know when I should expect to receive these." *Exhibit 11, Mar. 8 to May 9, 2024, Email*. Plaintiffs' counsel did not receive a response to this request until May 9, 2024, in which Dr. Amjad stated that she would need to check her notes regarding medical death reviews, but that she would "defer to DCR attorneys about the CID report requests." *Id.*

On April 16, 2024, Plaintiffs' counsel followed up with counsel for the Department of Homeland Security, of which DCR is a part, stating, "although we've been receiving mortality

docs from Dr. Amjad as she's able to complete them, we have yet to receive any CID investigations related to deaths in the settlement period." *Exhibit 12, Apr. 16, 2024, Email.*

On July 12, 2024, Plaintiffs' counsel again reached out to DCR with a request for updated mortality documents, stating, "in reviewing out charting today, I noticed that we have not received any Wexford mortality reviews relating to deaths post November 2023 … If you can let me know when we should expect to receive those documents, I'd appreciate it." *Exhibit 13, Jul. 12, 2024, Email.* Plaintiffs' counsel received no response to this request. On August 16, 2024, Plaintiffs' counsel again reached out to WVDCR following up on a phone call with Mr. Sean Francisco, WVDCR's in-house counsel, requesting a variety of documents, including "DCR's CID death investigations, as agreed under the settlement. We should receive those for every jail death from July 2022 onward." *Exhibit 14, Aug. 16, 2024, Email.* Plaintiffs' counsel also attached the protective orders in this case. *Id.*

Plaintiff's counsel met in person with key members of WVDCR's team, including the new medical director, Dr. Gary Davenport, on January 9, 2025. Among the issues discussed during this meeting was the serious delay in the provision of mortality documents to class counsel. During this meeting, Mr. Francisco assured class counsel that death documents—including CID investigations—would be forthcoming. Following a request by Mr. Franciso, Plaintiffs' counsel once again supplied WVDCR with a request for outstanding mortality documents and the protective orders in this matter. *Exhibit 15, Jan. 23, 2025, Email.* WVDCR followed up, stating "[w]e will work on addressing some of this." *Id.*

One of the most concerning issues has been DCR's inability or simple unwillingness to fully produce documents related to class member deaths during the settlement period. As of April 1, 2025, Plaintiffs' counsel is still lacking the following mortality documents:

| Mortality Review | SEIR Form | Autopsy | Psychological Autopsy | Medical Death Review | CID Investigation |
|---|---|---|---|---|---|
| 4 | 2[3] | 14 | 3[4] | 31 | 52 |

While members of the medical services team have since provided Plaintiffs' counsel with many mortality documents, *all* CID investigations are still outstanding. Because of the delay in providing Plaintiffs' counsel with many of these documents, counsel has only recently become aware of serious concerns regarding certain death documentation, particularly "abbreviated and delayed administrative death reviews" from Northern Regional Jail. *Exhibit 16, Mar. 19, 2025, Email.* WVDCR has not yet responded to Plaintiffs' counsel's concerns on this matter.

## 2. Delay in Implementation of Key Elements of the Settlement

As previously noted, the settlement agreement requires DCR to create a health auditing system "which will include at minimum one medical doctor/physician and two nurses." [ECF No. 653-1, Signed Settlement Agreement]. Approximately five months into the settlement implementation period, DCR hired Dr. Ayne Amjad, to lead its internal medical contract monitoring team. DCR did not fill either of the nurse positions until approximately July 2023, and it was not until October 2023 that both were filled. *Exhibit 17, Jul. 31, 2023, Email.*

On November 4, 2023, DCR announced it had completed its "first round of audits in all 10 jails." DCR also shared that they "hired our second nurse surveyor who started work on October 30." *Exhibit 18, Nov. 4, 2023, Email.* October 30, 2023, therefore, marked the date that the contract and health auditing system proposed by DCR and included in the General Settlement Terms

---

[3] Plaintiffs' counsel lacks SEIR forms for two deaths in 2022 but, per WVDCR, no SEIR reports were completed for those deaths.

[4] The precise number of missing psychological autopsies is uncertain; since these documents are only required in the event of a patient suicide and class counsel is not yet aware of the manner of death for several recent individuals, this number may be higher.

("which will include at minimum the one medical doctor/physician & two nurses to complete regular and complete ongoing auditing of the medical care in the facilities") was fully in place. *See* ECF No. 653-1, ¶ 3.

For approximately six to nine months, the DCR internal contract compliance team was fully staffed and functioning well. Then, in late summer 2024, class counsel noticed that it was no longer receiving correspondence from Dr. Ayne Amjad. In November 2024, Plaintiffs' counsel reached out to DCR regarding medical issues in WVDCR prisons. In this email, Plaintiffs' counsel stated, "I believe I raised this in a previous email and haven't received a response, but I'm sending this email to Dr. Amjad as well as the rest of the medical services team under the impression that she is still with DCR. However, I haven't heard from her in several months, so if she's no longer there or has been replaced, please let me know so that I can send my emails to the correct team. I would also request that we get formal notice of any change through our correspondence in the *Baxley* case." *Exhibit 19, Nov. 15, 2024, Email.* DCR followed up later that day to share that Dr. Gary Davenport was now the DCR medical director. This was the only notice that class counsel received of the change in DCR's medical services director and the departure of the person who had, until that point, been class counsel's main point of contact at DCR.

### 3. DCR Interference with Access to Class Members

On April 18, 2024, Plaintiffs' counsel conducted a visit to Potomac Highlands Regional Jail to meet with class members. While at the facility, Plaintiffs' counsel was told that a particular class member was not interested in meeting. Shortly after this visit, Plaintiffs' counsel was contacted by family of that same class member. The family notified Plaintiffs' counsel that the class member was never asked by correctional staff if she wanted to speak with MSJ, and that had she been asked, she would have said yes. Upon learning of this, Plaintiffs' counsel immediately

reached out by phone to Kaitlyn Powers, raising concerns about access to class members. After speaking with Ms. Powers on April 26, 2024, Plaintiffs' counsel followed up via email on May 1, 2024, stating, "I'm following up on the call we had last Friday, April 26, related to concerns we have about access to our class members . . . ." *Exhibit 20, May 1, 2024, Email.* Plaintiffs' counsel never received a response to this email.

Aside from this alarming incident, Plaintiffs' counsel has received reports at multiple facilities across the state that correctional staff have made either implicit or explicit statements to class members to the effect that either (a) they should not meet with class counsel or that (b) it would be pointless for class members to meet with class counsel. Class counsel raised these concerns to DCR's counsel, Sean Francisco, in an July 12, 2024, email, further stating that, "We ran into a similar issue last year, where we were informed an individual was not feeling well and declined to speak with me, only to later speak to the class member in question and be told that they had never been informed of my presence." *Ex. 13.*

### 4. Class Counsel Raises Concerns About Settlement Compliance With DCR and Homeland Security

In addition to the many, many emails and meetings conducted with DCR during which class counsel alerted DCR to its continued failure to implement all the terms of the settlement agreement, class counsel has additionally informed the highest administrators of the ongoing failures. On December 12, 2023, Plaintiffs' counsel spoke with Kaitlyn Powers, counsel for the Department of Homeland Security about extending the date of the settlement implementation period, as a result of the year-long delay in preparing the first nurse auditor report. In a follow up email on December 20, 2023, Plaintiffs' counsel wrote, "there has been some true progress in the provision of medical services; however, it is only in the past few months that DCR has come close to full compliance with the negotiated settlement terms, and we are still not in a place to get clean,

usable data to fully track required metrics and provision of care to class members." *Exhibit 21, Dec. 20, 2023, Email.*

On January 18, 2024, Plaintiffs' counsel met with Kaitlyn Powers and high-ranking members of the DCR and Homeland Security, including DCR Commissioner William K. Marshall and then-Assistant Homeland Security Commissioner Rob Cunningham. During that meeting, DCR agreed to provide Plaintiffs' counsel with the CID death investigations of class members during the settlement period, which had been agreed under the terms of the settlement but never provided. When DCR expressed concerns about confidentiality and required redactions, Plaintiffs' counsel explained that these investigations were produced during litigation pursuant to the Court's Protective Order, and thus would be maintained confidentially, and that Plaintiffs' counsel would be fine to accept the investigations with the same redactions as were used during litigation.

Despite the promises made at this meeting, no CID death investigations were provided to Plaintiff's counsel. Counsel continued to raise the issue with Ms. Powers, including by phone on April 26, 2024, and by email on May 1, 2024. *Ex. 20.* DCR did not respond to this email.

After learning through another matter that DCR had new in-house counsel, Plaintiffs' counsel reached out to Mr. Sean Francisco by phone and email on June 18, 2024. On July 10, 2024, Plaintiffs' counsel contacted Mr. Francisco briefly by phone and, on July 12, 2024, sent Mr. Francisco an email outlining issues pertaining to the ongoing *Baxley* settlement and requesting a call to discuss these issues more in-depth. *Ex. 13.*

Plaintiffs' counsel and Mr. Francisco met by videocall on August 12, 2024, during which the Parties discussed the potential future departure of Dr. Amjad from her post; Mr. Francisco's role as DCR's attorney on the *Baxley* matter; outstanding records; and Plaintiffs' counsel's concern about issues with access to class members at PHRJ, originally raised to DCR in April 2024. On

August 16, 2024, Plaintiffs' counsel sent a follow-up email, including information requested by Mr. Francisco regarding Plaintiffs' counsel's request to "re-do" its visit to PHRJ and information about outstanding settlement documents. *Ex. 14.* Plaintiffs' counsel did not receive a response to this email, nor a follow up from Mr. Franciso or another DCR official related to the issues and requests raised in this email.

On December 10, 2024, Plaintiffs' counsel reached out directly to DCR counsel Sean Francisco, expressing frustration with the lack of communication. Counsel stated:

> First, we are waiting on a number of WVDCR's medical death reviews. The last death we have received that information for was in October 2023. Based on my records, there are 26 deaths since the beginning of the settlement for which we are missing documentation. We also have not received DCR death investigations for any deaths during the settlement period. We are also waiting to begin receiving the ADA Accommodation request forms, which we first requested over the summer. We have also not received a response from WDCR about redoing our second class visit to PHRJ given our concerns about access to class members during our visit to that facility earlier this year. I raised these issues in my email from August 16.
>
> Second, I know that Dr. Gary Davenport has taken over Dr. Amjad's position as Director of Medical Services. I initially learned this because he was added to email threads and, when Dr. Amjad hadn't been responsive, I followed up with Kim Wilson to request we be formally notified if there had been a change in the Medical Director. As an initial matter, it is frustrating that we were not informed of this change in staffing, given how closely we expect to work with DCR's medical services director. We obviously have no say over who WVDCR hires to fill this position, but it is important that, as class counsel, we understand who we are communicating with and have a relationship with that person that will enable us to properly fulfill our duties vis-à-vis our class members and the settlement. I have not had an opportunity to speak with Dr. Davenport directly since he took over, and so I have only my limited email interactions to go off. However, based on what he communicated to you following the concerns we raised about a class member last week, it is not clear he understands MSJ's role in the settlement, nor his role in communicating and working with MSJ to implement the settlement.

*Exhibit 22, Dec. 10, 2024, Email.* Thereafter, Mr. Franciso responded and offered to meet and confer with class counsel to discuss the issues. Class counsel met with WVDCR on January 9, 2025. During this meeting, class counsel was able to discuss several major issues in depth with Dr.

Davenport and the other members of the medical services team at DCR, which has resulted in productive communication and collaboration between Dr. Davenport and class counsel, as well as improved updates on medical mortality documentation to class counsel.

**ONGOING FAILURE TO FULLY COMPLY WITH SETTLEMENT AGREEMENT**

As laid out in detail above, the Parties have engaged in frequent correspondence and significant collaboration, dating back to the months prior to the formal approval of the class action settlement by this Court on September 27, 2022. As stated in their December 20, 2023, email to DCR's counsel, Plaintiffs' counsel "have worked closely with DCR … and believe we have been truly valuable partners for DCR throughout the implementation period thus far." *Ex.* 21. However, despite improvements in both substantive medical care and oversight of such by DCR, Plaintiffs' counsel continues to have serious and well-documented concerns about DCR's compliance with the settlement agreement.

The addition of Dr. Amjad—and now Dr. Davenport—and the full medical services team has been positive. The long-needed work being performed by this internal team does not, however, erase the fact that it was nearly a year into the formal settlement period that Plaintiffs' counsel began receiving with any regularity most—but not all—of the documents it should have been receiving on a monthly basis from the start. Furthermore, though class counsel has no say in DCR's staffing decisions, it was frustrating to learn that counsel had been sending updates and questions to Dr. Amjad for weeks or months following her departure from the agency, only realizing she had been replaced when Dr. Davenport responded to an email in November 2024.

As noted in Section B.1. *supra*, Plaintiffs' counsel has struggled to access mortality documents to which it is clearly entitled under the settlement agreement. To date, Plaintiffs'

counsel has still not received any CID death investigations, despite numerous specific requests, in violation of the terms of the settlement.

Throughout the settlement implementation period thus far, Plaintiffs' counsel has also worked closely with both DCR and its contractor, Wexford, to create a data tool to allow for medical services to be tracked at the facility level. Despite this long collaboration, Plaintiffs' counsel is *still* attempting to resolve certain data issues that were first raised over a year ago with DCR, *see*, *e.g.*, medication issues. Other issues pertaining to adherence to the contract remain extremely problematic *Exhibit 23, Aug. 7, 2024, Non-Formulary Email*. During the January 9, 2025, meeting, Dr. Davenport suggested changes to certain electronic medical records forms to track and gather information pertaining to the discontinuation of non-formulary medications, but it is unclear to class counsel if this has or is being implemented.

Despite the delays and failures to provide all required documents and data, Plaintiffs' counsel has continued to work with DCR to improve settlement implementation and contract compliance. The request for a voluntary one-year extension of the collaboration period was Plaintiffs' counsel's attempt to balance their clear duty to their clients with their understanding of the difficulty inherent in creating an oversight structure where none existed before. Plaintiffs' counsel has devoted significant time and resources to making the collaboration as useful as possible while also protecting the rights of class members. Plaintiffs' counsel has made repeated requests for certain documentation, which, at this point, have gone unanswered for well over two years in some cases.

## **LEGAL STANDARD**

A district court possesses jurisdiction to enforce a settlement agreement if that agreement "is approved and incorporated into an order of the court." *Columbus-American Discovery Group*

*v. Atlantic Mut. Ins. Co.*, 203 F.3d 291, 299 (4th Cir. 2000) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Here, this Court specifically approved the settlement agreement by order, because approval was required for the settlement of a class action. Notably, this case was placed "on the Court's inactive docket for the two-year implementation period set forth in the settlement agreement," [ECF No. 686 at 10]; on April 1, 2024, this placement on the inactive docket was extended to August 31, 2025, following a joint motion by the Parties. [ECF No. 704.]

A "district court generally has jurisdiction to enforce a settlement agreement entered into under its aegis … and, as part of its enforcement powers to award damages for breach of such an agreement." *Hobbs & Co. v. American Investors Management, Inc.*, 576 F.3d 29, 33 (3rd Cir. 1978) (cleaned up). If a settlement is breached by one party, "the other party may obtain damages or specific performance as appropriate." *Bell-Atlantic-Washington, D.C. v. Zaidi*, 10 F. Supp. 2d 575, 577 (E.D. Va. Dec. 5, 1997) (citing *Kaktovik v. Watt*, 689 F.2d 222, 230 (D.C. Cir. 1982)).

Here, Plaintiffs seek specific performance and actual damages. Specifically, Plaintiffs seek specific performance of the settlement agreement through an order requiring Defendants to produce all documents required to be produced by the settlement agreement, for the entire time period since approval of the class action settlement and continuing until the end of the collaboration period in August 2025. In particular, this includes all of DCR's CID death investigation reports, of which Defendant has failed and refused to provide any to date, despite having been required to produce them on a monthly basis under the plain language of the settlement agreement. Plaintiffs further request that the Court order Defendant to permit class counsel to engage in cell-side visits with class members at Potomac Highlands Regional Jail and Correctional Facility, where class counsel has previously been denied access to class members by Defendants'

employees. Plaintiffs additionally request that the data-collection surrounding non-formulary medications suggested by Dr. Davenport in the January 9, 2025, meeting—or a similar process—be implemented and that data provided as a matter of course to class counsel through the end of the settlement implementation period.

Further, Plaintiffs seek actual damages for Defendant's failure to timely implement the terms of the settlement agreement, which has resulted in substantial expense to class counsel. Under the terms of the settlement agreement, signed by both parties and approved by this Court, the contemplated two-year settlement period formally began *not* on the day that this Court approved the settlement agreement but "on the date of the issuance of the first report issued by DCR's nurse surveyors." The parties had clearly anticipated that such period would begin running in or around September 2022, as reflected in the settlement agreement and final order approving the class action settlement [ECF No. 686]. DCR did not, however, hire the necessary team and begin issuing reports until a full year later, in September 2023. As a result, Plaintiff's counsel had to undertake a year's worth of settlement implementation in collaboration with DCR that was not anticipated nor bargained for when the parties reached the terms of the settlement agreement. Undisputedly, class counsel had no ability to control Defendant's hiring of the required nurse surveyor team and thus had no ability to mitigate the damages that it would suffer as a result of the year-long delay. Instead, class counsel was forced to engage in an entire year's worth of work that was not anticipated, and for which it has received no compensation, due solely to the Defendant's failure to timely implement the settlement agreement.

Plaintiffs' counsel therefore requests that this Court award actual damages that were incurred as a result of the Defendant's failure to implement the settlement agreement, in the amount of the fees and costs expended by class counsel for the period between the entry of the order

approving class settlement and the actual start of the settlement implementation period in September 2023. As set forth in the attached Affidavit of Lesley M. Nash, the amount being requested totals $54,319.81, of which $990.81 is for out of pocket costs, primarily related to travel to facilities to meet with class members.

WHEREFORE, Plaintiffs respectfully request that this Court order that Defendant fully comply with the terms of the settlement, including specific performance in the form of providing Plaintiffs' counsel all outstanding information and records pertaining to the deaths of class members during the settlement period, and actual damages, in the form of the reasonable fees and costs associated with the work performed between the entry of the order approving class settlement and the date on which the two-year settlement implementation period effectively began, September 2, 2023. Plaintiffs further seek any such other relief as this Court deems equitable and just, including attorney fees and costs associated with the filing of this petition.

Respectfully submitted,
JOHN BAXLEY, et al.,
Plaintiffs,
By counsel,

/s/ Lesley M. Nash
Lesley M. Nash (WVSB #14158)
Lydia C. Milnes (WVSB #10598)
Mountain State Justice, Inc.
1029 University Ave., Ste. 101
Morgantown, WV 26505
Telephone: (304) 326-0188
Facsimile: (304) 326-0189
lesley@msjlaw.org
lydia@msjlaw.org
Counsel for Plaintiffs